# Exhibit A to
# Declaration of Laura Hunter

# 2013 Contract No. CS 1039

**Between the U.S. Office of Personnel Management
and the Blue Cross and Blue Shield Association
on Behalf of, and as Agent for, Participating
Blue Cross and/or Blue Shield Plans**

CONTRACT FOR FEDERAL EMPLOYEES HEALTH BENEFITS

CONTRACT NO:  CS 1039                    FULL CONTRACT
EFFECTIVE:    January 1, 1960           EFFECTIVE: January 1, 2013

BETWEEN:      The United States Office of Personnel Management
              *hereinafter called OPM or the Government*

              Address:          1900 E Street, NW
                                Washington, DC 20415-3610

              AND

              CONTRACTOR:       Blue Cross and Blue Shield Association
                                *hereinafter also called the Carrier*

              Address:          1310 G. Street, NW, Suite 900
                                Washington, DC 20005


In consideration of payment by OPM of subscription charges set forth in Appendix B, the Carrier
agrees to perform all of the services set forth in this contract, including Appendix A.

FOR THE CARRIER                          FOR THE GOVERNMENT


William A. Breskin                       Sylvia V. Pulley
Name of person authorized to execute contract    Name of Contracting Officer
        *(type or print)*                        *(type or print)*


Vice President, Government Programs       Chief, Health Insurance I, Federal Employee
Title                                    Insurance Operations
                                         Title



Signature                                Signature


12/21/12                                 12/22/12
Date signed                              Date signed

(FES-2013)

# FEDERAL EMPLOYEES

# HEALTH BENEFITS PROGRAM

*STANDARD CONTRACT*

*FOR*

*FEE-FOR-SERVICE CARRIERS*

**2013**

(FFS-2013)

# TABLE OF CONTENTS

This is an experience-rated contract for the fee-for-service plan Carrier and consists of the cover page, the table of contents and the provisions, clauses and appendices as included in PARTS 1 through 6.

## PART I - GENERAL PROVISIONS

1.1     DEFINITIONS OF FEHB TERMS
1.2     ENTIRE CONTRACT
1.3     ORDER OF PRECEDENCE
1.4     INCORPORATION OF LAWS AND REGULATIONS
1.5     RECORDS AND INFORMATION TO BE FURNISHED BY OPM
1.6     CONFIDENTIALITY OF RECORDS (FEHBAR)
1.7     STATISTICS AND SPECIAL STUDIES
1.8     NOTICE
1.9     PLAN PERFORMANCE—EXPERIENCE-RATED FFS CONTRACTS
1.10    NOTICE OF SIGNIFICANT EVENTS (FEHBAR)
1.11    FEHB INSPECTION (FEHBAR)
1.12    CORRECTION OF DEFICIENCIES
1.13    INFORMATION AND MARKETING MATERIALS
1.14    MISLEADING, DECEPTIVE OR UNFAIR ADVERTISING (FEHBAR)
1.15    RENEWAL AND WITHDRAWAL OF APPROVAL (FEHBAR)
1.16    SUBCONTRACTS (FEHBAR)
1.17    NOVATION AGREEMENT (FEHBAR)
1.18    AGREEMENT TO RECOGNIZE CARRIER'S CHANGE OF NAME (FEHBAR)
1.19    UNDERWRITER
1.20    CERTIFICATION UNDER P.L. 104-191   (HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996)
1.21    PATIENTS' BILL OF RIGHTS
1.22    ADMINISTRATIVE SIMPLIFICATION - HIPAA
1.23    HIPAA COMPLIANCE
1.24    NOTICE ON TERMINATION OF FEHBP OR PROVIDER CONTRACT
1.25    TRANSITIONAL CARE
1.26    STANDARDS FOR PHARMACY BENEFITS MANAGEMENT COMPANY (PBM) ARRANGEMENTS
1.27    DISCLOSURE NOTICE UNDER P.L. 108-173 (MEDICARE MODERNIZATION ACT OF 2003)
1.28    CARRIER DISASTER RECOVERY PLAN
1.29    HEALTH INFORMATION TECHNOLOGY REQUIREMENTS
1.30    HEALTH INFORMATION TECHNOLOGY PRIVACY AND SECURITY
1.31    DEFINITION OF INFORMATION SECURITY
1.32    CARRIER PERSONNEL SECURITY REQUIREMENTS
1.33    INFORMATION TECHNOLOGY SYSTEMS SECURITY
1.34    CARRIER ACCESS TO OPM IT SYSTEMS
1.35    PROCEDURES FOR REPORTING A SECURITY BREACH

(FFS-2013)

PART II - BENEFITS

2.1 ENROLLMENT ELIGIBILITY AND EVIDENCE OF ENROLLMENT
2.2 BENEFITS PROVIDED
2.3 PAYMENT OF BENEFITS AND PROVISION OF SERVICES AND SUPPLIES
2.4 TERMINATION OF COVERAGE AND CONVERSION PRIVILEGES
2.5 SUBROGATION
2.6 COORDINATION OF BENEFITS (FEHBAR)
2.7 DEBARMENT AND OTHER SANCTIONS
2.8 FILING HEALTH BENEFIT CLAIMS/COURT REVIEW OF DISPUTED CLAIMS
2.9 CLAIMS PROCESSING
2.10 CALCULATION OF COST SHARING PROVISIONS
2.11 BENEFITS PAYMENTS WHEN MEDICARE IS PRIMARY
2.12 CONTINUING REQUIREMENTS AFTER TERMINATION OF THE CARRIER
2.13 LARGE PROVIDER AGREEMENTS (FEHBAR)
2.14 COORDINATION OF PRESCRIPTION DRUG BENEFITS WITH MEDICARE

PART III - PAYMENTS, CHARGES AND ACCOUNTING

3.1 PAYMENTS—EXPERIENCE-RATED CONTRACTS (FEHBAR)
3.2 ACCOUNTING AND ALLOWABLE COST (FEHBAR)
3.3 SPECIAL RESERVE
3.4 INVESTMENT INCOME (FEHBAR)
3.5 NON-COMMINGLING OF FUNDS (FEHBAR)
3.6 UNCASHED CHECKS
3.7 SERVICE CHARGE
3.8 CONTRACTOR RECORDS RETENTION (FEHBAR)
3.9 APPROVAL FOR ASSIGNMENT OF CLAIMS (FEHBAR)
3.10 AUDIT, FINANCIAL, AND OTHER INFORMATION
3.11 SURVEY CHARGES
3.12 FEHB CLEARINGHOUSE
3.13 TAXPAYER IDENTIFICATION NUMBER (FEHBAR)
3.14 REPORTABLE OVERPAYMENTS
3.15 AUDIT RESOLUTION
3.16 REPORTABLE FINDINGS

PART IV - SPECIAL PROVISIONS

4.1 ALTERATIONS IN CONTRACT (FAR)

PART V - STANDARD CLAUSES

This contract shall include all of the following standard clauses required by the Federal Acquisition Regulation (FAR) or Federal Employees Health Benefits Acquisition Regulation (FEHBAR).

(FFS-2013)

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 6 of 137

This contract shall include all of the following standard clauses required by the Federal Acquisition Regulation (FAR) or Federal Employees Health Benefits Acquisition Regulation (FEHBAR).

5.1    DEFINITIONS
5.2    [RESERVED]
5.3    GRATUITIES
5.4    COVENANT AGAINST CONTINGENT FEES
5.5    ANTI-KICKBACK PROCEDURES
5.6    [RESERVED]
5.7    AUDIT AND RECORDS-NEGOTIATION
5.8    PRICE REDUCTION FOR DEFECTIVE CERTIFIED COST OR PRICING DATA
5.9    [RESERVED]
5.10   SUBCONTRACTOR CERTIFIED COST OR PRICING DATA
5.11   [RESERVED]
5.12   [RESERVED]
5.13   [RESERVED]
5.14   UTILIZATION OF SMALL BUSINESS CONCERNS
5.15   [RESERVED]
5.16   [RESERVED]
5.17   CONVICT LABOR
5.18   CONTRACT WORK HOURS AND SAFETY STANDARDS ACT-OVERTIME
       COMPENSATION
5.19   EQUAL OPPORTUNITY
5.20   [RESERVED]
5.21   NOTIFICATION OF VISA DENIAL
5.22   EQUAL OPPORTUNITY FOR VETERANS
5.23   AFFIRMATIVE ACTION FOR WORKERS WITH DISABILITIES
5.24   [RESERVED]
5.25   DRUG FREE WORKPLACE
5.26   [RESERVED]
5.27   FEDERAL, STATE, AND LOCAL TAXES (STATE AND LOCAL ADJUSTMENTS)
5.28   [RESERVED]
5.29   TAXES--FOREIGN NEGOTIATED BENEFITS CONTRACTS
5.30   [RESERVED]
5.31   [RESERVED]
5.32   [RESERVED]
5.33   DISCOUNTS FOR PROMPT PAYMENT
5.34   INTEREST (FEHBAR MODIFICATION OF FAR)
5.35   ASSIGNMENT OF CLAIMS
5.36   DISPUTES
5.37   NOTICE OF INTENT TO DISALLOW COSTS
5.38   CHANGES--NEGOTIATED BENEFITS CONTRACTS
5.39   COMPETITION IN SUBCONTRACTING
5.40   GOVERNMENT PROPERTY (NEGOTIATED BENEFITS CONTRACTS)
5.41   LIMITATION OF LIABILITY--SERVICES

(FFS-2013)

5.42   PREFERENCE FOR U.S. FLAG AIR CARRIERS
5.43   GOVERNMENT SUPPLY SOURCES
5.44   AUTHORIZED DEVIATIONS IN CLAUSES
5.45   LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL
       TRANSACTIONS
5.46   [RESERVED]
5.47   PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING
       WITH CONTRACTORS DEBARRED, SUSPENDED OR PROPOSED FOR
       DEBARMENT
5.48   BANKRUPTCY
5.49   FEHBP TERMINATION FOR CONVENIENCE OF THE GOVERNMENT--
       NEGOTIATED BENEFITS CONTRACTS
5.50   FEHBP TERMINATION FOR DEFAULT-- NEGOTIATED BENEFITS CONTRACTS
5.51   PENSION ADJUSTMENTS AND ASSET REVERSIONS
5.52   REVERSION OR ADJUSTMENT OF PLANS FOR POSTRETIREMENT BENEFITS
       (PRB) OTHER THAN PENSIONS
5.53   NOTICE TO THE GOVERNMENT OF LABOR DISPUTES
5.54   PENALTIES FOR UNALLOWABLE COSTS
5.55   EMPLOYMENT REPORTS ON VETERANS
5.56   AUTHORIZATION AND CONSENT
5.57   NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT
       INFRINGEMENT
5.58   PAYMENT BY ELECTRONIC FUNDS TRANSFER—CENTRAL CONTRACTOR
       REGISTRATION
5.59   PROHIBITION OF SEGREGATED FACILITIES
5.60   SUBCONTRACTS FOR COMMERCIAL ITEMS
5.61   NOTIFICATION OF EMPLOYEE RIGHTS UNDER NATIONAL LABOR
       RELATIONS ACT
5.62   APPLICABLE LAW FOR BREACH OF CONTRACT CLAIM
5.63   CENTRAL CONTRACTOR REGISTRATION
5.64   CONTRACTOR CODE OF BUSINESS ETHICS AND CONDUCT
5.65   EMPLOYMENT ELIGIBILITY VERIFICATION
5.66   UPDATES OF PUBLICALLY AVAILABLE INFORMATION REGARDING
       RESPONSIBILITY MATTERS (DEVIATION)
5.67   PERSONAL IDENTITY VERIFICATION OF CONTRACTOR PERSONNEL
5.68   PRIVACY OR SECURITY SAFEGUARDS
5.69   ENCOURAGING CONTRACTOR POLICIES TO BAN TEXT MESSAGING WHILE
       DRIVING

PART VI -- APPENDICES

A-   FEHBP BROCHURE
B-   SUBSCRIPTION RATES, CHARGES AND LIMITATIONS
C-   FEHBP SUPPLEMENTAL LITERATURE GUIDELINES JANUARY 2000
D-   RULES FOR COORDINATION OF BENEFITS, MODEL REGULATION SERVICE,
     JANUARY 2005, NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS

(FFS-2013)

E- SMALL BUSINESS SUBCONTRACTING PLAN (if applicable)

(FFS-2013)

PART I - GENERAL PROVISIONS

SECTION 1.1
DEFINITIONS OF FEHB TERMS (JAN 2012)

For purpose of this contract, the following definitions apply:

**Act**: The Federal Employees Health Benefits Act, as amended; chapter 89 of title 5, United States Code.

**Benefits**: Covered services or payment for covered services set forth in Appendix A, to which Members are entitled to the extent provided by this contract.

**Carrier**: As defined by chapter 89 of title 5, United States Code, and may be used interchangeably with the term Contractor.

**Enrollee**: The Federal employee, Tribal Employee, annuitant, former spouse, temporarily-covered former Federal employee or family member enrolled under this contract.

**FEHBP**: Federal Employees Health Benefits Program.

**Letter of Credit**: The method by which certain Carriers, and their underwriters if authorized, receive recurring premium payments and contingency reserve payments by drawing against a commitment (certified by a responsible OPM official) which specifies a dollar amount available. For each Carrier participating in the Letter of Credit arrangement for payment under FEHBAR 1632.170(b), the terms "carrier reserves" and "special reserves" include any balance in the Carrier's Letter of Credit account.

**Member**: The Enrollee and/or an eligible family member for benefit purposes, and sometimes referred to as subscriber.

**Regulations**: (1) The Federal Employees Health Benefits Regulations; part 890, title 5, Code of Federal Regulations, and (2) Chapters 1 and 16 of title 48, Code of Federal Regulations.

**Subcontractor**: Any supplier, distributor, vendor, or firm that furnishes supplies or services to or for a prime contractor, or another subcontractor, except for providers of direct medical services or supplies pursuant to the Carrier's health benefits plan.

**Tribal Employee**: A full-time or part-time common law employee of a tribal employer.

**Tribal Employer**: A tribal employer is an Indian tribe or tribal organization, as those terms are defined in 25 U.S.C. Chapter 18, carrying out at least one program under the Indian Self-Determination and Education Assistance Act or an urban Indian organization as that term is defined in 25 U.S.C. Chapter 18 carrying out at least one program under the title V of the Indian Health Care Improvement Act, provided that OPM accepts the tribe, tribal organization, or urban Indian organization's agreement to offer FEHB.

(FFS-2013)

SECTION 1.2
ENTIRE CONTRACT (JAN 2009)

(a) This document as described in the *Table of Contents* constitutes the entire contract between the parties. No oral statement of any person shall modify or otherwise affect the terms, conditions, or specifications stated in this contract. Requests for modifications of this contract must be submitted to the authorized Contracting Officer. Only the Contracting Officer acting within the scope of his or her authority may execute a contract modification on behalf of the government.

(b) All statements concerning coverage or benefits made by OPM, the Carrier or by any individual covered under this contract shall be deemed representations and not warranties. No such statement shall convey or void any coverage, increase or reduce any benefits under this contract or be used in the prosecution of or defense of a claim under this contract unless it is contained in writing and a copy of the instrument containing the statement is or has been furnished to the Member or to the person making the claim.

SECTION 1.3
ORDER OF PRECEDENCE (JAN 1996)

Any inconsistency in this contract shall be resolved by giving precedence in the following descending order: The Act, the regulations in part 890, title 5, Code of Federal Regulations, the regulations in chapters 1 and 16, title 48, Code of Federal Regulations, and this contract.

SECTION 1.4
INCORPORATION OF LAWS AND REGULATIONS (JAN 2002)

(a) The applicable provisions of (1) chapter 89 of title 5, United States Code; (2) OPM's regulations as contained in part 890 of title 5, Code of Federal Regulations; and (3) chapters 1 and 16 of title 48, Code of Federal Regulations constitute a part of this contract as if fully set forth herein, and the other provisions of this contract shall be construed so as to comply therewith.

(b) If the Regulations are changed in a manner which would increase the Carrier's liability under this contract, the Contracting Officer will make an equitable adjustment in accordance with the changes clause, Section 5.38 -- Changes--Negotiated Benefits Contracts.

SECTION 1.5
RECORDS AND INFORMATION TO BE FURNISHED BY OPM (JAN 2012)

(a) OPM shall maintain or cause to be maintained records from which the Carrier may determine the names and social security numbers of all Enrollees. OPM, other agencies of the Federal Government, Tribal Employer, or the FEHB Clearinghouse shall furnish the information to the Carrier at such times and in such form and detail as will enable the Carrier to maintain a currently accurate record of all Enrollees.

(b) The Carrier is entitled to rely on information furnished to it under paragraph (a). OPM agrees that any liabilities incurred under this contract in reliance upon such information

shall be a valid charge against the contract. Errors or delays in keeping or reporting data relating to coverage shall not invalidate coverage that would otherwise be validly in force and shall not continue coverage that would otherwise be terminated. OPM shall make an equitable adjustment of premiums upon discovery of errors or delays under this Section.

(c) Clerical error (whether by OPM, any other agency, Tribal Employer, the FEHB Clearinghouse, or the Carrier) in keeping records pertaining to coverage under this contract, delays in making entries thereon, or failure to make or account for any deduction of enrollment charges, shall not invalidate coverage otherwise validly in force or continue coverage otherwise validly terminated. OPM shall make an equitable adjustment of premiums when an error, delay, or failure is discovered. If any person finds relevant facts pertaining to a person covered under this contract to be misstated, and if the misstatement affects the existence, amount, or extent of coverage, the actual facts shall determine whether coverage is in force under the terms of this contract and in what amount or to what extent. Any claim payments the Carrier makes before an adjustment or determination shall be a valid charge against this contract.

(d) The OPM shall direct the agencies and Tribal Employers to provide the Carrier or the FEHB Clearinghouse, not less often than quarterly, the names of Enrollees enrolled under the contract by payroll office and the premium paid for those Enrollees for the current pay cycle. The Carrier shall at least quarterly reconcile its enrollment records with those provided by the Government, the Tribal Employer, or the FEHB Clearinghouse.

(e) In instances of erroneous enrollments where benefit payments have been made in error, the Carrier must inform Enrollees within forty-five days of when the Carrier receives notification from the agency or the Tribal Employer that the Carrier will collect for these benefit payments. The Carrier shall provide notice to the Enrollees that they have the right to contest their enrollment change with their agency, Tribal Employer, or their retirement system.


SECTION 1.6
CONFIDENTIALITY OF RECORDS
(JAN 1991) (FEHBAR 1652.224-70)

(a) The Carrier shall use the personal data on employees and annuitants that is provided by agencies and OPM, including social security numbers, for only those routine uses stipulated for the data and published annually in the Federal Register as part of OPM's notice of systems of records.

(b) The Carrier shall also hold all medical records, and information relating thereto, of Federal subscribers confidential except as follows:

(1) As may be reasonably necessary for the administration of this contract;

(2) As authorized by the patient or his or her guardian;

(3) As disclosure is necessary to permit Government officials having authority to investigate and prosecute alleged civil or criminal actions;

(4) As necessary to audit the contract;

(5) As necessary to carry out the coordination of benefit provisions of this contract; and

(6) For bona fide medical research or educational purposes. Release of information for medical research or educational purposes shall be limited to aggregated information of a statistical nature that does not identify any individual by name, social security number, or any other identifier unique to an individual.

FFS-2013

(c) If the Carrier uses medical records for the administration of the contract, or for bona fide research or educational purposes, it shall so state in the Plan's brochure.

SECTION 1.7
STATISTICS AND SPECIAL STUDIES (JAN 2009)

(a) The Carrier shall maintain or cause to be maintained statistical records of its operations under the contract and shall furnish OPM, in the form prescribed by the Contracting Officer, the statistical reports reasonably necessary for the OPM to carry out its functions under Chapter 89 of title 5, United States Code.

(b) The Carrier shall furnish such other reasonable statistical data and reports of special studies as the Contracting Officer may from time to time request for the purpose of carrying out its functions under Chapter 89 of title 5, United States Code.

(c) The Carrier shall furnish the routine reports in the required number of copies in a format to be determined by the Contracting Officer as instructed by OPM.

(d) The Carrier shall notify the OPM Contract Representative immediately upon a change in the name or address of the Carrier's contract administrator(s).

SECTION 1.8
NOTICE (JAN 2003)

Where the contract requires that notice be given to the other party, such notice must be given in writing to the address shown on this contract's signature page. To notify OPM, the Carrier must write to the Contracting Officer, unless otherwise specified.

SECTION 1.9
PLAN PERFORMANCE--EXPERIENCE-RATED FFS CONTRACTS (JAN 2013)

(a) <u>Detection of Fraud and Abuse.</u> The Carrier shall conduct a program to assess its vulnerability to fraud and abuse and shall operate a system designed to detect and eliminate fraud and abuse internally by Carrier employees and subcontractors, by providers providing goods or services to FEHB Members, and by individual FEHB Members. The program must specify provisions in place for cost avoidance not just fraud detection, along with criteria for follow-up actions. The Carrier must submit to OPM an annual analysis of the costs and benefits of its fraud and abuse program. The Carrier must submit annual reports to OPM by March 31 addressing the following:

1) Cases opened;
2) Dollars identified as lost and recovered on active cases
3) Actual savings and prevented loss on active cases;
4) Active cases referred to law enforcement (other than the OPM-OIG)
5) Active cases referred to OPM – OIG;
6) Active cases resolved administratively;
7) Percentage of active cases where the FEHB Program is the only or primary line of business affected
8) Number of FEHB providers who are on prepayment review; and
9) Number of arrests and criminal convictions resulting from active cases

The report will also include the industry standards checklist.

(b) Clinical Care Measures. The Carrier shall measure and/or collect data on the quality of the health care services that are provided to its members as requested by OPM. Measurement/data collection efforts may include performance measurement systems such as Healthcare Effectiveness Data and Information Set (HEDIS) or similar measures developed by accrediting organizations such as the National Committee for Quality Assurance (NCQA), the Joint Commission on Accreditation of Healthcare Organizations (JCAHO), or URAC. Costs incurred by the Carrier for collecting or contracting with a vendor to collect quality measures/data shall be the Carrier's responsibility and are allowable administrative expenses, subject to the administrative cost limitation.

(c) Patient Safety. The Carrier shall implement a patient safety improvement program. At a minimum, the Carrier shall --

(1) Report to OPM on its current patient safety initiatives;

(2) Report to OPM on how it will strengthen its patient safety program for the future;

(3) Assist OPM in providing its members with consumer information and education regarding patient safety; and

(4) Work with its providers, independent accrediting organizations, and others to implement patient safety improvement programs.

(d) Accreditation. To demonstrate its commitment to providing quality, cost-effective health care, the Carrier shall continue to pursue and maintain accreditation according to the steps and timeframes outlined in the carrier's current business plan. The carrier shall submit accreditation changes and business plan updates to its OPM contract representative.

(e) Consumer Assessments of Healthcare Providers and Systems (CAHPS). In addition to any other means of surveying Plan members that the Carrier may develop, the Carrier shall participate in the HEDIS Consumer Assessments of Healthcare Providers and Systems (CAHPS) to provide feedback to Enrollees on Enrollee experience with the various FEHBP plans. The Carrier shall take into account the published results of the survey, or other results as directed by OPM, in identifying areas for improvement as part of the Carrier's quality assurance program. Payment of survey charges will be in accordance with Section 3.11.

(f) Contract Quality Assurance. The Carrier shall develop and apply a quality assurance program specifying procedures for assuring contract quality. At a minimum the carrier shall meet the following standards and submit an annual report to OPM on these standards by July 1 of the following contract period:

(1) *Claims Processing Accuracy* - the number of FEHB claims processed accurately and the total number of FEHB claims processed for the given time period, expressed as a percentage.

REQUIRED STANDARD: An average of 95 percent of FEHB claims must be processed accurately.

(2) *Claims Coding Accuracy* - the number of FEHB claims coded accurately divided by the total number of FEHB claims coded for the given time period, expressed as a percentage.

REQUIRED STANDARD: An average of 98 percent of FEHB claims shall be coded accurately.

(3) *Recovery of Erroneous Payments* - the average number of working days it takes for the Carrier to begin collection action against an FEHB provider or member following identification of an erroneous payment, including overpayments.

REQUIRED STANDARD: The Carrier takes an average of no more than 30 working days from the date it identifies an FEHB erroneous payment to the date it begins the collection action.

(4) *Coordination of Benefits (COB)* - the Carrier must demonstrate that a statistically valid sampling technique is routinely used to identify FEHB claims prior to or after processing that require(d) coordination of benefits (COB) with a third party payer. As an alternative, the Carrier may provide evidence that it pursues all claims for COB.

(5) *Claims Timeliness* - the average number of working days from the date the Carrier receives an FEHB claim to the date it adjudicates it (paid, denied or a request for further information is sent out), for the given time period, expressed as a cumulative percentage.

REQUIRED STANDARD: The Carrier adjudicates 95 percent of claims within 30 working days.

(6) *Processing ID cards on change of plan or option* - the number of calendar days from the date the Carrier receives the enrollment from the Enrollee's agency, Tribal Employer, or retirement system to the date it issues the ID card.

REQUIRED STANDARD: The Carrier issues the ID card within fifteen calendar days after receiving the enrollment from the Enrollee's agency, Tribal Employer, or retirement system except that the Carrier will issue ID cards resulting from an open season election within fifteen calendar days or by December 15, whichever is later.

(7) *Member Inquiries* - the number of working days taken to respond to an FEHB member's written inquiry, expressed as a cumulative percentage, for the given time period.

REQUIRED STANDARD: The Carrier responds to 90 percent of inquiries within 15 working days (including internet inquiries).

(8) *Written Inquiries Accuracy* – the number of FEHB written inquiries handled accurately divided by the total number of FEHB written inquiries handled for the given time period, expressed as a percentage.

REQUIRED STANDARD: A minimum of 97 percent of FEHB written inquiries shall be answered accurately.

(9) *Telephone Inquiries Accuracy* – the number of FEHB telephone inquiries handled accurately divided by the total number of FEHB telephone inquiries handled for the given time period, expressed as a percentage.

REQUIRED STANDARD: A minimum of 97 percent of FEHB telephone inquiries shall be answered accurately.

(10) *Internet Inquiries Accuracy* – the number of FEHB Internet inquiries handled accurately divided by the total number of FEHB Internet inquiries handled for the given time period, expressed as a percentage.

REQUIRED STANDARD: A minimum of 97 percent of FEHB Internet inquiries shall be answered accurately.

(11) *Telephone Access* - the Carrier shall report on the following statistics concerning telephone access to the member services department (or its equivalent) for the given time period. Except that, if the Carrier does not have a computerized phone system, report results of periodic surveys on telephone access.

(i) *Call Answer Timeliness* - the average number of seconds elapsing before the Carrier connects a member's telephone call to its service representative.

REQUIRED STANDARD: On average, no more than 30 seconds elapse before the Carrier connects a member's telephone call to its service representative.

*(ii) Telephone Blockage Rate* - the percentage of time that callers receive a busy signal when calling the Carrier.

REQUIRED STANDARD: No more than 5% of callers receive a busy signal.

*(iii) Telephone Abandonment Rate* - the number of calls attempted but not completed (presumably because callers tired of waiting to be connected to a Carrier representative) divided by the total number of calls attempted (both completed and not completed), expressed as a percentage.

REQUIRED STANDARD: On average, Enrollees abandon the effort no more than 5 percent of the time.

*(iv) Initial Call Resolution* – the percentage of issues resolved during the initial call.

REQUIRED STANDARD: On average, caller's issues must be resolved during the initial call at least 60% of the time.

(12) *Responsiveness to FEHB Member Requests for Reconsideration*:

REQUIRED STANDARD: For 100 percent of written FEHB disputed claim requests received for the given time period, within 30 days after receipt by the Carrier, the Carrier shall affirm the denial in writing to the FEHB member, pay the claim, provide or authorize coverage of the service, or request additional information reasonably necessary to make a determination.

(g) <u>Quality Assurance Plan</u>. The Carrier must demonstrate that a statistically valid sampling technique is routinely used prior to or after processing to randomly sample FEHB claims against Carrier quality assurance/fraud and abuse prevention standards.

(h) <u>Reporting Compliance.</u> The Carrier shall keep complete records of its quality assurance procedures and fraud prevention program and the results of their implementation and make them available to the Government as determined by OPM.

(i) <u>FEHB Clearinghouse (CLER)</u>. The Carrier shall not have any CLER records with a 160 error code and a fail count of four or higher, except for OPM annuitants. A '160' error is when a Carrier reports an enrollment but no agency or Tribal Employer reports that enrollment.

(j) <u>Correction of Deficiencies.</u> The Contracting Officer may order the correction of a deficiency in the Carrier's quality assurance program or fraud prevention program. The Carrier shall take the necessary action promptly to implement the Contracting Officer's order. If the Contracting Officer orders a modification of the Carrier's quality assurance program or fraud prevention program pursuant to this paragraph (j) after the contract year has begun, the costs incurred to correct the deficiency may be excluded from the administrative expenses -- for the contract year -- that are subject to the administrative expenses limitation specified at Appendix B; provided the Carrier demonstrates that the correction of the deficiency significantly increases the Carrier's liability under this contract.

(k) In order to allow sufficient implementation time, the Contracting Officer will notify the Carrier reasonably in advance of any new requirement(s) under paragraphs (a) through (j).

SECTION 1.10
NOTICE OF SIGNIFICANT EVENTS (JUL 2005) (FEHBAR 1652.222-70)

(a) The Carrier agrees to notify the Contracting Officer of any Significant Event within ten (10) working days after the Carrier becomes aware of it. As used in this section, a Significant Event is any occurrence or anticipated occurrence that might reasonably be expected

to have a material effect upon the Carrier's ability to meet its obligations under this contract, including, but not limited to, any of the following:

(1) Disposal of major assets;

(2) Loss of 15% or more of the Carrier's overall membership;

(3) Termination or modification of any contract or subcontract if such termination or modification might have a material effect on the Carrier's obligations under this contract;

(4) Addition or termination of provider agreements;

(5) Any changes in underwriters, reinsurers or participating plans;

(6) The imposition of, or notice of the intent to impose, a receivership, conservatorship, or special regulatory monitoring;

(7) The withdrawal of, or notice of intent to withdraw State licensing, HHS qualification, or any other status under Federal or State law;

(8) Default on a loan or other financial obligation;

(9) Any actual or potential labor dispute that delays or threatens to delay timely performance or substantially impairs the functioning of the Carrier's facilities or facilities used by the Carrier in the performance of the contract;

(10) Any change in its charter, constitution, or by-laws which affects any provision of this contract or the Carrier's participation in the Federal Employees Health Benefits Program;

(11) Any significant changes in policies and procedures or interpretations of the contract or brochure which would affect the benefits available under the contract or the costs charged to the contract;

(12) Any fraud, embezzlement or misappropriation of FEHB funds; or

(13) Any written exceptions, reservations or qualifications expressed by the independent accounting firm (which ascribes to the standards of the American Institute of Certified Public Accountants) contracted with by the Carrier to provide an opinion on its annual financial statements.

(b) Upon learning of a Significant Event OPM may institute action, in proportion to the seriousness of the event, to protect the interest of Members, including, but not limited to--

(1) Directing the Carrier to take corrective action;

(2) Suspending new enrollments under this contract;

(3) Advising Enrollees of the Significant Event and providing them an opportunity to transfer to another plan;

(4) Withholding payment of subscription income or restricting access to the Carrier's Letter of Credit account;

(5) Terminating the enrollment of those Enrollees who, in the judgment of OPM, would be adversely affected by the Significant Event; or

(6) Terminating this contract pursuant to Section 1.15, Renewal and Withdrawal of Approval.

(c) Prior to taking action as described in paragraph (b) of this clause, the OPM will notify the Carrier and offer an opportunity to respond.

(d) The carrier will insert this clause in any subcontract or subcontract modification if the amount of the subcontract or modification charged to the FEHB Program (or in the case of a community-rated carrier, applicable to the FEHB Program) equals or exceeds $550,000 and is at least 25 percent of the total subcontract cost. The amount of the dollar charge to the FEHB Program shall be adjusted by the same amount and at the same time as any change to the threshold for application of the Truth in Negotiations Act pursuant to 41 U.S.C. 254b(a)(7).

SECTION 1.11
FEHB INSPECTION (JUL 2005) (FEHBAR 1652.246-70)

(a) The Contracting Officer, or an authorized representative of the Contracting Officer, has the right to inspect or evaluate the work performed or being performed under the contract, and the premises where the work is being performed, at all reasonable times and in a manner that will not unreasonably delay the work.

(b) The Contractor shall maintain and the Contracting Officer, or an authorized representative of the Contracting Officer, shall have the right to examine and audit all books and records relating to the contract for purposes of the Contracting Officer's determination of the Carrier's subcontractor or Large Provider's compliance with the terms of the contract, including its payment (including rebate and other financial arrangements) and performance provisions. The Contractor shall make available at its office at all reasonable times those books and records for examination and audit for the record retention period specified in the Federal Employees Health Benefits Acquisition Regulation (FEHBAR), 48 CFR 1652.204-70. This subsection is applicable to subcontract and Large Provider Agreements with the exception of those that are subject to the "Audits and Records – Negotiation" clause, 48 CFR 52.215-2.

(c) If the Contracting Officer, or an authorized representative of the Contracting Officer, performs inspection, audit or evaluation on the premises of the Carrier, the subcontractor, or the Large Provider, the Carrier shall furnish or require the subcontractor or Large Provider to furnish all reasonable facilities for the safe and convenient performance of these duties.

(d) The Carrier shall insert this clause, including this subsection (d), in all subcontracts for underwriting and claim payments and administrative services and in all Large Provider Agreements and shall substitute "contractor", "Large Provider," or other appropriate reference for the term "carrier."

SECTION 1.12
CORRECTION OF DEFICIENCIES (JAN 1997)

(a) The Carrier shall maintain sufficient financial resources, facilities, providers, staff and other necessary resources to meet its obligations under this contract. If the OPM determines that the Carrier does not demonstrate the ability to meet its obligations under this contract, the OPM shall notify the Carrier of the asserted deficiencies. The Carrier agrees that, within ten (10) working days following notification, it shall present detailed plans for correcting the deficiencies. These plans shall be presented in a form prescribed by the OPM. Pending submission or implementation of plans required under this Section, the OPM may institute action as it deems necessary to protect the interests of Members, including, but not limited to:

(1) Suspending new enrollments under this contract;

(2) Advising Enrollees of the asserted deficiencies and providing them an opportunity to transfer to another plan;

(3) Withholding payment of subscription income or restricting access to the Carrier's Letter of Credit account; or

(4) Terminating the enrollment of those Enrollees who, in the judgment of OPM, would be adversely affected by the deficiency.

FFS-2013

(b) The Carrier agrees that failure to submit or to diligently implement plans which are required under this Section shall constitute sufficient grounds for termination of this contract pursuant to Section 1.15, *Renewal and Withdrawal of Approval.*

(c) Prior to taking action as described in paragraph (a) the OPM shall notify the Carrier and offer an opportunity to respond.

(d) The Carrier shall include the substance of this clause in the contract with its underwriter and substitute an appropriate term for "Carrier."

SECTION 1.13
INFORMATION AND MARKETING MATERIALS (JAN 2013)

(a) OPM and the Carrier shall agree upon language setting forth the benefits, exclusions and other language of the Plan. The Carrier bears full responsibility for the accuracy of its FEHB brochure. OPM in its sole discretion, may order the Carrier to produce and distribute the agreed upon brochure text in a format and quantity approved by OPM, including an electronic 508 compliant brochure version. Section 508 of the Rehabilitation Act of 1973, as amended 29 U.S.C. § 794d, for OPM's web site. This formatted document is referred to as the FEHB brochure. The Carrier shall distribute the FEHB brochure on a timely basis to new Enrollees and to other Enrollees upon their request. The Carrier shall also distribute the document(s) to Federal agencies and Tribal Employers to be made available to such individuals who are eligible to enroll under this contract. At the direction of OPM, the Carrier shall produce and distribute an audio cassette version, CD, or other electronic media of the approved language. The Carrier may print additional FEHB brochures for distribution for its own use, but only in the approved format and at its own expense.

(b) Supplemental material. Only marketing materials or other supplemental literature prepared in accordance with FEHBAR 1652.203-70 (Section 1.14 of this contract) may be distributed or displayed at or through Federal facilities.

(c) The Carrier shall reflect the statement of benefits in the agreed upon brochure text included at Appendix A of this contract, verbatim, in the FEHB brochure.

(d) OPM may order the Carrier to prepare an addendum or reissue the FEHB brochure or any piece(s) of supplemental marketing material at no expense to the Government if it is found to not conform to the agreed upon brochure text and/or supplemental marketing materials preparations described in paragraphs (a), (b) and (c) of this section.

(e) The Carrier shall produce and distribute an FEHB Summary of Benefits and Coverage (SBC).

SECTION 1.14
MISLEADING, DECEPTIVE OR UNFAIR ADVERTISING (JAN 1991) (FEHBAR 1652.203-70)

(a) The Carrier agrees that any advertising material, including that labeled promotional material, marketing material, or supplemental literature, shall be truthful and not misleading.

(b) Criteria to assess compliance with paragraph (a) of this clause are available in the *FEHB Supplemental Literature Guidelines* which are developed by OPM and should be used, along with the additional guidelines set forth in FEHBAR 1603.7002, as the primary guide in preparing material; further guidance is provided in the NAIC *Advertisements of Accident and Sickness*

*Insurance Model Regulation.* The guidelines are periodically updated and provided to the Carrier by OPM.

(c) Failure to conform to paragraph (a) of this clause may result in a reduction in the service charge, if appropriate, and corrective action to protect the interest of Federal Members. Corrective action will be appropriate to the circumstances and may include, but is not limited to the following actions by OPM:

(1) Directing the Carrier to cease and desist distribution, publication, or broadcast of the material;

(2) Directing the Carrier to issue corrections at the Carrier's expense and in the same manner and media as the original material was made; and

(3) Directing the Carrier to provide, at the Carrier's expense, the correction in writing by certified mail to all Enrollees of the Plan(s) that had been the subject of the original material.

(d) Egregious or repeated offenses may result in the following action by OPM:

(1) Suspending new enrollments in the Carrier's Plan(s);

(2) Providing Enrollees an opportunity to transfer to another plan; and

(3) Terminating the contract in accordance with Section 1.15, *Renewal and Withdrawal of Approval.*

(e) Prior to taking action as described in paragraphs (c) and (d) of this clause, the OPM will notify the Carrier and offer an opportunity to respond.

(f) The Carrier shall incorporate this clause in subcontracts with its underwriter, if any, and other subcontractors directly involved in the preparation or distribution of such advertising material and shall substitute "Contractor" or other appropriate reference for the term "Carrier."

SECTION 1.15
RENEWAL AND WITHDRAWAL OF APPROVAL (JAN 1991) (FEHBAR 1652.249-70)

(a) The contract renews automatically for a term of one (1) year each January first, unless written notice of non-renewal is given either by OPM or the Carrier not less than 60 calendar days before the renewal date, or unless modified by mutual agreement.

(b) This contract also may be terminated at other times by order of OPM pursuant to 5 U.S.C. 8902(e). After OPM notifies the Carrier of its intent to terminate the contract, OPM may take action as it deems necessary to protect the interests of Members, including but not limited to--

(1) Suspending new enrollments under the contract;

(2) Advising Enrollees of the asserted deficiencies; and

(3) Providing Enrollees an opportunity to transfer to another plan.

(c) OPM may, after proper notice, terminate the contract at the end of the contract term if it finds that the Carrier did not have at least 300 Enrollees enrolled in its Plan at any time during the two preceding contract terms.

SECTION 1.16
SUBCONTRACTS (JUL 2005) (FEHBAR 1652.244-70)

(a) The Carrier will notify the Contracting Officer in writing at least 30 days in advance of entering into any subcontract or subcontract modification, or as otherwise specified by this contract, if the amount of the subcontract or modification charged to the FEHB Program equals or

FS-2013

exceeds $550,000 and is at least 25 percent of the total subcontract cost. The amount of the dollar charge to the FEHB Program shall be adjusted by the same amount and at the same time as any change to the threshold for application of the Truth in Negotiations Act pursuant to 41 U.S.C. 254b(a)(7). Failure to provide advance notice may result in a Contracting Officer's disallowance of subcontract costs or a penalty in the performance aspect of the Carrier's service charge. In determining whether the amount chargeable to the FEHB Program contract for a given subcontract or modification equals or exceeds the $550,000 threshold, the following rules apply:

(1) For initial advance notification, the Carrier shall add the total cost/price for the base year and all options, including quantity or service options and option periods.

(2) For contract modifications, options and/or renewals (e.g. evergreen contracts) not accounted for in paragraph (a)(1) of this clause, the carrier shall provide advance notification if they cause the total price to equal or exceed the threshold. OPM's review will be of the modification(s), itself, but documentation for the original subcontract will be required to perform the review. The $550,000 threshold will be adjusted by the same amount and at the same time as any change to the threshold for application of the Truth in Negotiations Act. All subcontracts or subcontract modifications that equal or exceed the threshold are subject to audit under FAR 52.215-2 "Audit and Records-Negotiations" if based on cost analysis or 48 CFR 1646.301 and 1652.246-70 "FEHB Inspection" if based on price analysis.

(b) The advance notification required by paragraph (a) of this clause shall include the information specified below:

(1) A description of the supplies or services to be subcontracted;

(2) Identification of the type of subcontract to be used;

(3) Identification of the proposed subcontractor and an explanation of why and how the proposed subcontractor was selected, including the competition obtained;

(4) The proposed subcontract price and the Carrier's cost or price analysis;

(5) The subcontractor's current, complete, and accurate cost or pricing data and Certificate of Current Cost or Pricing Data, must be submitted to the Contracting Officer if required by law, regulation, or other contract provisions.

(6) (Reserved)

(7) A negotiation memorandum reflecting--

(i) The principal elements of the subcontract price negotiations;

(ii) The most significant consideration controlling establishment of initial or revised prices;

(iii) An explanation of the reason cost or pricing data are not required, if the Carrier believes that cost or pricing data are not required.

(iv) The extent, if any, to which the Carrier did not rely on the subcontractor's cost or pricing data in determining the price objective and in negotiating the final price;

(v) The extent, if any, to which it was recognized in the negotiation that the subcontractor's cost or pricing data were not accurate, complete, or current; the action taken by the Carrier and the subcontractor; and the effect of any such defective data on the total price negotiated;

(vi) The reasons for any significant difference between the Carrier's price objective and the price negotiated; and

(vii) A complete explanation of the incentive fee or profit plan when incentives are used. The explanation will identify each critical performance element, management decisions used to

FFS-2013

quantify each incentive element, reasons for the incentives, and a summary of all trade-off possibilities considered.

(c) The Carrier will obtain the Contracting Officer's written consent before placing any subcontract for which advance notification is required under paragraph (a) of this clause. However, the Contracting Officer may ratify in writing any such subcontract for which written consent was not obtained. Ratification will constitute the consent of the Contracting Officer.

(d) The Contracting Officer may waive the requirement for advance notification and consent required by paragraphs (a), (b) and (c) of this clause where the Carrier and subcontractor submit an application or renewal as a contractor team arrangement as defined in FAR Subpart 9.6 and--

(1) The Contracting Officer evaluated the arrangement during negotiation of the contract or contract renewal; and

(2) The subcontractor's price and/or costs were included in the Plan's rates that were reviewed and approved by the Contracting Officer during negotiation of the contract or contract renewal.

(e) If the carrier follows the notification and consent requirements of paragraphs (a), (b) and (c) of this clause and subsequently obtains the Contracting Officer's consent or ratification, then the reasonableness of the subcontract's costs will be inferred as provided for in 1631.205-81. However, consent or ratification by the Contracting Officer will not constitute a determination:

(1) Of the acceptability of any subcontract terms or conditions;

(2) Of the allowability of any cost under this contract; or

(3) That the Carrier should be relieved of any responsibility for performing this contract.

(f) No subcontract placed under this contract will provide for payment on a cost-plus-a-percentage-of-cost basis. Any fee payable under cost reimbursement type subcontracts will not exceed the fee limitations in FAR 15.404-4(c)(4)(i). Any profit or fee payable under a subcontract will be in accordance with the provision of Section 3.7, *Service Charge*.

(g) The Carrier will give the Contracting Officer immediate written notice of any action or suit filed and prompt notice of any claim made against the Carrier by any subcontractor or vendor that, in the opinion of the Carrier, may result in litigation related in any way to this contract with respect to which the Carrier may be entitled to reimbursement from the Government.

SECTION 1.17
NOVATION AGREEMENT (JAN 1996)

The agreement at FEHBAR 1642.1204 shall be submitted for approval to OPM when the Carrier's assets or the entire portion of the assets pertinent to the performance of this contract, as determined by the Government, are transferred.

SECTION 1.18
AGREEMENT TO RECOGNIZE CARRIER'S CHANGE OF NAME (JAN 1996)

The agreement at FEHBAR 1642.1205 shall be submitted for approval to OPM when the carrier changes its name and the Government's and Contractor's rights and obligations remain unaffected.

FFS-2013

SECTION 1.19
UNDERWRITER (JAN 2009)

(a) If this Plan is underwritten, the Carrier shall not modify (except as allowed in Section 2.3, *Payment of Benefits and Provision of Services and Supplies*) or terminate the policy issued by the Underwriter of the Plan or give notice of termination or intent not to renew the policy without prior express approval of the Contracting Officer. The Carrier shall notify the Contracting Officer in writing of its decision to change Underwriters as soon as is reasonable after the decision is made but no later than at the time the Carrier submits its benefit and rate proposal to OPM for the succeeding contract term.

(b) In the event of any inconsistency between the terms of this contract between OPM and the Carrier and the terms of the policy issued by the Underwriter to the Carrier, the terms of this contract shall prevail.

(c) If this Plan is underwritten, the policy issued to the Carrier by its Underwriter is a part of this contract and is incorporated therein by reference. The Carrier shall include paragraph (b) in the contract with its Underwriter.

SECTION 1.20
CERTIFICATION UNDER P.L. 104-191 (HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996) (JAN 1998)

The Carrier will issue a certification of coverage for members in accordance with the regulations issued by the Department of Health and Human Services.

SECTION 1.21
PATIENTS' BILL OF RIGHTS (JAN 1999)

(a) The Carrier shall implement the recommendations in the Health Care Consumer Bill of Rights and Responsibilities ("Patients' Bill of Rights") in accordance with OPM guidance.

(b) During the Carrier's provider contract renewal process, the Carrier shall make any necessary modifications to such provider contracts to comply with the recommendations of the Patients' Bill of Rights in accordance with OPM guidance. All new provider contracts with the Carrier shall comply with the recommendations of the Patients' Bill of Rights in accordance with OPM guidance.

SECTION 1.22
ADMINISTRATIVE SIMPLIFICATION-HIPAA (JAN 2008)

(a) The Carrier shall implement and be in compliance with the Department of Health and Human Services (DHHS) regulations regarding the standards for electronic transactions, code sets and unique identifiers on the date DHHS specifies. Subject to paragraph (c) of this section, the regulations at 45 CFR parts 160 and 162 are incorporated by reference in this contract.

(b) The Carrier shall implement and be in compliance with the DHHS regulations regarding the standards for privacy and security of individually identifiable health information on

FFS-2013

the date DHHS specifies. Subject to paragraph (c) of this section, the regulations at 45 CFR parts 160 and 164 are incorporated by reference in this contract.

(c) Because OPM has determined that the DHHS administrative simplification regulations should serve as a uniform nationwide standard for the FEHB Program, and because of the preemption provision at 5 U.S.C. 8902(m)(1), the provisions of 45 CFR part 160, subpart B are inapplicable to the Carrier with respect to the Plan.

(d) If the Carrier is an employee organization that retains an underwriter, then these requirements also apply to the underwriter with respect to the Plan. If the Carrier for the plan authorized under 5 U.S.C. 8903(1), qualifies for limited application of the HHS Privacy Rule as a business associate, then the HHS Privacy Rule requirements apply to the underwriting participating affiliates.

SECTION 1.23
HIPAA COMPLIANCE (JAN 1998)

(a) The Carrier shall comply with and shall take all steps reasonably necessary to ensure that its affiliates, subcontractors, and agents comply with the guaranteed availability provisions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and implementing regulations. "Guaranteed availability" means the Carrier, affiliates, subcontractors, and agents do not engage in practices that: 1) decline to offer health insurance coverage (as defined in section 2791(b)(1) of the Public Health Service Act "the Act" ) to, or deny enrollment of an eligible individual (as defined in section 2741(b) of the Act); or, 2) impose any preexisting condition exclusion (as defined in section 2701(b)(1)(A) of the Act), with respect to such coverage.

(b) A State or Federal enforcement action as the result of noncompliance with the requirements of HIPAA is a significant event under Section 1.10 of this contract. Notice of Significant Events. If the Carrier, or any affiliate, subcontractor, or agent, is notified of any enforcement action by any Federal or State authority with regard to HIPAA compliance, the Carrier must notify OPM within ten working days of learning of the action.

SECTION 1.24
NOTICE ON TERMINATION OF FEHBP OR PROVIDER CONTRACT (JAN 2003)

(a) Members who are undergoing treatment for a chronic or disabling condition or who are in the second or third trimester of pregnancy at the time a carrier terminates (1) its FEHBP contract, (2) the members' specialty provider contract, or (3) a Preferred Provider Organization (PPO) or Point of Service (POS) network contract, for reasons other than cause, may be able to continue to see their specialty provider for up to 90 days or through their postpartum care.

(b) The Carrier shall notify its members in writing of its intent to terminate its FEHBP contract, the members' specialty provider contract, or a PPO or POS network contract, for reasons other than cause, in order to allow sufficient time for the members to arrange for continued care after the 90-day period or their postpartum care, whichever applies. The Carrier shall send the required notice to the member if the Carrier has in its records an address for the member different from the Enrollee's address; otherwise, the Carrier may send the notice to the Enrollee. The Carrier shall send the notice in time to ensure it is received by the members no less than 90 days prior to the date it terminates the contract, unless the Carrier demonstrates it was prevented from doing so for

FFS-2013

reasons beyond its control. The Carrier's prompt notice will ensure that the notification period and the transitional care period run concurrently.

SECTION 1.25
TRANSITIONAL CARE (JAN 2003)

(a) "Transitional care" is specialized care provided for up to 90 days or through the postpartum period, whichever is later, to a member who is undergoing treatment for a chronic or disabling condition or who is in the second or third trimester of pregnancy when the Carrier terminates (1) its FEHBP contract, (2) the member's specialty provider contract, or (3) a Preferred Provider Organization (PPO) or Point of Service (POS) network contract for reasons other than cause. The 90-day period begins the earlier of the date the member receives the notice required under Section 1.24, Notice on Termination of FEHBP or Provider Contract, or the date the Carrier's or the provider's contract ends.

(b) The Carrier shall ensure the following:

(1) If it terminates a specialty provider contract or a PPO or POS network contract other than for cause, it allows members who are undergoing treatment for a chronic or disabling condition or who are in the second or third trimester of pregnancy to continue treatment under the specialty provider for up to 90 days, or through their postpartum period, whichever is later, under the same terms and conditions that existed at the beginning of the transitional care period; and

(2) If it enrolls a new member who voluntarily changed carriers because the member's former carrier was no longer available in the FEHB Program, it provides transitional care for the member if he or she is undergoing treatment for a chronic or disabling condition or is in the second or third trimester of pregnancy for up to 90 days, or through the postpartum period, whichever is later, under the same terms and conditions the member had under the prior carrier.

(c) In addition, the Carrier shall (1) pay for or provide the transitional care required under this clause at no additional cost to members;

(2) require the specialty provider or network to promptly transfer all medical records to the designated new provider during or upon completion of the transition period, as authorized by the patient; and,

(3) require the specialty provider or network to give all necessary information to the Carrier for quality assurance purposes.

SECTION 1.26
STANDARDS FOR PHARMACY BENEFIT MANAGEMENT COMPANY (PBM) ARRANGEMENTS (JAN 2012)

The Carrier will ensure and report that the following standards are included in new, renewing or amended contracts with vendors providing a retail pharmacy network and/or a mail order pharmacy and/or a specialty pharmacy to Enrollees and Family Members (hereafter "PBM") effective on or after January 1, 2011. Notwithstanding the foregoing, the revisions to Section 1.26(a) in the January 2011 clause shall not take effect before the expiration of the Carrier's current contract (including the exercise of an existing option to extend the term by not more than one year at a time) but not later than January 2013. The PBM includes all entities that have a

FFS-2013
1-16

majority ownership interest in or majority control over the PBM. The PBM also includes any other subsidiary of the entity that has majority ownership or control over the PBM.

This section does not apply to carrier-owned PBMs, which are already expected to adhere to the FAR and FEHBAR standards and requirements, and the remaining provisions of this contract.

(a) Transparency Standards

      (1) The PBM is not majority-owned or majority-controlled by a pharmaceutical manufacturing company. The PBM must disclose to the Carrier and OPM the name of any entity that has a majority ownership interest in or majority control over the PBM.

      (2) The PBM agrees to provide pass-through transparent pricing based on the PBM's cost for drugs (as described below) in which the Carrier receives the value of the PBM's negotiated discounts, rebates, credits or other financial benefits.

          (i) The PBM shall charge the Carrier no more than the amount it pays the pharmacies in its retail network for brand and generic drugs plus a dispensing fee.

          (ii) The PBM shall charge the Carrier the cost of drugs at mail order pharmacies based on the actual cost, plus a dispensing fee. Costs shall not be based on industry benchmarks; for example, Average Acquisition Cost (AAC) or Wholesale Acquisition Cost (WAC).

          (iii) The PBM, or any other entity that negotiates and collects Manufacturer Payments allocable to the Carrier, agrees to credit to the Carrier either as a price reduction or by cash refund the value of all Manufacturer Payments properly allocated to the Carrier. Manufacturer Payments are any and all compensation, financial benefits, or remuneration the PBM receives from a pharmaceutical manufacturer, including but not limited to, discounts; credits; rebates, regardless of how categorized; market share incentives, chargebacks, commissions, and administrative or management fees. Manufacturer payments also include any fees received for sales of utilization data to a pharmaceutical manufacturer.

      (3) The PBM must identify sources of profit to the Carrier and OPM as it relates to the FEHB contract.

      (4) The PBM's administrative fees, such as dispensing fees, must be clearly identified to retail claims, mail claims and clinical programs, if applicable. The PBM must agree to disclose sources of each administrative fee to the Carrier and OPM.

      (5) The PBM, or any other entity that negotiates and collects Manufacturer Payments allocable to the Plan, will provide the Carrier with quarterly and annual Manufacturer Payment Reports identifying the following information. This information shall be presented for both the total of all prescription drugs dispensed through the PBM, acting as a mail order pharmacy, and its retail network and in the aggregate for the 25 brand name drugs that represent the greatest cost to the Carrier or such number of brand name drugs that together represent 75% of the total cost to the Carrier, whichever is the greater number:

          (i) the dollar amount of Total Product Revenue for the reporting period, with respect to the PBM's entire client base. Total Product Revenue is the PBM's net revenue which consists of sales of prescription drugs to clients, either through retail networks or PBM-owned or controlled mail order pharmacies. Net revenue is recognized at the prescription price negotiated with clients and associated administrative fees;

(ii) the dollar amount of total drug expenditures for the Plan;

(iii) the dollar amount of all Manufacturer Payments earned by the PBM for the reporting period;

(iv) the Manufacturer Payments that have been (1) earned but not billed (2) billed and (3) paid to the PBM based on the drugs dispensed to the Plan members during the past year.

(v) the percentage of all Manufacturer Payments earned by the PBM for the reporting period that were Manufacturer Formulary Payments, which are payments the PBM receives from a manufacturer in return for formulary placement and/or access, or payments that are characterized as "formulary" or "base" rebates or payments pursuant to the PBM's agreements with pharmaceutical manufacturers;

(vi) the percentage of all Manufacturer Payments received by the PBM during the reporting period that were Manufacturer Additional Payments, which are all Manufacturer Payments other than Manufacturer Formulary Payments.

(6) The PBM agrees to provide the Carrier, at least annually, with all financial and utilization information requested by the Carrier relating to the provision of benefits to eligible Enrollees through the PBM and all financial and utilization information relating to services provided to the Carrier.

(7) The Carrier shall provide any information it receives from the PBM, including a copy of its contract with the PBM to OPM. A PBM providing information to a Carrier under this subsection may designate that information as confidential commercial information. The Carrier in its contract with the PBM shall effectuate the PBM's consent to the disclosure of this information to OPM. OPM shall treat such designated information as confidential under 5 C.F.R. § 294.112.

(8) If the Carrier's PBM arrangement is with an Underwriter rather than with the Carrier, then all references to the Carrier and Plan appearing in this Section 1.26 shall be deemed to be references to the Underwriter.

(9) The Carrier will require that its PBM contractors:

(i)     Provide information to physicians, pharmacists, other health care professionals, consumers, and payers about the factors that affect formulary system decisions, including: cost containment measures; the procedures for obtaining non-formulary drugs; and the importance of formulary compliance to improving quality of care and restraining health care costs;

(ii)    Provide consumer education that explains how formulary decisions are made and the roles and responsibilities of the consumer; and

(iii)   Disclose the existence of formularies and have copies of the current formulary readily available and publicly accessible.

(10) In accordance with FEHBAR 1652.204-74, FAR 52.215-2 and FEHBAR 1652.246-70, all contracts and other documentation that support amounts charged to the Carrier contract are fully disclosed to and auditable by the OPM Office of Inspector General (OPM OIG). The PBM must provide the OPM OIG upon request all PBM records including, but not limited to:

(i) All PBM contracts with Participating Pharmacies;

(ii) All PBM contracts with Pharmaceutical Manufacturers;

(iii) All PBM contracts with third parties purchasing or using claims data;

(iv) All PBM transmittals in connection with sales of claims data to third parties; and

FFS-2013

(v) All PBM Maximum Allowable Cost (MAC) price lists.

(b) Integrity Standard
The Carrier will require that its PBM contractors agree to adopt and adhere to a code of ethics promulgated by a national professional association, such as the Code of Ethics of the American Pharmacists Association (dated October 27, 1994), for their employed pharmacists.

(c) Performance Standards
The Carrier will require that its PBM contractors develop and apply a quality assurance program specifying procedures for ensuring contract quality on the following standards at a minimum and submit reports to the Carrier on their performance. PBMs must meet, at minimum, the member inquiry, telephone customer service, paper claims processing, and other applicable standards set for Carriers at Section 1.9(f)(1), (2), (5), (7), and (11). All other standards discussed below will have specific target goals the PBM is expected to achieve. Carriers may permit PBMs to measure compliance using statistically valid samples for the PBMs book of business. Agreed to standards shall be provided to OPM for its review and comment. If OPM has concerns about a particular standard, the Carrier agrees to present OPM's concerns to the PBM and either revise the standard as requested by OPM or revise the standard to the extent feasible and present to OPM information demonstrating the problems associated with making the requested revisions in full.

   (1) Retail Pharmacy Standards

      (i)     Point of Service (POS) system response time. The PBM's network electronic
              transaction system provides rapid response to network pharmacies.
      (ii)    POS system availability. The PBM's network electronic transaction system
              generally is available to, and accessible by, network pharmacies.
      (iii)   Licensing – The PBM verifies the appropriate licensing of its
              network pharmacies.

   (2) Mail Service Pharmacy Standards

      (i)     Dispensing accuracy – The PBM dispenses its prescriptions to the correct patient
              and for the correct drug, drug strength and dosage in accordance with the
              physician's prescription not less than 99.9% of the time.
      (ii)    Turnaround time – The PBM promptly dispenses and ships at least 98% on
              average of all prescriptions not requiring intervention or clarification within 3
              business days or meets an equivalent measure approved by OPM.

   (3) Prior Approval – if applicable – The PBM promptly reviews and responds to requests for
       prior approval for specific drugs following receipt of all required information.

   (4) Quality of Drug Therapy - The quality assurance program implemented by a Carrier's
       PBM contractor must include a process to measure the quality of its drug therapy provided to
       Enrollees. Specific areas to be addressed include achievement of quality targets measured by
       both internal and external metrics; identification and appropriate use of best practices; and

FFS-2013

application of evidence-based medicine, as appropriate.

(d) Alternative Drug Options
The Carrier will require that its PBM contractors, at a minimum, utilize the following protocols for PBM initiated drug interchanges (any change from the original prescription) other than generic substitutions:

(i)     The PBM must treat the prescribing physician, and not itself, as the ultimate decision-maker. Furthermore, to the extent appropriate under the circumstances, the PBM must allow the patient input into that decision-making process. At a minimum, the PBM must provide the patient with a written notice in the package sent to the patient that the drug interchange has occurred with the approval of the Prescriber.

(ii)    The PBM will obtain authorization for a drug interchange only with the express, verifiable authorization from the Prescriber as communicated directly by the Prescriber, in writing or verbally, or by a licensed medical professional or other physician's office staff member as authorized by the Prescriber.

(iii)   The PBM must memorialize in appropriate detail all conversations with patients and physicians in connection with drug interchanging requests, including the identity of the contact person at the physician's office and the basis for his or her authority.

(iv)    The PBM will only interchange a patient's drug from a lower priced drug to a higher priced drug to patient or Plan when authorized by the Carrier or the Plan.

(v)     The PBM will permit pharmacists to express their professional judgment to both the PBM and physicians on the impact of drug interchanges and to answer physicians' questions about dosing. PBMs will not require pharmacists to, and will not penalize pharmacists for refusing to, initiate calls to physicians for drug interchanges that in their professional judgment should not be made.

(vi)    The PBM will offer to disclose, and if requested, will disclose to physicians, the Carrier, and patients (i) the reason(s) why it is suggesting a drug interchange and (ii) how the interchange will affect the PBM, the Plan, and the patients financially.

(e) Patient Safety Standard - The Carrier will require that its PBM contractors establish drug utilization management, formulary process and procedures that have distinct systems for identifying and rectifying consumer safety issues including:

(i)     A system for identifying and communicating drug and consumer safety issues at point-of-service; and

(ii)    A system of drug utilization management tools, such as prospective and concurrent drug utilization management that identifies situations which may compromise the safety of the consumer.

(f) Safety and Accessibility for Consumers - The Carrier will require that its PBM contractors meet the following standards related to pharmacy network management and consumer access to medications.

FFS-2013

(1) The Carrier will require that its PBM contractor define the scope of its services with respect to:

    (i)       The distribution channels offered (e.g. pharmacy network, mail order pharmacies, or specialty pharmacies);

    (ii)     The types of pharmacy services offered within each distribution channel; and

    (iii)    The geographic area served by each distribution channel.

(2) The Carrier will require that for each distribution channel provided by its PBM contractor, the PBM contractor:

    (i)       Establishes criteria and measures actual performance in comparison to those criteria; and

    (ii)     Makes improvements where necessary to maintain the pharmacy network and meet contractual requirements.

(3) The Carrier will require that its PBM contractor establish a quality and safety mechanism for each distribution channel in order to identify and address concerns related to:

    (i)       Quality and safety of drug distribution; and

    (ii)     Quality of service

(g) <u>Contract Terms</u> - The contract between the PBM and the Carrier must not exceed 3 years without re-competition unless the Contracting Officer approves an exception. The Carrier's PBM contract must allow for termination based on a material breach of any terms and conditions stated in the Carrier's PBM contract. The Carrier must provide sufficient written notice of the material breach to the PBM and the PBM must be given adequate time to respond and cure the material breach.

SECTION 1.27
DISCLOSURE NOTICE UNDER P.L. 108-173 (MEDICARE MODERNIZATION ACT OF 2003) (JAN 2006)

       The Carrier will issue, as part of its FEHB benefits brochure, a disclosure notice concerning creditable prescription drug coverage in accordance with the regulation at 42 CFR §423.56 issued by the Department of Health and Human Services.

SECTION 1.28
CARRIER DISASTER RECOVERY PLAN (JAN 2007)

The Carrier must implement a disaster recovery plan that addresses flexibility for the following:

    (a) Medical and pharmacy procedures and requirements

    (b) Barriers to accessing needed health care;

    (c) Requests for out-of-network medical services;

    (d) Alternatives for medical pre-certification, referrals, medical necessity review and notification of hospital admissions;

    (e) Accessing other PCPs or specialists;

FFS-2013

(f) Pharmacy restrictions, refills, additional supplies of medications as backup;

(g) Mail-order pharmacy;

(h) Adhering to recommendations for vaccinations from the Center for Disease Control;

(i) Claims payments;

(j) Crisis toll free hotline;

(k) Ability to identify current members;

(l) Recovery procedures for critical business functions (i.e., system, network, communication, work area recovery); and

(m) Secure backup site (hot/cold). A "hot work site" is a designated location to be used in the event of a disaster that is fully prepared for continuation of work to which the employees can go. A "cold work site" is a designated location to use in the event of a disaster that is not fully prepared for continuation of work to which the employees can go.

The Carrier must provide OPM with the following information:

(a) description of its disaster recovery plan;

(b) the carrier's current state of readiness and the frequency of evaluations;

(c) the carrier's work with its subcontractor on this issue;

(d) a timeline; and

(e) any potential problem areas.

The Carrier may implement its own additional measures.

Carriers must submit this information by January 1, 2007. Carriers who enter the FEHBP subsequent to 2007, must submit this information by January 1st of their first FEHBP contract year. Any material changes to the disaster recovery plan, such as a prime disaster recovery subcontract change or a hot site change, should be reported to OPM.

SECTION 1.29
HEALTH INFORMATION TECHNOLOGY REQUIREMENTS (JAN 2011)

(a) The Carrier agrees that as it implements, acquires, or upgrades health information technology systems, it shall utilize, where available, certified health information technology systems and products that meet interoperability standards recognized by the Secretary of Health and Human Services, as existing on the date of the implementation, acquisition, or upgrade of health information technology systems ("Interoperability Standards"). Interoperability standards include those standards adopted by the Secretary to promote meaningful use of health information technology in accordance with Public Law 111-5, The Health Information Technology for Economic and Clinical Health Act (HITECH Act).

(b) The Carrier agrees that such health information technology systems will have already been pilot tested in a variety of live settings and refined, if needed, before the Carrier will consider them for implementation.

(c) The Carrier agrees that as its provider agreements are established or renewed, it will encourage contracted providers to comply with applicable Interoperability Standards and to demonstrate meaningful use of health information technology in accordance with the HITECH ACT.

SECTION 1.30
HEALTH INFORMATION TECHNOLOGY PRIVACY AND SECURITY (JAN 2012)

(a) Any Carrier subcontractor, large provider, or vendor, that administers a personal health record or quality and cost or price transparency software applications for Members that collect, create, receive, store or transmit individually identifiable protected health information of Members that does not qualify as a covered entity or business associate under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or regulations will be required by the Carrier to, at a minimum, comply with equivalent privacy and security policies as are required of a "covered entity" under the HIPAA Privacy and Security regulations.

(b) The Carrier will provide for consumer transparency including, but not limited to, the posting of the subcontractor's, large provider's, or vendor's notice of privacy practices prominently at the point where the Member enters the subcontractor's, large provider's, vendor's or other entity's website or web portal.

(c) Notices of privacy practices disclosures must describe the uses of individually identifiable protected health information and any potential disclosure to other entities as described in the HIPAA Privacy Rule.

SECTION 1.31
DEFINITION AND SCOPE OF INFORMATION SECURITY (JAN 2012)

(a) As indicated in FAR Subpart 2.1, information security means protecting OPM information and information systems from unauthorized access, use, disclosure, disruption, modification, or destruction in order to provide —
    1. Integrity, which means guarding against improper information modification or destruction, and includes ensuring information nonrepudiation and authenticity; or destruction.
    2. Confidentiality, which means preserving authorized restrictions on access and disclosure, including means for protecting personal privacy and proprietary information; and
    3. Availability, which means ensuring timely and reliable access to, and use of, information.
    (b) This Contract grants the Carrier access to OPM's Letter of Credit (LOC) System. The Carrier recognizes its responsibility to help maintain the information security of OPM's LOC System. Section 1.31 through 1.35 inclusive and Section 5.67 and 5.68 pertain exclusively to such limited access to OPM's LOC System.

SECTION 1.32
CARRIER PERSONNEL ACCESS DETERMINATION REQUIREMENTS (JAN 2012)

(a) Carrier personnel who receive a user identification and password to access OPM's LOC System shall comply with the U.S. Office of Management and Budget (OMB) Memorandum M-05-24, referenced in paragraph (a) of FAR 52.204-9, Personal Identity Verification of Contractor Personnel, which is available on-line at http://www.whitehouse.gov/omb/memoranda/fy2005/m05-24.pdf.

(b) Homeland Security Presidential Directive (HSPD) 12 requires the Government to institute standards for secure and reliable identification of employees and contractors accessing

Federal facilities. OPM has determined that a National Agency Check with Written Inquiries (NACI) is required for Carrier employees with access to OPM's LOC System. The Carrier must obtain these access determinations for its employees with access to OPM's LOC System using the e-QIP system. The NACI will be requested on a Standard Form (SF) 85, "Questionnaire for Non-Sensitive Positions." OPM will not allow Carrier employees who have not completed the NACI process in any of its facilities, pursuant to applicable security policies.

(c) Carriers must meet facility and access clearance requirements.

(d) Carriers are responsible for the security, integrity and appropriate authorized use of their systems interfacing with OPM's LOC System. OPM, through its Contracting Officer, may require the use or modification of security and/or secure communications technologies related to Government systems access and use.

(e) OPM, at its discretion, may suspend or terminate the Carrier's access to and/or use of OPM's LOC System when a security or other electronic access, use or misuse issue gives cause for such action. The suspension or termination may last until such time as the Government determines that the situation has been corrected or no longer exists.

SECTION 1.33
INFORMATION TECHNOLOGY SYSTEMS SECURITY (JULY 2011)

Carriers must comply with OPM IT Security and Privacy, NIST and OMB requirements for system users. System users are Carrier employees with a user identification and password to access OPM's LOCS. Based upon the Federal Information Processing Standards Publication 199 (FIPS PUB 199), the Government has determined that a minimum level, applies to the sensitivity of the data contained in OPM's LOC System and a minimum level, applies to the operational criticality of the data processing capabilities of OPM's LOC System. (Note: FIPS PUB 199 is accessible on line at: http://csrc.nist.gov/publications/fips/fips199/FIPS-PUB-199-final.pdf.)

In order to access the OPM LOC System, the Carriers must demonstrate that they comply with the end-user security requirements in the Federal Information Security Management Act of 2002 (FISMA, Public Law 107-347, 44 U.S.C. 3531-3536); Office of Management and Budget (OMB) Circular A-130, Appendix III, "Security of Federal Automated Information Systems" and an acknowledgement of their understanding of the security requirements in the contract. (Note: OMB Circular A-130, Appendix III is accessible on line at: http://www.whitehouse.gov/omb/circulars/a130/appendix_iii.pdf.)

SECTION 1.34
CARRIER ACCESS TO OPM IT SYSTEMS (JAN 2011)

Each Carrier employee is required to utilize individual identification and authorization to access the OPM LOC System. Using shared accounts to access the OPM LOC System is strictly prohibited. OPM will disable accounts and access to the OPM LOC System will be revoked and denied if carriers share accounts. Users of the OPM LOC System will be subject to periodic auditing to ensure compliance to OPM Security and Privacy Policy. In addition, Carriers are required to comply with the following NIST 800-53 security controls to include at a minimum: Access Control (AC) - Controls falling under the AC category ensure that proper restrictions are in place to limit access to authorized users with a need to know.

(1) Provide to the OPM Letter of Credit (LOC) System Security Officer listed in OPM's "Letter of Credit Drawdown System User Manual For Experience Rated Carriers" - Contacts for Questions and Problem Resolution, an initial and complete list of employees' names that require access to OPM's LOC System;

(2) By the fifth day of each month thereafter, send a staffing change report to the Contracting Officer's Representative, contract administrator and LOC Security Officer. The report must contain the listing of all staff members with an LOC System user identification and password who left employment or were hired under this contract in the past 60 days. This form must be submitted even if no separation has occurred during this period. Failure to submit a 'Contractor Staffing Change Report' each month will result in the suspensions of all user IDs associated with this contract; and

(3) Anyone who accesses the OPM LOC System must complete OPM's IT Security and Privacy Awareness Training (ITPSA) annually and upon the initial access. This requirement applies to all Carriers.

SECTION 1.35
PROCEDURES FOR REPORTING A LETTER OF CREDIT SYSTEM SECURITY BREACH (JAN 2013)

(a) A breach of data, system access, etc. includes loss of control, compromise, unauthorized disclosure, unauthorized acquisition, or unauthorized access of information whether physical or electronic. As an agency, OPM is required to immediately report all potential security and data breaches -- whether they involve paper documents or electronic information. In order to meet this responsibility, OPM has established a new internal procedure for reporting the loss or possible compromise of any data, and this clause conforms to that procedure.

(b) OPM Carriers must report any breach or potential breach to the OPM Situation Room and the Contracting Officer within 30 minutes of becoming aware of the risk – regardless of the time or day of the week. Breaches should be reported, even if it is believed the breach is limited, small, or insignificant. OPM's IT security experts, who will determine when a breach needs additional focus and attention. The OPM Situation Room is available 24 hours per day, 365 days per year. Report the breach to the OPM Situation Room and the Contracting Officer either by phone or by e-mail; however, be sure NOT to include PII in the e-mail.

(1) OPM Carriers must report a breach or potential security breach to the OPM Situation Room at: sitroom@opm.gov, (202) 418-0111, Fax (202) 606-0624.

(2) When notifying the Situation Room, please copy the Contracting Officer.

(3) To get help with WinZip, please contact the OPM Help Desk at: helpdesk@opm.gov, (202) 606-4927, TTY (202) 606-1295.

(4) If you have questions regarding these procedures, contact the Contracting Officer.

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 34 of 137

PART II – BENEFITS

SECTION 2.1
ENROLLMENT ELIGIBILITY AND EVIDENCE OF ENROLLMENT (JAN 2012)

(a) Enrollment.
(1) Each eligible individual who wishes to be enrolled in the plan offered by this Carrier shall, as a prerequisite to such enrollment, complete a Health Benefits Election Form, or use an electronic or telephonic method approved by OPM, within the time and under the conditions specified in 5 CFR Part 890. The personnel office having cognizance over the Enrollee shall promptly furnish notification of such election to the Carrier.
(2) A person's eligibility for coverage, effective date of enrollment, the level of benefits (option), the effective date of termination or cancellation of a person's coverage, the date any extension of a person's coverage ceases, and any continuance of benefits beyond a period of enrollment and the date any such continuance ceases, shall all be determined in accordance with regulations or directions of OPM given pursuant to chapter 89, title 5, United States Code.
(b) Special Limitations With Regard To Employee Organizations.
(1) A plan sponsored by an employee organization as defined by the Act, is available only to eligible employees, Tribal Employees, annuitants, former spouses, and former employees and eligible members of their families who must be or must become members of the sponsoring organization to enroll in the Plan.
(2) Employees or Tribal Employees with membership status in an employee organization at the time they become annuitants may retain their membership in the organization and, if eligible, continue their enrollment in the Plan. Survivor annuitants of Enrollees in the Plan may continue their enrollment in the Plan without becoming members of the sponsoring employee organization.
(c) The Carrier shall issue evidence of the Enrollee's coverage and furnish to the Enrollee copies of any forms necessary to make claim for benefits.


SECTION 2.2
BENEFITS PROVIDED (JAN 2009)

(a) The Carrier shall provide the benefits as described in the agreed upon brochure text found in Appendix A.
(b) In addition to providing benefits in accordance with (a) above, the Carrier shall be authorized to modify them as follows:
(1) To permit methods of treatment not expressly provided for, but not prohibited by law, rule or Federal policy, if otherwise contractually appropriate, and if such treatment is medically necessary and is as cost effective as providing benefits to which the Member may otherwise be entitled.
(2) To pay for or provide a health service or supply in an individual case which does not come within the specific benefit provisions of the contract, if the Carrier determines the benefit is within the intent of the contract, and the Carrier determines that the provision of such benefit is in the best interests of the Federal Employees Health Benefits Program.

(FFS-2013)

(3) To offer in individual cases. after consultation with and concurrence by the Member and provider(s). a benefit alternative not ordinarily covered under this contract which will result in equally effective medical treatment at no greater benefit cost. An alternative benefit will be made available for a limited time period and is subject to the Carrier's ongoing review. Members must cooperate with the Carrier's review process.

(c) The decision to offer, deny, or withdraw coverage for a modified benefit provided in accordance with (b) above is solely within the Carrier's discretion (unless the Carrier and Member have entered into an alternative benefits agreement that expressly modifies this authority). and is not subject to OPM review under the disputed claims process.

(d) In each case when the Carrier provides a non-covered benefit in accordance with the authority of (b) above. the Carrier shall document in writing prior to the provision of such benefit the reasons and justification for its determination. The writing may be in the form of an alternative benefit agreement with the Member. Such payment or provision of services or supplies while a valid charge under the contract shall not be considered to be a precedent in the disposition of similar cases or extensions in the same case beyond the approved period.

(e) Except as provided for in (b) above. the Carrier shall provide benefits for services or supplies in accordance with Appendix A.

(f) The Carrier, subject to (g) below, shall determine whether in its judgment a service or supply is medically necessary or payable under this contract.

(g) The Carrier agrees to pay for or provide a health service or supply in an individual case if OPM finds that the Member is entitled thereto under the terms of the contract.

(h) (1) Notwithstanding (b) and (e) above, in accordance with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and 5 C.F.R. § 723.130(d), in the case of a Member who is a qualified individual with a handicap, the Carrier shall pay for or provide a covered health service or supply in the most integrated setting appropriate to the Member's needs, when required by OPM following OPM consultation with the Carrier, pursuant to paragraph 2.2(g), above.

(2) An OPM requirement under (h)(1) is subject to ongoing review by OPM and the Carrier. Members must cooperate with the review process. If, in the Carrier's judgment, the conditions for the OPM requirement are no longer satisfied, the Carrier may request that OPM modify or terminate the requirement. OPM's decision to modify or terminate a requirement shall be subject to judicial review.

SECTION 2.3
PAYMENT OF BENEFITS AND PROVISION OF SERVICES AND SUPPLIES (JAN 2013)

(a) By enrolling or accepting services under this contract, Members are obligated to all terms, conditions, and provisions of this contract. The Carrier may request Members to complete reasonable forms or provide information which the Carrier may reasonably request, provided, however, that the Carrier shall not require Members to complete any form as a precondition of receiving benefits unless the form has first been approved for use by OPM. Notwithstanding Section 2.9, *Claims Processing*, forms requiring specific approval do not include claim forms and other forms necessary to receive payment of individual claims.

(b) All benefits shall be paid (with appropriate documentation of payment) within a reasonable time after receipt of reasonable proof covering the occurrence, character, and extent of the event for which the claim is made. The claimant shall furnish satisfactory evidence that all

services or supplies for which expenses are claimed are covered services or supplies within the meaning of the contract.

(c) The procedures and time period for filing claims shall be as specified in the agreed upon brochure text (*Appendix A*). However, failure to file a claim within the time required shall not in itself invalidate or reduce any claim where timely filing was prevented by administrative operations of Government or legal incapacitation, provided the claim was submitted as soon as reasonably possible.

(d) The Carrier may request a Member to submit to one or more medical examinations to determine whether benefits applied for are for services and supplies necessary for the diagnosis or treatment of an illness or injury or covered condition of the Member and may withhold payment of such benefits pending completion of the examinations. The examinations shall be made at the expense of the Carrier by a physician selected by the Member from a panel of at least three physicians whose names are furnished by the Carrier, and the results of the examinations shall be made available to the Carrier and the Member.

(e) As a condition precedent to the provision of benefits hereunder, the Carrier, to the extent reasonable and necessary and consistent with Federal law, shall be entitled to obtain from any person, Tribal Employer, organization or agency, including the Office of Personnel Management, all information and records relating to visits or examination of, or treatment rendered or supplies furnished to, a Member as the Carrier requires in the administration of such benefits. The Carrier may obtain from any insurance company or other organization or person any information, with respect to any Member, which it has determined is reasonably necessary to:

(1) identify enrollment in a plan,

(2) verify eligibility for payment of a claim for health benefits, and

(3) carry out the provisions of the contract, such as subrogation, recovery of payments made in error, workers compensation, and coordination of benefits.

(f) Benefits are payable to the Enrollee in the Plan or his or her assignees. However, under the following circumstances different payment arrangements are allowed:

(1) Reimbursement Payments for the Enrollee. If benefits become payable to the estate of an Enrollee or an Enrollee is a minor, or an Enrollee is physically or mentally not competent to give a valid release, the Carrier may either pay such benefits directly to a hospital or other provider of services or pay such benefits to any relative by blood or connection by marriage of the Enrollee determined by the Carrier to be equitably entitled thereto.

(2) Reimbursement Payments for a minor child. If a child is covered as a Family Member under the Enrollee's self and family enrollment and is in the custody of a person other than the Enrollee, and if that other person certifies to the Carrier that he or she has custody of and financial responsibility for the child, then the Carrier may issue an identification card for the child(ren) to that person and may reimburse that person for any covered medical service or supply.

(3) Reimbursement Payments to family members covered under the Enrollee's self and family enrollment. If a covered child is legally responsible, or if a covered spouse is legally separated, and if the covered person does not reside with the Enrollee and certifies such conditions to the Carrier, then the Carrier may issue an identification card to the person and may reimburse that person for any covered medical service or supply. In the case of a legally separated spouse, the Carrier may also furnish the explanation of benefits to the spouse when determined by the Carrier to be required.

(FFS-2013)

(4) Reimbursement payments to Government programs, such as Medicaid. If Federal law provides that reimbursement is payable to a Government program under coordination of benefits or similar rules, in lieu of being payable to the Enrollee or other covered person, the Carrier may reimburse the other Government program for any covered medical service or supply. To the degree that the Carrier is able to identify Medicaid beneficiaries, the Carrier will process claims directly to the provider of service or reimburse the Medicaid agency if the Medicaid agency has already paid the provider and is seeking reimbursement. When this situation is identified, the Carrier will update the member's records to ensure proper adjudication of claims.

(5) Compliance with the HIPAA Privacy Rule. The Carrier may pay benefits to a covered person other than the Enrollee when in the exercise of its discretion the Carrier decides that such action is necessary to comply with the HIPAA Privacy Rule, 45 C.F.R. §164.500 et seq.

(6) Any payments made in good faith in accordance with paragraphs (f)(1) through (f)(5) shall fully discharge the Carrier to the extent of such payment.

(g) *Erroneous Payments.* It is the Carrier's responsibility to proactively identify overpayments through comprehensive, statistically valid reviews and a robust internal control program. If the Carrier determines that a Member's claim has been paid in error for any reason (except in the case of fraud or abuse), the Carrier shall make a prompt and diligent effort to recover the erroneous payment to the member from the member or, if to the provider, from the provider. The recovery of any overpayment must be treated as an erroneous benefit payment, overpayment, or duplicate payment under 48 C.F.R. §1631.201-70(h) regardless of time period limitations in the written agreement with the provider. The Carrier shall follow general business practices and procedures in collecting debts owed under the Federal Employees Health Benefits Program. Prompt and diligent effort to recover erroneous payments means that upon discovering that an erroneous payment exists, the Carrier shall--

(1) Send a written notice of erroneous payment to the member or provider that provides: (A) an explanation of when and how the erroneous payment occurred, (B) when applicable, cite the appropriate contractual benefit provision, (C) the exact identifying information (i.e., dollar amount paid erroneously, date paid, check number, date of service and provider name), (D) a request for payment of the debt in full, and (E) an explanation of what may occur should the debt not be paid, including possible offset to future benefits. The notice may also offer an installment option. In addition, the Carrier shall provide the debtor with an opportunity to dispute the existence and amount of the debt before proceeding with collection activities;

(2) After confirming that the debt does exist and in the appropriate amount, send follow-up notices to the member or the provider at 30, 60 and 90 day intervals, if the debt remains unpaid and undisputed;

(3) The Carrier may off-set future benefits payable to the member or to a provider on behalf of the member to satisfy a debt due under the FEHBP if the debt remains unpaid and undisputed for 120 days after the first notice;

(4) After applying the first three steps, refer cases when it is cost effective to do so to a collection attorney or a collection agency if the debt is not recovered; provided, however, that the carrier may not commence an overpayment recovery lawsuit later than December 31 of the third year after the year in which the overpayment was discovered by the carrier (except in cases where the False Claims Act, 31 U.S.C § 3729, or another federal limitations period applies);

(5) Make prompt and diligent effort to recover erroneous payments until the debt is paid in full or determined to be uncollectible by the Carrier because it is no longer cost effective to

pursue further collection efforts or it would be against equity and good conscience to continue collection efforts;

(6) Additional prompt and diligent effort is required for significant claim overpayments that exceed $10,000 per each claim. Examples of such efforts include copies of dated notices, offset attempt(s) made, certified letter communication(s), and third party collection efforts to the extent required under (g)(4) above. The Carrier should maintain and provide to OPM upon request, documentation of those efforts.

(7) Suspend recovery efforts for a debt which is based upon a retroactive disenrollment that has been appealed under 5 C.F.R. § 890.104 or a claim that has been appealed as a disputed claim under Section 2.8, until the appeal has been resolved;

(8)(i) The Carrier may charge the contract for benefit payments made erroneously but in good faith provided that it can document that it made a prompt and diligent effort to recover erroneous payments as described above.

(ii) Notwithstanding (g)(8)(i), the Carrier may not charge the contract for the administrative costs to correct erroneous benefit payments (or to correct processes or procedures that caused erroneous benefit payments) when the errors are egregious or repeated. These costs are deemed to be unreasonable and unallowable under section 3.2(b)(2)(ii);

(9) Maintain records that document individual unrecovered erroneous payment collection activities for audit or future reference.

(10) If OPM determines that a Member's claim has been paid in error for any reason (except fraud and abuse), the Carrier shall make a prompt and diligent effort to recover the erroneous payment to the member from the member or, if to the provider, from the provider as specified in (g)(1) through (9).

(11) At the request of OPM, the Carrier shall provide evidence that it has taken the steps enumerated above in this subsection to promptly recover erroneous payments, including but not limited to overpayments related to Medicare coordination of benefits. OPM will review the Carrier's claims payments and procedures to validate the Carrier's prompt and diligent effort. The Contracting Officer may require the Carrier to establish and submit to the Contracting Officer a written corrective action plan.

(12) In compliance with the provisions of the Contract Disputes Act, the Carrier shall return to the Program an amount equal to the uncollected erroneous payment where the Contracting Officer determines that (a) the Carrier's failure to appropriately apply its operating procedure caused the erroneous payment and (b) that the Carrier failed to make a prompt and diligent effort to recover an erroneous payment.

(h) Erroneous payment recoveries may be reduced by any legal or collection agency fees expended to obtain the recoveries and which are not otherwise payable under this experience-rated contract. The amount credited to the contract shall be the net amount remaining after deducting the related legal or collection agency fees.

(i) All health benefit refunds and recoveries, including erroneous payment recoveries, must be deposited into the working capital or investment account within 30 days and returned to or accounted for in the FEHBP letter of credit account within 60 days after receipt by the Carrier.

(j) Notwithstanding subsection (f), the Carrier reserves the right to pay the Member directly for all covered services described in the agreed upon brochure text attached as Appendix A.

(FFS-2013)

II-5

(a) A Member's coverage is terminated as specified in regulations issued by the OPM. Benefits after termination of coverage are as specified in the regulations.

(b) A Member is entitled to a temporary continuation of coverage or an extension of coverage under the conditions and to the extent specified in the regulations.

(c) A Member whose coverage hereunder has terminated is entitled, upon application within the times and under the conditions specified in regulations, to a non-group contract regularly offered for the purpose of conversion from the contract or similar contracts. The conversion contract shall be in compliance with 5 U.S.C., chapter 89, and regulations issued thereunder.

(d) Costs associated with writing or providing benefits under conversion contracts shall not be an allowable cost of this contract.

(e) The Carrier shall maintain on file with OPM copies of the conversion policies offered to persons whose coverage under this contract terminates and advise OPM promptly of any changes in the policies. The Contracting Officer may waive this requirement where because of the large number of different conversion policies offered by the Carrier it would be impractical to maintain a complete up-to-date file of all policies. In this case the Carrier shall submit a representative sample of the general types of policies offered and provide copies of specific policies on demand.

SECTION 2.5
SUBROGATION (JAN 2006)

(a) The Carrier's subrogation rights, procedures and policies, including recovery rights, for payments with respect to benefits shall be in accordance with the provisions of the agreed upon brochure text. which is incorporated in this Contract in Appendix A. As the member is obligated by Section 2.3(a) to comply with the terms of this Contract, the Carrier, in its discretion, shall have the right to file suit in federal court in order to enforce those rights.

(b) Subrogation recoveries may be reduced by any legal fees expended to obtain the recoveries and which are not otherwise payable under this experience-rated contract. The amount credited to the contract shall be the net amount remaining after deducting the related legal fees.

SECTION 2.6
COORDINATION OF BENEFITS (JAN 2001) (FEHBAR 1652.204-71)

(a) The Carrier shall coordinate the payment of benefits under this contract with the payment of benefits under Medicare, other group health benefits coverages, and the payment of medical and hospital costs under no-fault or other automobile insurance that pays benefits without regard to fault.

(b) The Carrier shall not pay benefits under this contract until it has determined whether it is the primary carrier or unless permitted to do so by the Contracting Officer.

(c) In coordinating benefits between plans, the Carrier shall follow the order of precedence established by the NAIC Group Coordination of Benefits Model Regulation, Rules for Coordination of Benefits, as specified by OPM.

(d) Where (1) the Carrier makes payments under this contract which are subject to COB provisions; (2) the payments are erroneous, not in accordance with the terms of the contract, or in

(FFS-2013)

excess of the limitations applicable under this contract; and (3) the Carrier is unable to recover such COB overpayments from the Member or the providers of services or supplies, the Contracting Officer may allow such amounts to be charged to the contract; the Carrier must be prepared to demonstrate that it has made a diligent effort to recover such COB overpayments.

(e) COB savings shall be reported by experience-rated carriers each year along with the Carrier's annual accounting statement in a form specified by OPM.

(f) Changes in the order of precedence established by the NAIC Group Coordination of Benefits Model Regulation, Rules for Coordination of Benefits, implemented after January 1 of any given year shall be required no earlier than the beginning of the following contract term.

*[NOTE: In the event that benefits are payable to the Member under no-fault automobile insurance, the no-fault automobile insurer shall be the Primary Carrier if it is obligated legally to pay benefits for health care expenses without regard to other health benefits coverage that the Member may have. The term "no-fault automobile insurance" includes any automobile insurance policy under which the insurer pays benefits for health care expenses resulting from the accident without regard to whether the insured's conduct contributed to the accident.]*

SECTION 2.7
DEBARMENT AND OTHER SANCTIONS (JAN 1999)

(a) Notwithstanding 5 U.S.C. 8902(j) or any other provision of the law and regulations, if, under 5 U.S.C. 8902a, 5 CFR 970, or Public Law 103-123 (or other applicable appropriations law), a provider is barred from participating in the Program under 5 U.S.C. or the provider's services under 5 U.S.C. are excluded, the Carrier agrees that no payment shall be made by the Carrier pursuant to any contract under 5 U.S.C. (either to such provider or by reimbursement) for any service or supply furnished by such provider during the period of the debarment, except as provided in 5 CFR 970.200(b).

(b) The OPM shall notify the Carrier when a provider is barred from the FEHBP.

SECTION 2.8
FILING HEALTH BENEFIT CLAIMS/COURT REVIEW OF DISPUTED CLAIMS (MAR 1995) (FEHBAR 1652.204-72)

(a) General. (1) The Carrier resolves claims filed under the Plan. All health benefit claims must be submitted initially to the Carrier. If the Carrier denies a claim (or a portion of a claim), the covered individual may ask the Carrier to reconsider its denial. If the Carrier affirms its denial or fails to respond as required by paragraph (b) of this clause, the covered individual may ask OPM to review the claim. A covered individual must exhaust both the Carrier and OPM review processes specified in this clause before seeking judicial review of the denied claim.

(2) This clause applies to covered individuals and to other individuals or entities who are acting on the behalf of a covered individual and who have the covered individual's specific written consent to pursue payment of the disputed claim.

(b) Time limits for reconsidering a claim. (1) The covered individual has 6 months from the date of the notice to the covered individual that a claim (or a portion of a claim) was denied by the Carrier in which to submit a written request for reconsideration to the Carrier. The time limit for requesting reconsideration may be extended when the covered individual shows that he

or she was prevented by circumstances beyond his or her control from making the request within the time limit.

(2) The Carrier has 30 days after the date of receipt of a timely-filed request for reconsideration to:

(i) Affirm the denial in writing to the covered individual;

(ii) Pay the bill or provide the service; or

(iii) Request from the covered individual or provider additional information needed to make a decision on the claim. The Carrier must simultaneously notify the covered individual of the information requested if it requests additional information from a provider. The Carrier has 30 days after the date the information is received to affirm the denial in writing to the covered individual or pay the bill or provide the service. The Carrier must make its decision based on the evidence it has if the covered individual or provider does not respond within 60 days after the date of the Carrier's notice requesting additional information. The Carrier must then send written notice to the covered individual of its decision on the claim. The covered individual may request OPM review as provided in paragraph (b)(3) of this clause if the Carrier fails to act within the time limit set forth in this paragraph.

(3) The covered individual may write to OPM and request that OPM review the Carrier's decision if the Carrier either affirms its denial of a claim or fails to respond to a covered individual's written request for reconsideration within the time limit set forth in paragraph (b)(2) of this clause. The covered individual must submit the request for OPM review within the time limit specified in paragraph (e)(1) of this clause.

(4) The Carrier may extend the time limit for a covered individual's submission of additional information to the Carrier when the covered individual shows he or she was not notified of the time limit or was prevented by circumstances beyond his or her control from submitting the additional information.

(c) Information required to process requests for reconsideration. (1) The covered individual must put the request to the Carrier to reconsider a claim in writing and give the reasons, in terms of applicable brochure provisions, that the denied claim should have been approved.

(2) If the Carrier needs additional information from the covered individual to make a decision, it must:

(i) Specifically identify the information needed;

(ii) State the reason the information is required to make a decision on the claim;

(iii) Specify the time limit (60 days after the date of the Carrier's request) for submitting the information; and

(iv) State the consequences of failure to respond within the time limit specified, as set out in paragraph (b)(2) of this section.

(d) Carrier determinations. The Carrier must provide written notice to the covered individual of its determination. If the Carrier affirms the initial denial, the notice must inform the covered individual of:

(1) The specific and detailed reasons for the denial;

(2) The covered individual's right to request a review by OPM; and

(3) The requirement that requests for OPM review must be received within 90 days after the date of the Carrier's denial notice and include a copy of the denial notice as well as documents to support the covered individual's position.

(FFS-2013)

(e) OPM review. (1) If the covered individual seeks further review of the denied claim, the covered individual must make a request to OPM to review the Carrier's decision. Such a request to OPM must be made:

(i) Within 90 days after the date of the Carrier's notice to the covered individual that the denial was affirmed; or

(ii) If the Carrier fails to respond to the covered individual as provided in paragraph (b)(2) of this clause, within 120 days after the date of the covered individual's timely request for reconsideration by the Carrier; or

(iii) Within 120 days after the date the Carrier requests additional information from the covered individual, or the date the covered individual is notified that the Carrier is requesting additional information from a provider. OPM may extend the time limit for a covered individual's request for OPM review when the covered individual shows he or she was not notified of the time limit or was prevented by circumstances beyond his or her control from submitting the request for OPM review within the time limit.

(2) In reviewing a claim denied by the Carrier, OPM may

(i) Request that the covered individual submit additional information;

(ii) Obtain an advisory opinion from an independent physician;

(iii) Obtain any other information as may in its judgment be required to make a determination; or

(iv) Make its decision based solely on the information the covered individual provided with his or her request for review.

(3) When OPM requests information from the Carrier, the Carrier must release the information within 30 days after the date of OPM's written request unless a different time limit is specified by OPM in its request.

(4) Within 90 days after receipt of the request for review, OPM will either:

(i) Give a written notice of its decision to the covered individual and the Carrier; or

(ii) Notify the individual of the status of the review. If OPM does not receive requested evidence within 15 days after expiration of the applicable time limit in paragraph (e)(3) of this clause, OPM may make its decision based solely on information available to it at that time and give a written notice of its decision to the covered individual and to the Carrier.

(f) OPM, upon its own motion, may reopen its review if it receives evidence that was unavailable at the time of its original decision.

(g) Court review. (1) A suit to compel enrollment under § 890.102 of Title 5, Code of Federal Regulations, must be brought against the employing office that made the enrollment decision.

(2) A suit to review the legality of OPM's regulations under this part must be brought against the Office of Personnel Management.

(3) Federal Employees Health Benefits (FEHB) carriers resolve FEHB claims under authority of Federal statute (chapter 89, title 5, United States Code). A covered individual may seek judicial review of OPM's final action on the denial of a health benefits claim. A legal action to review final action by OPM involving such denial of health benefits must be brought against OPM and not against the Carrier or the Carrier's subcontractors. The recovery in such a suit shall be limited to a court order directing OPM to require the Carrier to pay the amount of benefits in dispute.

(4) An action under paragraph (3) of this clause to recover on a claim for health benefits:

(i) May not be brought prior to exhaustion of the administrative remedies provided in paragraphs (a) through (f) of this clause;

(FFS-2013)

(ii) May not be brought later than December 31 of the 3rd year after the year in which the care or service was provided; and

(iii) Will be limited to the record that was before OPM when it rendered its decision affirming the Carrier's denial of benefits.

SECTION 2.9
CLAIMS PROCESSING (JAN 2011)

A standardized claims filing process shall be used by all FEHB carriers. The Carrier shall apply procedures for using the standard claims process. At a minimum the Carrier's program must achieve the following objectives:

(1) The majority of provider claims should be submitted electronically;

(2) All providers shall be notified that future claims must be submitted electronically, or on the Centers for Medicare and Medicaid Services 1500 form or the UB-04 form;

(3) The Carrier shall not use any unique provider claim form(s) for such FEHB member claims;

(4) The Carrier should reject all such claims submitted on forms other than the CMS 1500 form or the UB-04 form and shall explain the reason on the Explanation of Benefits form; and

(5) The Carrier shall advise OPM of its progress in implementing this policy as directed by the Contracting Officer.

SECTION 2.10
CALCULATION OF COST SHARING PROVISIONS (JAN 1996)

When the Member is required to pay a specified percentage of the cost of covered services, the Member's obligation for covered services shall be based on the amount the provider has agreed to accept as full payment, including future discounts that are known and that can be accurately calculated at the time the claim is processed. This includes for example, prompt pay discounts as well as other discounts granted for various business reasons. Any discount not determined at the time of the actual adjudication shall be placed in the Special Reserve upon its determination.

SECTION 2.11
BENEFITS PAYMENTS WHEN MEDICARE IS PRIMARY (JAN 2007)

When a Member who is covered by Medicare Part A, Part B, or Parts A and B on a fee-for-service basis (a) receives services that generally are eligible for coverage by Medicare (regardless of whether or not benefits are paid by Medicare) and are covered by the Carrier, and (b) Medicare is the primary payer and the Carrier is the secondary payer for the Member under the order of benefit determination rules stated in Appendix A and Appendix D of this contract, then the Carrier shall limit its payment to an amount that supplements the benefits payable by Medicare (regardless of whether or not Medicare benefits are paid). For Medicare Part B prescription drugs, the Carrier will coordinate benefits except when prescription drugs are purchased from retail or mail order. When emergency services have been provided by a Medicare nonparticipating institutional provider and the provider is not reimbursed by Medicare, the Carrier shall pay its primary benefits. Payments that supplement Medicare include amounts necessary to reimburse the Member for Medicare deductibles, coinsurance, copayments, and the

balance between the Medicare approved amount and the Medicare limiting charge made by non-participating providers.

Carriers may use the Department of Veterans Affairs (VA) Medicare-equivalent remittance advice (MRA) when the form is submitted to determine the Plan's benefits payment for covered services provided to members who have Medicare as their primary payer, when Medicare does not pay the VA facility.

SECTION 2.12
CONTINUING REQUIREMENTS AFTER TERMINATION OF THE CARRIER
(JAN 2004)

(a) The Carrier shall fulfill all of the requirements agreed to under the contract that continue after termination. The order of precedence for the applicable laws, regulations, and the contract are listed in Section 1.3.

(b) Contract requirements extend beyond the date of the Carrier's termination until the effective date of the new enrollment including processing and paying claims incurred prior to the effective date of the new enrollment.

(c) When the prior carrier is discontinued in whole or in part, the gaining carrier assumes full coverage on the effective date of the new enrollment.

SECTION 2.13
LARGE PROVIDER AGREEMENTS (OCT 2005) (FEHBAR 1652.204-74)

(a) Notification and Information Requirements. (1) The experience-rated Carrier must provide notice to the Contracting Officer of its intent to enter into or to make a significant modification of a Large Provider Agreement:

(i) Not less than 60 days before entering into any Large Provider Agreement; and

(ii) Not less than 60 days before exercising a renewal or other option, or significant modification to a Large Provider Agreement, when such action would result in total costs to the FEHB Program of an additional 20 percent or more above the existing contract. However, if a Carrier is exercising a simple renewal or other option contemplated by a Large Provider Agreement that OPM previously reviewed, and there are no significant changes, then a statement to the effect that the renewal or other option is being exercised along with the dollar amount is sufficient notice.

(2) The Carrier's notification to the Contracting Officer must be in writing and must, at a minimum:

(i) Describe the supplies and/or services the proposed provider agreement will require;

(ii) Identify the proposed basis for reimbursement;

(iii) Identify the proposed provider agreement, explain why the Carrier selected the proposed provider, and what contracting method it used, where applicable, including the kind of competition obtained;

(iv) Describe the methodology the Carrier used to compute the provider's profit; and,

(v) Describe provider risk provisions.

(3) The Contracting Officer may request from the Carrier any additional information on a proposed provider agreement and its terms and conditions prior to a provider award and during the performance of the agreement.

(FFS-2013)

(4)  Within 30 days of receiving the Carrier's notification, the Contracting Officer will give the Carrier either written comments or written notice that there will be no comments.  If the Contracting Officer comments, the Carrier must respond in writing within 10 calendar days, and explain how it intends to address any concerns.

(5)  When computing the Carrier's service charge, the Contracting Officer will consider how well the Carrier complies with the provisions of this section, including the advance notification requirements, as an aspect of the Carrier's performance factor.

(6)  The Contracting Officer's review of any Large Provider Agreement, option, renewal, or modification will not constitute a determination of the acceptability of the terms and conditions of any provider agreement or of the allowability of any costs under the Carrier's contract, nor will it relieve the Carrier of any responsibility for performing the contract.

(b)  Records and Inspection. The Carrier must insert in all Large Provider Agreements the requirement that the provider will retain and make available to the Government all records relating to the agreement that support the annual statement of operations and Enrollee records-- Retain for 6 years after the agreement term ends.

(c)  Audit and Records - Negotiation.  The provisions of FAR 52.215-2, "Audit and Records--Negotiation," when required, or FEHBAR 1652.246-70, "FEHB Inspection" apply to all experience-rated Carriers' Large Provider Agreements.  The Carrier will insert the clauses at FAR 52.215-2, when applicable, or FEHBAR 1652.246-70 in all Large Provider Agreements.  In FAR 52.215-2 the Carrier will substitute

(1) The term "Large Provider" for the term "Contractor" throughout the clause, and

(2) The term "Large Provider Agreement" for the term "Subcontracts" in paragraph (g) of FAR 52.215-2.  The term "Contracting Officer" will mean the FEHB Program Contracting Officer at OPM.  The Carrier will be responsible for ensuring the Large Provider complies with the provisions set forth in the clause.

(d)  Prohibited Agreements.  No provider agreement made under this contract will provide for payment on a cost-plus-a-percentage-of-cost basis.

(e)  The Carrier will insert this clause, 1652.204-74, in all Large Provider Agreements.


SECTION 2.14
COORDINATION OF PRESCRIPTION DRUG BENEFITS WITH MEDICARE (JAN 2006)

(a) The Carrier shall comply with the Center for Medicare and Medicaid Services' (CMS) Part D Coordination of Benefits Guidance when the mechanisms and systems indicated in this guidance are in place and functioning properly. This guidance provides the requirements and procedures for coordination of benefits between Part D plans and other providers of prescription drug coverage.

(b) For Medicare Part B covered prescription drugs, the Carrier will coordinate benefits with Medicare except when such prescription drugs are purchased from retail or mail order pharmacies.  The Carrier may pay its benefits on retail pharmacy or mail order drugs eligible for Medicare Part B coverage.

(FFS-2013)

## SECTION 3.1
## PAYMENTS—EXPERIENCE-RATED CONTRACTS (JAN 2003) (FEHBAR 1652.232-71)

(a) OPM will pay to the Carrier, in full settlement of its obligations under this contract, subject to adjustment for error or fraud, the subscription charges received for the Plan by the Employees Health Benefits Fund (hereinafter called the Fund) less the amounts set aside by OPM for the Contingency Reserve and for the administrative expenses of OPM and amounts for obligations due pursuant to paragraph (b) of this clause, plus any payments made by OPM from the Contingency Reserve.

(b) OPM will notify the Carrier of amounts due for outstanding obligations under the contract. Not later than 60 days after the date of written notice from OPM, the Carrier shall reimburse OPM. If payment is not received within the prescribed time frame, OPM shall withhold the amount due from the subscription charges owed the Carrier under paragraph (a) of this clause.

(c) The specific subscription rates, charges, allowances and limitations applicable to the contract are set forth in Appendix B.

(d) Recurring payments from premiums shall be made available for carrier drawdown not later than thirty days after receipt by the Fund. The Contracting Officer may authorize special non-recurring payments from the Contingency Reserve in accordance with OPM's regulations.

(e) In the event this contract between the Carrier and OPM is terminated or not renewed in accordance with General Provision 1.15, *Renewal and Withdrawal of Approval*, the Contingency Reserve of the Carrier held by OPM shall be available to the Carrier to pay the necessary and proper charges against this contract to the extent that the Carrier reserves are insufficient for that purpose.

## SECTION 3.2
## ACCOUNTING AND ALLOWABLE COST (JAN 2003) (FEHBAR 1652.216-71)

(a) <u>Annual Accounting Statements</u>.

(1) The Carrier shall furnish to OPM an accounting of its operations under the contract. In preparing the accounting, the Carrier shall follow the reporting requirements and statement formats prescribed by OPM in the OPM Annual and Fiscal Year Financial Reporting Instructions.

(2) The Carrier shall have its Annual Accounting Statements and that of its underwriter, if any, audited in accordance with the FEHBP Experienced-Rated Carrier and Service Organization Audit Guide (Guide). The Carrier shall submit the audit report and the Annual Accounting Statements to OPM in accordance with the requirements of the Guide.

(3) Based on the results of either the independent audit prescribed by the Guide or a Government audit, OPM may require the Carrier to adjust its annual accounting statements (i) by amounts found not to constitute actual, allowable, allocable and reasonable costs; or (ii) to reflect prior overpayments or underpayments.

(4) The Carrier shall develop corrective action plans to resolve audit findings identified in audits that were performed in accordance with the Guide. The corrective action plans will be prepared in accordance with and as defined by the Guide.

(b) <u>Definition of costs</u>. (1) The Carrier may charge a cost to the contract for a contract term if the cost is actual, allowable, allocable, and reasonable. In addition, the Carrier must:

(FFS-2013)

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 47 of 137

(i) on request, document and make available accounting support for the cost to justify that the cost is actual, reasonable and necessary; and

(ii) determine the cost in accordance with: (A) the terms of this contract, and (B) Subpart 31.2 of the Federal Acquisition Regulation (FAR) and Subpart 1631.2 of the Federal Employees Health Benefits Program Acquisition Regulation (FEHBAR) applicable on the first day of the contract period.

(2) In the absence of specific contract terms to the contrary, the Carrier shall classify contract costs in accordance with the following criteria:

(i) Benefits. Benefit costs consist of payments made and liabilities incurred for covered health care services on behalf of FEHBP subscribers less any refunds, rebates, allowances or other credits received.

(ii) Administrative expenses. Administrative expenses consist of all actual, allowable, allocable and reasonable expenses incurred in the adjudication of subscriber benefit claims or incurred in the Carrier's overall operation of the business. Unless otherwise stated in the contract, administrative expenses include, in part: all taxes (excluding premium taxes, as provided in section 1631.205-41), insurance and reinsurance premiums, medical and dental consultants used in the adjudication process, concurrent or managed care review when not billed by a health care provider and other forms of utilization review, the cost of maintaining eligibility files, legal expenses incurred in the litigation of benefit payments and bank charges for letters of credit. Administrative expenses exclude the cost of Carrier personnel, equipment, and facilities directly used in the delivery of health care services, which are benefit costs, and the expense of managing the FEHBP investment program which is a reduction of investment income earned.

(iii) Investment income. While compliance with the checks presented letter of credit methodology will minimize funds on hand, the Carrier shall invest and reinvest all funds on hand, including any in the Special Reserve or any attributable to the reserve for incurred but unpaid claims, which are in excess of the funds needed to discharge promptly the obligations incurred under the contract. Investment income represents the net amount earned by the Carrier after deducting investment expenses. Investment expenses are those actual, allowable, allocable, and reasonable contract costs that are attributable to the investment of funds, such as consultant or management fees.

(iv) Other charges. (A) Mandatory statutory reserve. Charges for mandatory statutory reserves are not allowable unless specifically provided for in the contract. When the term "mandatory statutory reserve" is specifically identified as an allowable contract charge without further definition or explanation, it means a requirement imposed by State law upon the Carrier to set aside a specific amount or rate of funds into a restricted reserve that is accounted for separately from all other reserves and surpluses of the Carrier and which may be used only with the specific approval of the State official designated by law to make such approvals. The amount chargeable to the contract may not exceed an allocable portion of the amount actually set aside. If the statutory reserve is no longer required for the purpose for which it was created, and these funds become available for the general use of the Carrier, the Carrier shall return to the FEHBP a pro rata share based upon FEHBP's contribution to the total Carrier's set aside shall be returned to the FEHBP in accordance with FAR 31.205-5.

(B) Premium taxes. (1) When the term "premium taxes" is used in this contract without further definition or explanation, it means a tax, fee, or other monetary payment directly or indirectly imposed on FEHB premiums by any State, the District of Columbia, or the Commonwealth of Puerto Rico or by any political subdivision or other governmental authority of

(FFS-2013)

those entities, with the sole exception of a tax on net income or profit, if that tax, fee, or payment is applicable to a broad range of business activity.

(2) For purposes of this paragraph (B), OPM has determined that the term "State" as used in 5 U.S.C. 8909(f) includes, but is not limited to, a territory or possession of the United States.

(c) <u>Certification of Accounting Statement Accuracy</u>. (1) The Carrier shall certify the annual and fiscal year accounting statements in the form set forth in paragraph (c)(3) of this clause. The Carrier's chief executive officer and the chief financial officer shall sign the certificate.

(2) The Carrier shall require an authorized agent of its underwriter, if any, also to certify the annual accounting statement.

(3) The certificate required shall be in the following form:

CERTIFICATION OF ACCOUNTING
STATEMENT ACCURACY

This is to certify that I have reviewed this accounting statement and to the best of my knowledge and belief:

1. The statement was prepared in conformity with the guidelines issued by the Office of Personnel Management and fairly presents the financial results of this reporting period in conformity with those guidelines.

2. The costs included in the statement are actual, allowable, allocable, and reasonable in accordance with the terms of the contract and with the cost principles of the Federal Employees Health Benefits Acquisition Regulation and the Federal Acquisition Regulation;

3. Income, rebates, allowances, refunds and other credits made or owed in accordance with the terms of the contract and applicable cost principles have been included in the statement;

4. If applicable, the letter of credit account was managed in accordance with 5 CFR part 890, 48 CFR chapter 16, and OPM guidelines.

Carrier Name: _____

Name of Chief Executive Officer:
(Type or Print)

_____

Name of Chief Financial Officer:

_____

Signature of Chief Executive Officer:

_____

Signature of Chief Financial Officer:

_____

Date Signed:

_____

Date Signed:     _____
Underwriter:

_____

Name and Title of Responsible Corporate Official:
(Type or Print:)

_____

Signature of Responsible Corporate Official:

_____

Date Signed:_____

SECTION 3.3
SPECIAL RESERVE (JAN 2003)

(a)  This contract is experience rated.  The Special Reserve represents the cumulative difference between income to the plan (subscription income plus interest on investments [item (b)(2)(iii) in Section 3.2, *Accounting and Allowable Cost*, which also includes income gain or loss]) and plan expenses (benefit costs plus allowable administrative expenses and retentions). The Special Reserve held by or on behalf of the Carrier is to be used only for payment of charges against this contract.

(b)  If this contract is terminated or not renewed and there is a positive balance remaining in the Special Reserve after all allowable costs chargeable to the contract in accordance with Section 3.2 plus an agreed-upon amount of administrative expenses for contract liquidation have been paid. the balance of any funds held by the Carrier. including current income on its investment. shall be paid to OPM for credit to the Carrier's Contingency Reserve maintained by OPM when the Carrier submits its annual accounting statement for the final contract year.

(c)  The Carrier shall incorporate this clause in all agreements with underwriters of the Carrier's FEHB Plan.

SECTION 3.4
INVESTMENT INCOME (JAN 1998) (FEHBAR 1652.215-71)

(a)  The Carrier shall invest and reinvest all FEHB funds on hand that are in excess of the funds needed to promptly discharge the obligations incurred under this contract. The Carrier shall seek to maximize investment income with prudent consideration to the safety and liquidity of investments.

(b)  All investment income earned on FEHB funds shall be credited to the Special Reserve on behalf of the FEHBP.

(c)  When the Contracting Officer concludes that the Carrier failed to comply with paragraphs (a) or (b) of this clause, the Carrier shall credit the Special Reserve with investment income that would have been earned, at the rate(s) specified in paragraph (f) of this clause, had it not been for the Carrier's noncompliance.  "Failed to comply with paragraphs (a) or (b)" means:  (1) making any charges against the contract which are not allowable, allocable, or reasonable; or (2) failing to credit any income due the contract and/or failing to place excess funds, including subscription income and payments from OPM not needed to discharge promptly the obligations incurred under the contract, refunds, credits, payments, deposits, investment income earned, uncashed checks, or other amounts owed the Special Reserve, in income producing investments and accounts.

(d)  Investment income lost as a result of unallowable, unallocable, or unreasonable charges against the contract shall be paid from the first day of the contract term following the contract term in which the unallowable charge was made and shall end on the earlier of: (1) the date the amounts are returned to the Special Reserve (or the Office of Personnel Management); (2) the date specified by the Contracting Officer; or (3) the date of the Contracting Officer's Final Decision.

(e)  Investment income lost as a result of failure to credit income due the contract or failure to place excess funds in income producing investments and accounts shall be paid from the date the

funds should have been invested or appropriate income was not credited and shall end on the earlier of: (1) the date the amounts are returned to the Special Reserve (or the Office of Personnel Management); (2) the date specified by the Contracting Officer; or (3) the date of the Contracting Officer's Final Decision.

(f) The Carrier shall credit the Special Reserve for income due in accordance with this clause. All lost investment income payable shall bear simple interest at the quarterly rate determined by the Secretary of the Treasury under the authority of 26 U.S.C. 6621(a)(2) applicable to the periods in which the amount becomes due, as provided in paragraphs (d) and (e) of this clause.

(g) The Carrier shall incorporate this clause into agreements with underwriters of the Carrier's FEHB plan and shall substitute "underwriter" or other appropriate reference for the term "Carrier".

SECTION 3.5
NON-COMMINGLING OF FUNDS (JAN 1991) (FEHBAR 1652.232-72)

(a) The Carrier and/or its underwriter shall keep all FEHBP funds for this contract (cash and investments) physically separate from funds obtained from other sources. Accounting for such FEHBP funds shall not be based on allocations or other sharing mechanisms and shall agree with the Carrier's accounting records.

(b) In certain instances the physical separation of FEHBP funds may not be practical or desirable. In such cases, the Carrier may request a waiver from this requirement from the Contracting Officer. The waiver shall be requested in advance and the Carrier shall demonstrate that accounting techniques have been established that will clearly measure FEHBP cash and investment income (*i.e.*, subsidiary ledgers). Reconciliations between amounts reported and actual amounts shown in accounting records shall be provided as supporting schedules to the Annual Accounting Statements.

(c) The Carrier shall incorporate this clause in all subcontracts that exceed $25,000 and shall substitute "contractor" or other appropriate reference for "Carrier and/or its underwriter".

SECTION 3.6
UNCASHED CHECKS (JAN 1996)

Payment of checks issued pursuant to this contract shall be voided if the checks have been outstanding for two (2) years. The amounts represented by these checks shall be credited to the Special Reserve of this contract no later than the 25th month after issuance. The term "Check" shall include any written instrument issued to pay or reimburse the payment of benefits, or any services, supplies or subcontracts hereunder.

SECTION 3.7
SERVICE CHARGE (JAN 1996)

(a) Any service charge negotiated shall be set forth in Appendix B and shall be the total profit that can be charged to the contract. The amount set forth in Appendix B shall encompass all profit (whether entitled service charge, profit, fee, contribution to reserves or surpluses or any other title) that may be included in major subcontracts in accordance with the provisions of FEHBAR 1631.205-80, Major Subcontractor Service Charges.

(FFS-2013)

(b) One-twelfth of the service charge for the contract term accrues on the last day of each month during the contract term. The Carrier shall withdraw the service charge from the Special Reserve when it accrues.

(c) If this contract is renewed by operation of section 1.15(a), the amount of the service charge accrued under (b) shall be "one-twenty-fourth" rather than "one-twelfth." The remainder of the service charge not otherwise accrued during the contract term shall accrue on the last day of the contract term.

## SECTION 3.8
## CONTRACTOR RECORDS RETENTION (JUL 2005) (FEHBAR 1652.204-70)

Notwithstanding the provisions of Section 5.7 (FAR 52.215-2(f)). *Audit and Records - Negotiation* the Carrier will retain and make available all records applicable to a contract term that support the annual statement of operations and, for contracts that equal or exceed the threshold at FAR 15.403-4(a)(1). the rate submission for that contract term for a period of six years after the end of the contract term to which the records relate. This includes all records of Large Provider Agreements and subcontracts that equal or exceed the threshold requirements. In addition, individual Enrollee and/or patient claim records will be maintained for six years after the end of the contract term to which the claim records relate. This clause is effective prospectively as of the 2005 contract year.

## SECTION 3.9
## APPROVAL FOR ASSIGNMENT OF CLAIMS (JAN 1991) (FEHBAR 1652.232-73)

(a) Notwithstanding the provisions of Section 5.35 [FAR 52.232-23]. *Assignment of Claims*. the Carrier shall not make any assignment under the Assignment of Claims Act without the prior written approval of the Contracting Officer.

(b) Unless a different period is specified in the Contracting Officer's written approval, an assignment shall be in force only for a period of one year from the date of the Contracting Officer's approval. However, assignments may be renewed upon their expiration.

## SECTION 3.10
## AUDIT, FINANCIAL, AND OTHER INFORMATION  (JAN 2001)

The Carrier shall furnish to OPM audit, financial, and other information in the format and within the time frames specified in the Audit Guide for Financial Statement Audits, Reporting on Internal Controls and Compliance with Laws and Regulations, Attestation Reports, Agreed-Upon Procedures, and Reporting on Internal Controls of Third Party Servicing Organizations. Information and reports shall be furnished in the required number of copies to the addresses specified by OPM.

## SECTION 3.11
## SURVEY CHARGES (JAN 2002)

(a) If the Carrier participates in an FEHB annual consumer assessment survey, it shall pay OPM's contractor a pro rata share of the total cost of consolidating and reporting the survey

(FFS-2013)

results to OPM. The Carrier shall pay a separate fee for each plan option and /or rating area. The Carrier agrees to pay the contractor's invoice within 30 days of the billing date. If the Carrier does not remit payment to the contractor within 60 days of the billing date, OPM shall withhold the amount due from the Carrier's subscription charges according to FEHBAR 1652.232-71, Payments–experience-rated contracts, and forward payment to the contractor.

(b) Costs incurred by the Carrier for contracting with a vendor to conduct the survey shall be the Carrier's responsibility and constitute allowable administrative charges.

## SECTION 3.12
## FEHB CLEARINGHOUSE (JAN 2012)

(a) The FEHB Clearinghouse will facilitate the reconciliation of enrollments between carriers and Federal agencies, and between Carriers and Tribal Employers. The Carrier shall pay a pro rata share based on its proportion of FEHB premiums as determined by OPM for the cost of developing and operating the Clearinghouse.

(b) OPM shall withhold the amount due from the Carrier's subscription charges under the authority of FEHBAR 1652.232-71, Payments--Experience-Rated Contracts, and shall forward payment to the FEHB Clearinghouse.

## SECTION 3.13
## TAXPAYER IDENTIFICATION NUMBER (JAN 2000) (FEHBAR 1652.204-73)

*(a)    Definitions.*

*Common parent,* as used in this provision, means that corporate entity that owns or controls an affiliated group of corporations that files its Federal income tax returns on a consolidated basis, and of which the Carrier is a member.

*Taxpayer Identification Number (TIN),* as used in this provision, means the number required by the Internal Revenue Service (IRS) to be used by the Carrier in reporting income tax and other returns.

(b) The Carrier must submit the information required in paragraphs (d) through (f) of this clause to comply with debt collection requirements of 31 U.S.C. 7701(c) and 3325(d), reporting requirements of 26 U.S.C. 6041, 6041A, and 6050M, and implementing regulations issued by the IRS. The Carrier is subject to the payment reporting requirements described in Federal Acquisition Regulation (FAR) 4.904. The Carrier's failure or refusal to furnish the information will result in payment being withheld until the TIN number is provided.

(c) The Government may use the TIN to collect and report on any delinquent amounts arising out of the Carrier's relationship with the Government (31 U.S.C. 7701(c)(3)). The TIN provided hereunder may be matched with IRS records to verify its accuracy.

(d) Taxpayer Identification Number (TIN*).*
TIN: _____

(e) Type of organization.
☐        Sole proprietorship;
☐        Partnership;
☐        Corporate entity (not tax-exempt);
☐        Corporate entity (tax-exempt);
☐        Other_____.

(f) Common parent.

⸚ Carrier is not owned or controlled by a common parent as defined in paragraph (a) of this clause.

⸚ Name and TIN of common parent:

Name_____

TIN_____

SECTION 3.14
REPORTABLE OVERPAYMENTS (JAN 2011)

(a) If the Carrier becomes aware of either a duplicate letter of credit payment or a significant letter of credit overpayment made by OPM, the Carrier shall notify the Contracting Officer within a maximum of ten days and request instructions for disposition of the overpayment. See FAR § 3.1003(a)(3) for penalties applicable to the failure to timely report credible evidence of significant overpayments which shall mean letter of credit payments that are 25% or a percentage determined by the Contracting Officer above the total checks presented amount for the day(s) in question and are reoccurring with no corrective action plan in place.

SECTION 3.15
AUDIT RESOLUTIONS (JAN 2011)

When OIG issues a Draft Report of findings to the Carrier, the Carrier must respond with all available, accurate and relevant documentation to validate or invalidate the findings. This must be done within the timeframe specified in the OIG Draft Report transmittal letter. The Carriers shall promptly begin reconciling findings and not wait until the receipt of the Final Report to address disagreement with any findings previously communicated in the Draft Report.

OPM expects to fully resolve audits within 180 days of issuance of the final report. To enable this, Carriers must expeditiously tender all documentation necessary for resolution of the audit not later than 120 days from the date of the final audit report. This includes overpayment recoveries via check or certification, full documentation of the Carrier's position for findings being contested, evidence supporting due diligence assertions, and support for all other pertinent issues which OPM must consider, as appropriate. Fully supported requests for an extension will be evaluated by the Contracting Officer on a case-by-case basis.

SECTION 3.16 REPORTABLE FINDINGS (JAN 2013)

(a) Audit findings (except for claim payment findings) in the scope of an OIG audit are reportable as questioned charges unless the Carrier provides documentation supporting that the findings were already identified and corrected (i.e., administrative expense overcharges and untimely health benefit refunds were already processed and returned to the FEHBP) prior to audit notification.

(b) Claim payment findings (i.e., claim overpayments) in the scope of an OIG audit are reportable as questioned charges unless the Carrier provides documentation supporting that these findings were already identified (i.e., documentation that the plan initiated recovery efforts) prior

to audit notification and corrected (i.e.. claims were adjusted and/or voided and overpayments were recovered and returned to the FEHBP) by the original due date of the draft report response.

Part IV-SPECIAL PROVISIONS is deleted and replaced with the following:

SECTION 4.1
ALTERATIONS IN CONTRACT (JAN 2011) (FAR 52.252-4)

Portions of this contract are altered as follows:

(a) Section 1.6 Confidentiality of Records. The following subsection is added:

(d) Local Blue Cross and/or Blue Shield Plans may combine the personal data and medical records of Federal subscribers, and information relating thereto, with the same information of other individuals who have health benefits coverage under the Local Blue Cross and/or Blue Shield Plan. This combined data may only be used and disclosed for the Plan's health care operations and payment activities, as such terms and conditions are defined under the Health Insurance Portability and Accountability Act, and its implementing regulations (45 CFR § 164.501). Such activities include, but are not limited to: care management; prevention, detection, and recovery of funds subject to fraud and abuse; and negotiation of provider contracts.

(e) As used in subsection (b)(1) of this section, "administration of this contract" means health care operations and payment activities, as such terms and conditions are defined under the Health Insurance Portability and Accountability Act, and its implementing regulations (45 CFR § 164.501).

(b) Section 1.9 Plan Performance—Experience-Rated FFS Contracts.

The Carrier may use the appropriate systems for measurement and/or collection of data on the quality of the health care services as described in subparagraph 1.9(b).

(c) Section 1.14, Misleading, Deceptive, or Unfair Advertising, is amended by removing the reference to the NAIC Advertisements of Accident and Sickness Insurance Model Regulation (Appendix D-b). Carrier should continue to use the FEHB Supplemental Literature Guidelines (now at the renumbered Appendix C) along with FEHBAR 1603.7002.

(d) Section 1.15 Renewal and Withdrawal of Approval (FEHBAR). The following subsections are added:

(d) If the agency suspends payment of the subscription charges for any reason, the Carrier may (1) suspend making benefit payments until payment of all subscription charges due is fully restored; or (2) terminate the contract without prior notice.

(e) Section 1.21 Patient Bill of Rights. For the purpose of compliance with this Section, the Carrier will conduct the following minimum activities: (1) the Carrier will provide subscribers with a Fact Sheet that includes information about the disenrollment rate in the Blue Cross and Blue Shield Service Benefit Plan, as well as Local Plan-specific information including compliance with Federal and State financial requirements, public corporate information, years in existence, and accreditation status; (2) Provider

Directories will include language advising subscribers to contact their providers directly to obtain information about the providers, including but not limited to board certifications, languages spoken, availability of interpreters, facility accessibility, and whether the provider is accepting new patients.

(f) Section 1.30 Health Information Technology Privacy and Security. Subsections (b) and (c) of Section 1.30 are amended to read as follows:

(b) The Carrier will promote consumer transparency by ensuring that at the point where the Federal member enters the subcontractor's, large provider's, or vendor's website or web portal the link to the subcontractor's, large provider's, or vendor's notice of privacy practices and/or privacy policies is displayed on the bottom, or prominently displayed elsewhere, on the website or web portal.

(c) Notice of privacy practices and/or privacy policies disclosures must describe the uses of individually identifiable protected health information and any potential disclosure to other entities as described in the HIPAA Privacy Rule.

(g) Section 2.2 Benefits Provided. The following paragraph is added to subsection 2.2(a):

(4) The Carrier may pay the Preferred Provider Organization level of benefits under this contract to ease the hardship of members affected by natural disasters such as earthquakes, floods, etc., when because of the natural disaster members have difficulty gaining access to Preferred network providers. The Carrier may pay the Preferred level of benefits without regard to the provider's contractual relationship with the Carrier and will determine an appropriate time frame based on local conditions during which the provision of this paragraph will apply. Benefits provided under this paragraph will be made available to all members similarly affected by the natural disaster.

(h) Section 2.3 Payment of Benefits and Provision of Services and Supplies. Notwithstanding subsection (f) of Section 2.3, benefits provided under the contract are not assignable by the Member to any person without express written approval of the carrier, and in the absence of such approval, any such assignment shall be void. Notwithstanding such approval, no assignment of benefits may be made in any case prior to the time that a valid claim for benefits arises.

(i) Section 2.3 Payment of Benefits and Provision of Services and Supplies. The introductory paragraph of Subsection 2.3(g) is amended to read as follows:

(g) *Erroneous Payments.*
(i) If the Carrier or OPM determines that a Member's claim has been paid in error for any reason (except in the case of fraud or abuse), the Carrier shall make a prompt and diligent effort to recover the erroneous payment to the member from the member or, if to the provider, from the provider; the recovery of any overpayment must be treated as an erroneous benefit payment, overpayment, or duplicate payment under 48 C.F.R. 1631.201-70(h) regardless of any time period limitations in the written agreement with the provider.

(ii) The Carrier shall be deemed to have satisfied the requirements of

Subsection (g) (i) above by complying with Subsections (ii), (iii), and (iv). Local Blue Cross and Blue Shield Plans which have time period limitations in their provider contracts which prevent the Plan from recovering erroneous benefit payments made to providers will participate in an action plan. The action plan shall be developed by the Blue Cross and Blue Shield Association by December 31, 2008 and agreed to by the Contracting Officer and the Blue Cross and Blue Shield Association. The Blue Cross and Blue Shield Association and the Contracting Officer shall utilize standards of commercial reasonableness and neither shall unreasonably withhold agreement. The action plan shall be designed to reduce the occurrence of erroneous benefit payments, to identify and recover erroneous benefit payments within the time limits stipulated in their provider contracts, and to demonstrate due diligence in making an attempt to identify and recover within that provider contract timeframe such erroneous benefit payments.

(iii) The Blue Cross and Blue Shield Association shall be responsible for monitoring and determining whether each Blue Cross and Blue Shield Plan participating in the action plan is complying with its obligations under the action plan.

(iv) A Blue Cross and Blue Shield Plan which is in compliance with its obligations under the action plan shall be found to be in compliance with its obligation under this Section 2.3(g) to make a prompt and diligent effort to recover erroneous benefit payments. In the event that any Plan with such time period limitations is determined to be not in substantial compliance with the action plan, and that Plan is determined not to have pursued material benefit payments with promptness and diligence, then the Plan shall return the erroneous benefit payments to the Program.

(v) The Carrier shall follow general business practices and procedures in collecting debts owed under the Federal Employees Health Benefits Program. Prompt and diligent effort to recover erroneous payments means that upon discovering that an erroneous payment exists, the Carrier shall—

(j) Section 2.3 Payment of Benefits and Provision of Services and Supplies. Subsection (g)(7)(ii) of Section 2.3 is amended to read as follows:

Notwithstanding (g)(7)(i), the Carrier may not charge the contract for the administrative costs to correct erroneous benefit payments (or to correct processes or procedures that caused erroneous benefit payments) when the errors are egregious and repeated. These costs are deemed to be unreasonable and unallowable under Section 3.2(b). The term "repeated" in the previous sentence does not apply to situations in which a claims processing system error causes multiple erroneous payments or to situations that involve audit findings on errors that are endemic to the provision of insurance and claims processing.

(k) Section 2.3 Payment of Benefits and Provision of Services and Supplies. Subsection (g)(10) of Section 2.3 is amended to read as follows:

(10) In compliance with the Contracts Disputes Act, the Carrier shall return to the

Program an amount equal to the uncollected erroneous benefit payment where the Contracting Officer determines that the Carrier failed to make a prompt and diligent effort, as that term is described above, to recover the erroneous benefit payment. This provision applies to benefit payments which have been paid in error for any reason (except in the case of fraud or abuse).

(l) Section 2.4 Termination of Coverage and Conversion Privileges. The conversion contract set forth in Section 2.4(c) may be a contract that is regularly offered by the local Blue Cross and/or Blue Shield Plan.

(m) Section 2.5 Subrogation. The following subsections are added:

(c) To the extent that a Member has received benefits for covered services under this contract for an injury or illness caused by a third party, the Carrier shall have the right to be subrogated and succeed to any rights of recovery against any person or organization from whom the Member is legally entitled to receive all or part of those same benefits, including insurers of individuals (non-group) policies of liability insurance that are issued to and in the name of the Member. The obligation of the Carrier to recover amounts through subrogation is limited to making a reasonable effort to seek recovery of amounts to which it is entitled to recover in cases which are brought to its attention. The Carrier shall not be required to recover any amounts from any person or organization who causes an injury or illness for which the Member makes claims for benefits.

(d) The Carrier may also recover directly from the Member all amounts received by the Member by suit, settlement, or otherwise from any third party or its insurer, or the Member's insurer under an individual policy or liability insurance, for benefits which have also been paid under this contract.

(e) The Member shall take such action, furnish such information and assistance, and execute such papers as the Carrier or its representative believes are necessary to facilitate enforcement of its rights, and shall take no action which would prejudice the interests of the Carrier to subrogation.

(f) Effective January 1, 1997, all Participating Plans shall subrogate under a single, nation-wide policy to ensure equitable and consistent treatment for all Members under the contract.

(n) Section 2.6 Coordination of Benefits (FEHBAR). The following subsections are added:

(g) The benefits payable by this Plan shall be determined, on a claim by claim basis, only for those claims in excess of $100, except where Medicare is the primary payer of benefits.

(h) Whenever payments which should have been made under this contract in accordance with this provision have been made under any other group health coverage, the Carrier shall have the right, exercisable alone and in its sole discretion, to pay over to any organizations making such other payments any amount it shall determine to be

warranted in order to satisfy the intent of this provision, and amounts so paid shall be deemed to be benefits paid under this contract and, to the extent of such payments discharged from liability under the contract.

(o) Section 3.1 Payments (FEHBAR). The following sentence is added to the end of Section 3.1(a):

OPM will withhold from the subscription charges amounts for other obligations due under the contract only to the extent that OPM and the Carrier have agreed in writing to specific deductions for such other obligations.

(p) Section 3.1 Payments (FEHBAR). The following subsection is added:

(g) Except as required pursuant to Sections 1.25 and 2.12, in the event this contract is terminated or not renewed, the agency shall be liable for all sums due and unpaid, including subscription charges, for the period up to the last day of the Member's entitlement to benefits.

(q) Section 3.2 Accounting and Allowable Cost (FEHBAR). Section 3.2(b)(2)(ii) of this contract is amended to comply with 5 U.S.C. 8909(f) as follows:

(1) No tax, fee, or other monetary payment may be imposed, directly or indirectly, on a Carrier or an underwriting or plan administration subcontractor of an approved health benefits plan by any State, the District of Columbia, or the Commonwealth of Puerto Rico, or by any political subdivision or other governmental authority thereof, with respect to any payment made from the Fund.

(2) Paragraph (1) shall not be construed to exempt any Carrier or subcontractor of an approved health benefits plan from the imposition, payment, or collection of a tax, fee, or other monetary payment on the net income or profit accruing to or realized by such Carrier or underwriting or plan administration subcontractor from business conducted under this Chapter, if that tax, fee, or payment is applicable to a broad range of business activity.

(r) Section 3.2 Accounting and Allowable Cost (FEHBAR). The provision in Section 3.2 (b)(2)(iv)(A) is supplemented as follows:

Charges for mandatory statutory reserves (Section 3.2(b)(2)(iv)(A)) to satisfy mandatory statutory reserve requirements of Participating Plans are allowable to the extent that such requirements exceed that portion of the service charge at Appendix B, Subscription Rates, Charges, Allowances and Limitations applicable to such Plans.

(s) Section 3.2 Accounting and Allowable Cost (FEHBAR). This section is modified as follows:

The Carrier, as required by the Blue Cross and Blue Shield Service Benefit Plan Workplan, shall furnish OPM an accounting of its operations under the contract not less than 120 days after the end of the calendar year contract period.

(t) Section 3.3 Special Reserve. The provision in Section 3.3(a) is supplemented as follows:

The Special reserve held by or on behalf of the Carrier is to be used only for payment of charges against this contract, including advance payments to Participating Plans and to hospitals.

(u) Section 3.10, Audit, Financial, and Other Information. Compliance by the Carrier and Participating Blue Cross and Blue Shield Plans with the Blue Cross Blue Shield Service Benefit Plan Workplan, as agreed upon between the Carrier and OPM, will constitute compliance with the Audit Guide referred to in Sections 3.2 and 3.10.

SECTION 4.2
HOSPITAL (FACILITY) BENEFIT PAYMENTS AND CONDITIONS (JAN 1991)

(a) Benefits described in the agreed upon brochure text shall be provided to the extent practicable in the form of services rendered by hospitals, freestanding ambulatory facilities, and home health care agencies, and payment, therefore, by or on behalf of the carrier shall constitute a complete discharge of their obligations under this contract to the extent of services rendered in accordance with the terms and conditions of the contract.

(b) Benefits for inpatient hospital care shall be available only to a Member admitted to the hospital on the recommendation, and while under the active medical supervision of a duly licensed physician or alternative provider as described in section 8902(k)(1) of title 5 U.S.C. who is a member of the staff of, or acceptable to, the hospital selected.

(c) Hospital service is subject to all the rules and regulations of the hospital selected including rules governing admissions.

(d) While a Member may elect to be hospitalized in any hospital, the Carrier does not undertake to guarantee the admission of such Member to the hospital, nor the availability of any accommodations or services therein requested by the Member or his physician.

SECTION 4.3
DEFINITION OF CARRIER (JAN 1991)

The Carrier is the Blue Cross and Blue Shield Association, an Illinois not-for-profit corporation, acting on behalf of participating Blue Cross and Blue Shield Plans and pursuant to authority specified in Exhibit A for and in behalf of the organizations specified in Exhibit A (hereinafter sometimes referred to as "Participating Plans").

SECTION 4.4
AUDIT DISPUTES (JAN 2000)

(a) Any questioned costs or issues documented by or on behalf of OPM's Office of the Inspector General (OIG) in draft or final audit reports examining the Carrier's and Participating Plans' performance under this contract, that are provided to the Carrier and that were initially raised in the timeframe set forth in subsection (c) below, remain open until resolved. Audit issues related to monetary findings for which extensions of the

waiver period for the issuance of final decisions and processing of prior period adjustments were obtained in previous contract terms also remain open until resolved.

(b) Resolution of a questioned cost or issue can be the result of a resolution letter or the issuance of a final decision by the Contracting Officer, or by the processing of a prior period adjustment, an adjustment to the Special reserve, or submission of a claim to OPM (as appropriate) by the Carrier or Participating Plan. A prior period adjustment intended to partially or fully resolve an audit finding will not be considered closed until properly reported on the calendar year Annual Accounting Statement.

(c) A claim seeking, as a matter of right, the payment of money, in a sum certain, pursuant to 48 CFR section 52.233-1, shall not be made more than five years following the last day prescribed by the contract for filing the calendar year Annual Accounting Statement for the year with respect to which the claim arises. A claim includes, in the case of the carrier, a charge against the contract.

SECTION 4.5
ASSOCIATION DUES (JAN 2004)

A Participating local Blue Cross and Blue Shield Plan may charge to this contract Association Dues, with the exception of dues related to those lobbying costs and Special Assessments determined to be unallowable. In calculating the unallowable portion of dues related to lobbying costs for a contract year, the Blue Cross and Blue Shield Plan will rely on the percentage of dues, less any special assessments, as determined by the BCBSA for IRS purposes, to be not tax deductible from the previous contract year.

SECTION 4.6
TRAVEL COSTS (JAN 1996)

The Carrier may charge and account for travel expenses related to administration of the contract on a per diem basis, subject to the maximums prescribed by the Federal Travel Regulations. For those travel costs for each contract term that are subject to the Federal per diem rates set forth at 48 CFR section 31.205-46, the Carrier shall charge to the contract an amount equal to the lesser of:

(i) the actual aggregate charges for those costs, or
(ii) the aggregate charges calculated using the per diem rates set forth in the Federal Travel Regulations.

SECTION 4.7
MARKET RESEARCH COSTS (JAN 1996)

(a) Costs of market research surveys or studies are generally allowable if the survey or study is:

1. directed to current Members and Members who left the Blue Cross and Blue Shield Service Benefit Plan in the most recent Open season, or
2. focused on long-range planning, industry state-of-the-art developments, or product development issues for which a direct benefit or potential benefit to the FEHB Program

can be identified, or
3. pre-approved by the Contracting Officer.

(b) Costs of market research surveys or studies are generally not allowable if the primary purpose is to survey or study an otherwise unallowable cost item, such as: to determine the effectiveness of advertising or sales strategies; to evaluate image effectiveness or ways to achieve image enhancement; or to perform a competitive analysis with other carriers in the FEHB Program. Such costs are unallowable, regardless of who receives the research surveys or studies.

(c) This provision does not supersede other contract requirements, such as prior approval for subcontracts under Section 1.16 Subcontracts (FEHBAR 1652.244-70).

SECTION 4.8
PRESCRIPTION DRUG BENEFITS WAIVER PROVISIONS (JAN 2009)

(a) For the purposes of applying the special provisions in this section, the Standard Option Mail Service Prescription Drug Program service standards are:
    (1) When a prescription order is placed that does not require additional information or clarification (i.e., a clean or non-diverted prescription), the prescription order shall be dispensed within three business days from the date of receipt so the enrollee may expect to receive the medication within 7 calendar days.

    (2) When a prescription order is placed that does require additional information, clarification or resolution of payment issues (i.e., a diverted prescription), the prescription order shall be dispensed within seven business days from the date of receipt so the enrollee may expect to receive the medication within 14 calendar days. However the following situations will not be considered a diverted prescription for the purposes of this section:
    (i) Prescriptions for refrigerated products that require prior arrangements between the mail order pharmacy and a Member before the Member can receive the Prescription;
    (ii) Prescriptions requiring specific counseling obligations imposed by the pharmaceutical manufacturer, distributor or the FDA;
    (iii) Prescriptions requiring "registration" with a pharmaceutical manufacturer.

(b) The special provisions described in paragraphs (c)(1), (2), and (3) shall become effective automatically when less than 98 percent of the prescriptions are filled within the service standards described in either paragraph (a)(1) or (a)(2) for 7 consecutive business days. The special provisions shall terminate when for 7 consecutive business days 98 percent or more of the prescriptions are filled within the service standards described in paragraphs (a)(1) and (a)(2) of this section.

(c) The special provisions are:
    (1) The Carrier shall waive during the effective periods in paragraph (b) the coinsurance for a 21 day prescription filled at a Preferred retail pharmacy when the Mail Service Prescription Drug Program vendor is unable to fill the prescription within the service standards. This waiver of the coinsurance shall be in effect for 14 calendar days after notice to the enrollee as described in paragraph (c)(2) below.

(2) The Carrier shall deliver to the enrollee a written or telephone notice no later than 5 days from the date of receipt for clean or non-diverted prescriptions and no later than 12 days from the date of receipt for diverted prescriptions.
This notice shall:

(i) advise the enrollee that the Mail Service Prescription Drug Program may not be able to fill the prescription(s) within the service standard timeframes;

(ii) advise the enrollee that any applicable coinsurance will be waived for a 21 day supply of the medication(s) when filled at a Preferred retail pharmacy;

(iii) provide the enrollee with instructions on how to use the waiver, and

(iv) advise the enrollee when the waiver will expire.

(3) The Carrier may use next day delivery service at no additional cost to the enrollee in order to meet the service standards in (a)(1) and (a)(2).

SECTION 4.9
SMALL BUSINESS SUBCONTRACTING PLAN (JAN 2002) (FAR 52.219-9) (AS AMENDED)

An amended clause 52.219-9, Small Business Subcontracting Plan, is attached to Appendix E.

SECTION 4.10
LETTER OF CREDIT (JAN 1997)

As of January 1, 1997, OPM will administer Letter of Credit drawdowns directly with the local Plans.

SECTION 4.11
PILOTING OF COST CONTAINMENT PROGRAMS (JAN 2001)

Upon approval by the Contracting Officer, the Carrier may design and implement pilot programs in one or more local Plan areas that test the feasibility and examine the impact of various managed care initiatives. The Carrier shall brief the Contracting Officer on a pilot program prior to its implementation, advise the Contracting Officer of the progress of the pilot program and provide a written evaluation at the conclusion of the pilot program. The evaluation of the pilot program shall, at a minimum, assess the cost effectiveness, effect on quality of care and/or quality of life, and customer satisfaction, and recommend whether the pilot program should be continued or expanded.

SECTION 4.12
TRANSITION COSTS FOR PLAN TERMINATIONS (JAN 1999)

In the event a Participating Plan's license to use the Blue Cross and/or Blue Shield service marks is terminated, thereby rendering it ineligible to participate in this Contract, the costs of transitioning the terminated Plan's Service Benefit Plan subscribers to a successor Plan shall be subject to advance approval. The Carrier shall submit to OPM a proposed transition plan, together with a detailed estimate of costs, prior to the incurrence of any significant transition costs. OPM and the Carrier shall negotiate an advance agreement pursuant to FAR 31.109 that covers the extent of allowable transition costs.

SECTION 4.13
PAYMENT BY ELECTRONIC FUNDS TRANSFER-CENTRAL CONTRACTOR
REGISTRATION (MAY 1999) (FAR 52.232-33)

The references to the Central Contractor Registration in FAR 52.232-33 are not applicable to this contract.

SECTION 5.1
DEFINITIONS (JAN 2012) (FAR 52.202-1)

a) When a solicitation provision or contract clause uses a word or term that is defined in the Federal Acquisition Regulation (FAR), the word or term has the same meaning as the definition in FAR 2.101 in effect at the time the solicitation was issued, unless—
    (1) The solicitation, or amended solicitation, provides a different definition;
    (2) The contracting parties agree to a different definition;
    (3) The part, subpart, or section of the FAR where the provision or clause is prescribed provides a different meaning; or
    (4) The word or term is defined in FAR Part 31, for use in the cost principles and procedures.

b) The FAR Index is a guide to words and terms the FAR defines and shows where each definition is located. The FAR Index is available via the Internet at https://www.acquisition.gov/far at the end of the FAR, after the FAR Appendix.

SECTION 5.2
[RESERVED]

SECTION 5.3
GRATUITIES (APR 1984) (FAR 52.203-3)

(a) The right of the Contractor to proceed may be terminated by written notice if, after notice and hearing, the agency head or a designee determines that the Contractor, its agent, or another representative -
(1) Offered or gave a gratuity (e.g., an entertainment or gift) to an officer, official, or employee of the Government; and
(2) Intended, by the gratuity, to obtain a contract or favorable treatment under a contract.
(b) The facts supporting this determination may be reviewed by any court having lawful jurisdiction.
(c) If this contract is terminated under paragraph (a) above, the Government is entitled -
(1) To pursue the same remedies as in a breach of the contract; and
(2) In addition to any other damages provided by law, to exemplary damages of not less than 3 nor more than 10 times the cost incurred by the Contractor in giving gratuities to the person concerned, as determined by the agency head or a designee. (This subparagraph (c)(2) is applicable only if this contract uses money appropriated to the Department of Defense.)
(d) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

SECTION 5.4
COVENANT AGAINST CONTINGENT FEES (APR 1984) (FAR 52.203-5)

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 66 of 137 (FEB 2013)

(a) The Contractor warrants that no person or agency has been employed or retained to solicit or obtain this contract upon an agreement or understanding for a contingent fee, except a bona fide employee or agency. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or, in its discretion, to deduct from the contract price or consideration, or otherwise recover, the full amount of the contingent fee.

(b) "Bona fide agency," as used in this clause, means an established commercial or selling agency, maintained by a contractor for the purpose of securing business, that neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds itself out as being able to obtain any Government contract or contracts through improper influence.

"Bona fide employee," as used in this clause, means a person, employed by a contractor and subject to the contractor's supervision and control as to time, place, and manner of performance, who neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds out as being able to obtain any Government contract or contracts through improper influence.

"Contingent fee", as used in this clause, means any commission, percentage, brokerage, or other fee that is contingent upon the success that a person or concern has in securing a Government contract.

"Improper influence," as used in this clause, means any influence that induces or tends to induce a Government employee or officer to give consideration or to act regarding a Government contract on any basis other than the merits of the matter.

SECTION 5.5
ANTI-KICKBACK PROCEDURES (OCT 2010) (FAR 52.203-7)

(a) Definitions.
"Kickback," as used in this clause, means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime Contractor, prime Contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

"Person," as used in this clause, means a corporation, partnership, business association of any kind, trust, joint-stock company, or individual.

"Prime contract," as used in this clause, means a contract or contractual action entered into by the United States for the purpose of obtaining supplies, materials, equipment, or services of any kind.

"Prime Contractor," as used in this clause, means a person who has entered into a prime contract with the United States.

"Prime Contractor employee," as used in this clause, means any officer, partner, employee, or agent of a prime Contractor.

"Subcontract," as used in this clause, means a contract or contractual action entered into by a prime Contractor or subcontractor for the purpose of obtaining supplies, materials, equipment, or services of any kind under a prime contract.

"Subcontractor," as used in this clause, (1) means any person, other than the prime Contractor, who offers to furnish or furnishes any supplies, materials, equipment, or services of any kind under a prime contract or a subcontract entered into in connection with such prime contract, and (2) includes any person who offers to furnish or furnishes general supplies to the prime

V-2                                                                    (FEB 2013)

Contractor or a higher tier subcontractor.

"Subcontractor employee." as used in this clause, means any officer, partner, employee, or agent of a subcontractor.

(b) The Anti-Kickback Act of 1986 (41 U.S.C. 51-58) (the Act), prohibits any person from --

(1) Providing or attempting to provide or offering to provide any kickback;

(2) Soliciting, accepting, or attempting to accept any kickback; or

(3) Including, directly or indirectly, the amount of any kickback in the contract price charged by a prime Contractor to the United States or in the contract price charged by a subcontractor to a prime Contractor or higher tier subcontractor.

(c)(1) The Contractor shall have in place and follow reasonable procedures designed to prevent and detect possible violations described in paragraph (b) of this clause in its own operations and direct business relationships.

(2) When the Contractor has reasonable grounds to believe that a violation described in paragraph (b) of this clause may have occurred, the Contractor shall promptly report in writing the possible violation. Such reports shall be made to the inspector general of the contracting agency, the head of the contracting agency if the agency does not have an inspector general, or the Department of Justice.

(3) The Contractor shall cooperate fully with any Federal agency investigating a possible violation described in paragraph (b) of this clause.

(4) The Contracting Officer may (i) offset the amount of the kickback against any monies owed by the United States under the prime contract and/or (ii) direct that the Prime Contractor withhold, from sums owed a subcontractor under the prime contract, the amount of the kickback. The Contracting Officer may order the monies withheld under division (c)(4)(ii) of this clause be paid over to the Government unless the Government has already offset those monies under subdivision (c)(4)(i) of this clause. In either case, the Prime Contractor shall notify the Contracting Officer when the monies are withheld.

(5) The Contractor agrees to incorporate the substance of this clause, including this paragraph (c)(5) but excepting paragraph (c)(1), in all subcontracts under this contract which exceed $150,000.

SECTION 5.6
[RESERVED]

SECTION 5.7
AUDIT AND RECORDS-NEGOTIATION (OCT 2010) (FAR 52.215-2)

(a) As used in this clause, "records" includes books, documents, accounting procedures and practices, and other data, regardless of type and regardless of whether such items are in written form, in the form of computer data, or in any other form.

(b) *Examination of costs*. If this is a cost- reimbursement, incentive, time-and-materials, labor-hour, or price redeterminable contract, or any combination of these, the Contractor shall maintain and the Contracting Officer, or an authorized representative of the Contracting Officer, shall have the right to examine and audit all records and other evidence sufficient to reflect properly all costs claimed to have been incurred or anticipated to be incurred directly or indirectly in performance of this contract. This right of examination shall include inspection at all reasonable times of the Contractor's plants, or parts of them, engaged in performing the

V-3                                                                                           (FFS 2013)

contract.

(c) *Certified cost or pricing data.* If the Contractor has been required to submit certified cost or pricing data in connection with any pricing action relating to this contract, the Contracting Officer, or an authorized representative of the Contracting Officer, in order to evaluate the accuracy, completeness, and currency of the certified cost or pricing data, shall have the right to examine and audit all of the Contractor's records, including computations and projections, related to--

(1) The proposal for the contract, subcontract, or modification;

(2) The discussions conducted on the proposal(s), including those related to negotiating;

(3) Pricing of the contract, subcontract, or modification; or

(4) Performance of the contract, subcontract or modification.

(d) *Comptroller General* -- (1) The Comptroller General of the United States, or an authorized representative, shall have access to and the right to examine any of the Contractor's directly pertinent records involving transactions related to this contract or a subcontract hereunder and to interview any current employee regarding such transactions.

(2) This paragraph may not be construed to require the Contractor or subcontractor to create or maintain any record that the Contractor or subcontractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e) *Reports.* If the Contractor is required to furnish cost, funding, or performance reports, the Contracting Officer or an authorized representative of the Contracting Officer shall have the right to examine and audit the supporting records and materials, for the purpose of evaluating-- (1) The effectiveness of the Contractor's policies and procedures to produce data compatible with the objectives of these reports and (2) The data reported.

(f) *Availability.* The Contractor shall make available at its office at all reasonable times the records, materials, and other evidence described in paragraphs (a), (b), (c), (d), and (e) of this clause, for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in Subpart 4.7, Contractor Records Retention, of the Federal Acquisition Regulation (FAR), or for any longer period required by statute or by other clauses of this contract. In addition--(1) If this contract is completely or partially terminated, the Contractor shall make available the records relating to the work terminated until 3 years after any resulting final termination settlement; and (2) The Contractor shall make available records relating to appeals under the Disputes clause or to litigation or the settlement of claims arising under or relating to this contract until such appeals, litigation, or claims are finally resolved.

(g) The Contractor shall insert a clause containing all the terms of this clause, including this paragraph (g), in all subcontracts under this contract that exceed the simplified acquisition threshold and--

(1) That are cost-reimbursement, incentive, time-and-materials, labor-hour, or price-redeterminable type or any combination of these;

(2) For which certified cost or pricing data are required; or

(3) That require the subcontractor to furnish reports as discussed in paragraph (e) of this clause.

The clause may be altered only as necessary to identify properly the contracting parties and the Contracting Officer under the Government prime contract.

SECTION 5.8
PRICE REDUCTION FOR DEFECTIVE CERTIFIED COST OR PRICING DATA (AUG

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 69 of 137

(a) If any price, including profit or fee, negotiated in connection with this contract, or any cost reimbursable under this contract, was increased by any significant amount because (1) the Contractor or a subcontractor furnished certified cost or pricing data that were not complete, accurate, and current as certified in its Certificate of Current Cost or Pricing Data, (2) a subcontractor or prospective subcontractor furnished the Contractor certified cost or pricing data that were not complete, accurate, and current as certified in the Contractor's Certificate of Current Cost or Pricing Data, or (3) any of these parties furnished data of any description that were not accurate, the price or cost shall be reduced accordingly and the contract shall be modified to reflect the reduction.

(b) Any reduction in the contract price under paragraph (a) of this clause due to defective data from a prospective subcontractor that was not subsequently awarded the subcontract shall be limited to the amount, plus applicable overhead and profit markup, by which (1) the actual subcontract; or (2) the actual cost to the Contractor, if there was no subcontract, was less than the prospective subcontract cost estimate submitted by the Contractor; provided, that the actual subcontract price was not itself affected by defective certified cost or pricing data.

(c)(1) If the Contracting Officer determines under paragraph (a) of this clause that a price or cost reduction should be made, the Contractor agrees not to raise the following matters as a defense:

(i) The Contractor or subcontractor was a sole source supplier or otherwise was in a superior bargaining position and thus the price of the contract would not have been modified even if accurate, complete, and current certified cost of pricing data had been submitted;

(ii) The Contracting Officer should have known that the certified cost or pricing data in issue were defective even though the Contractor or subcontractor took no affirmative action to bring the character of the data to the attention of the Contracting Officer;

(iii) The contract was based on an agreement about the total cost of the contract and there was no agreement about the cost of each item procured under the contract; or

(iv) The Contractor or subcontractor did not submit a Certificate of Current Cost or Pricing Data.

(2)(i) Except as prohibited by subdivision (c)(2)(ii) of this clause, an offset in an amount determined appropriate by the Contracting Officer based upon the facts shall be allowed against the amount of a contract price reduction if--

(A) The Contractor certifies to the Contracting Officer that, to the best of the Contractor's knowledge and belief, the Contractor is entitled to the offset in the amount requested; and

(B) The Contractor proves that the certified cost or pricing data were available before the "as of" date specified on its Certificate of Current Cost or Pricing Data, and that the data were not submitted before such date.

(ii) An offset shall not be allowed if--

(A) The understated data were known by the Contractor to be understated before the "as of" date specified on its Certificate of Current Cost or Pricing Data; or

(B) The Government proves that the facts demonstrate that the contract price would not have increased in the amount to be offset even if the available data had been submitted before the "as of" date specified on its Certificate of Current Cost or Pricing Data.

(d) If any reduction in the contract price under this clause reduces the price of items for which payment was made prior to the date of the modification reflecting the price reduction, the

V-5 (FFS 2013)

Contractor shall be liable to and shall pay the United States at the time such overpayment is repaid--

(1) Interest compounded daily, as required by 26 U.S.C. 6622, on the amount of such overpayment to be computed from the date(s) of overpayment to the Contractor to the date the Government is repaid by the Contractor at the applicable underpayment rate effective for each quarter prescribed by the Secretary of the Treasury under 26 U.S.C. 6621(a)(2); and

(2) A penalty equal to the amount of the overpayment, if the Contractor or subcontractor knowingly submitted certified cost or pricing data which were incomplete, inaccurate, or noncurrent.

SECTION 5.9
[RESERVED]

SECTION 5.10
SUBCONTRACTOR CERTIFIED COST OR PRICING DATA (OCT 2010) (FAR 52.215-12)

(a) Before awarding any subcontract expected to exceed the threshold for submission of certified cost or pricing data at FAR 15.403-4, on the date of agreement on price or the date of award, whichever is later; or before pricing any subcontract modification involving a pricing adjustment expected to exceed the threshold for submission of certified cost or pricing data at FAR 15.403-4, the Contractor shall require the subcontractor to submit certified cost or pricing data (actually or by specific identification in writing), unless an exception under FAR 15.403-1 applies.

(b) The Contractor shall require the subcontractor to certify in substantially the form prescribed in FAR 15.406-2 that, to the best of its knowledge and belief, the data submitted under paragraph (a) of this clause were accurate, complete, and current as of the date of agreement on the negotiated price of the subcontract or subcontract modification.

(c) In each subcontract that exceeds the threshold for submission of certified cost or pricing data at FAR 15.403-4, when entered into, the Contractor shall insert either --

(1) The substance of this clause, including this paragraph (c), if paragraph (a) of this clause requires submission of certified cost or pricing data for the subcontract; or

(2) The substance of the clause at FAR 52.215-13, Subcontractor Certified Cost or Pricing Data - Modifications.

SECTION 5.11
[RESERVED]

SECTION 5.12
[RESERVED]

SECTION 5.13
[RESERVED]

SECTION 5.14
UTILIZATION OF SMALL BUSINESS CONCERNS[1] (JAN 2011) (FAR 52.219-8)

---

[1] Section 5.14 only applies to plans participating in the small business pilot (none are experience-rated HMOs).

V-6                                    (FFS 2013)

(a) It is the policy of the United States that small business concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns, HUBZone small business concerns, small disadvantaged business concerns, and women-owned small business concerns shall have the maximum practicable opportunity to participate in performing contracts let by any Federal agency, including contracts and subcontracts for subsystems, assemblies, components, and related services for major systems. It is further the policy of the United States that its prime contractors establish procedures to ensure the timely payment of amounts due pursuant to the terms of their subcontracts with small business concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns, HUBZone small business concerns, small disadvantaged business concerns, and women-owned small business concerns.

(b) The Contractor hereby agrees to carry out this policy in the awarding of subcontracts to the fullest extent consistent with efficient contract performance. The Contractor further agrees to cooperate in any studies or surveys as may be conducted by the United States Small Business Administration or the awarding agency of the United States as may be necessary to determine the extent of the Contractor's compliance with this clause.

(c) *Definitions*. As used in this contract--

"HUBZone small business concern" means a small business concern that appears on the List of Qualified HUBZone Small Business Concerns maintained by the Small Business Administration.

"Service-disabled veteran-owned small business concern"--

(1) Means a small business concern--

(i) Not less than 51 percent of which is owned by one or more service-disabled veterans or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more service-disabled veterans; and

(ii) The management and daily business operations of which are controlled by one or more service-disabled veterans or, in the case of a veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran.

(2) Service-disabled veteran means a veteran, as defined in 38 U.S.C. 101(2), with a disability that is service-connected, as defined in 38 U.S.C. 101(16).

"Small business concern" means a small business as defined pursuant to Section 3 of the Small Business Act and relevant regulations promulgated pursuant thereto.

"Small disadvantaged business concern" means a small business concern that represents, as part of its offer that--

(1)(i) It has received certification as a small disadvantaged business concern consistent with 13 CFR part 124, Subpart B;

(1)(ii) No material change in disadvantaged ownership and control has occurred since its certification;

(1)(iii) Where the concern is owned by one or more individuals, the net worth of each individual upon whom the certification is based does not exceed $750,000 after taking into account the applicable exclusions set forth at 13 CFR 124.104(c)(2); and

(1)(iv) It is identified, on the date of its representation, as a certified small disadvantaged business in the CCR Dynamic Small Business Search database maintained by the Small Business Administration, or

(FFS-2013)

(2) It represents in writing that it qualifies as a small disadvantaged business (SDB) for any Federal subcontracting program, and believes in good faith that it is owned and controlled by one or more socially and economically disadvantaged individuals and meets the SDB eligibility criteria of 13 CFR 124.1002.

"Veteran-owned small business concern" means a small business concern--

(1) Not less than 51 percent of which is owned by one or more veterans (as defined at 38 U.S.C. 101(2)) or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more veterans; and

(2) The management and daily business operations of which are controlled by one or more veterans.

"Women-owned small business concern" means a small business concern--

(1) That is at least 51 percent owned by one or more women, or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women; and

(2) Whose management and daily business operations are controlled by one or more women.

(d)(1) Contractors acting in good faith may rely on written representations by their subcontractors regarding their status as a small business concern, a veteran-owned small business concern, a service-disabled veteran-owned small business concern, a HUBZone small business concern, a small disadvantaged business concern, or a women-owned small business concern.

(2) The Contractor shall confirm that a subcontractor representing itself as a HUBZone small business concern is certified by SBA as a HUBZone small business concern by accessing the Central Contractor Registration (CCR) database or by contacting the SBA. Options for contacting the SBA include—

(i) HUBZone small business database search application web page at http://dsbs.sba.gov/dsbs/search/dsp_searchhubzone.cfm; or http://www.sba.gov/hubzone;

(ii) In writing to the Director/HUB, U.S. Small Business Administration, 409 3rd Street, SW., Washington, DC 20416; or

(iii) The SBA HUBZone Help Desk at hubzone@sba.gov.


SECTION 5.15
[RESERVED]

SECTION 5.16
[RESERVED]

SECTION 5.17
CONVICT LABOR (JUN 2003) (FAR 52.222-3)

(a) Except as provided in paragraph (b) of this clause, the Contractor shall not employ in the performance of this contract any person undergoing a sentence of imprisonment imposed by any court of a State, the District of Columbia, Puerto Rico, the Northern Mariana Islands, American Samoa, Guam, or the U.S. Virgin Islands.

(b) The Contractor is not prohibited from employing persons-

(1) On parole or probation to work at paid employment during the term of their sentence;

(2) Who have been pardoned or who have served their terms; or

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 73 of 137

(3) Confined for violation of the laws of any of the States, the District of Columbia, Puerto Rico, the Northern Mariana Islands, American Samoa, Guam, or the U.S. Virgin Islands who are authorized to work at paid employment in the community under the laws of such jurisdiction, if-

(i) The worker is paid or is in an approved work training program on a voluntary basis;

(ii) Representatives of local union central bodies or similar labor union organizations have been consulted;

(iii) Such paid employment will not result in the displacement of employed workers, or be applied in skills, crafts, or trades in which there is a surplus of available gainful labor in the locality, or impair existing contracts for services:

(iv) The rates of pay and other conditions of employment will not be less than those paid or provided for work of a similar nature in the locality in which the work is being performed; and

(v) The Attorney General of the United States has certified that the work-release laws or regulations of the jurisdiction involved are in conformity with the requirements of Executive Order 11755, as amended by Executive Orders 12608 and 12943.

SECTION 5.18
CONTRACT WORK HOURS AND SAFETY STANDARDS ACT -- OVERTIME COMPEN-
SATION (JUL 2005) (FAR 52.222-4)

(a) *Overtime requirements.* No Contractor or subcontractor employing laborers or mechanics (see Federal Acquisition Regulation 22.300) shall require or permit them to work over 40 hours in any workweek unless they are paid at least 1 and ½ times the basic rate of pay for each hour worked over 40 hours.

(b) *Violation; liability for unpaid wages; liquidated damages.* The responsible Contractor and subcontractor are liable for unpaid wages if they violate the terms in paragraph (a) of this clause. In addition, the Contractor and subcontractor are liable for liquidated damages payable to the Government. The Contracting Officer will assess liquidated damages at the rate of $10 per affected employee for each calendar day on which the employer required or permitted the employee to work in excess of the standard workweek of 40 hours without paying overtime wages required by the Contract Work Hours and Safety Standards Act.

(c) *Withholding for unpaid wages and liquidated damages.* The Contracting Officer will withhold from payments due under the contract sufficient funds required to satisfy any Contractor or subcontractor liabilities for unpaid wages and liquidated damages. If amounts withheld under the contract are insufficient to satisfy Contractor or subcontractor liabilities, the Contracting Officer will withhold payments from other Federal or federally assisted contracts held by the same Contractor that are subject to the Contract Work Hours and Safety Standards Act.

(d) *Payrolls and basic records.* (1) The Contractor and its subcontractors shall maintain payrolls and basic payroll records for all laborers and mechanics working on the contract during the contract and shall make them available to the Government until 3 years after contract completion. The records shall contain the name and address of each employee, social security number, labor classifications, hourly rates of wages paid, daily and weekly number of hours worked, deductions made, and actual wages paid. The records need not duplicate those required for construction work by Department of Labor regulations at 29 CFR 5.5(a)(3) implementing the Davis-Bacon Act.

(FFS-2013)
Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 74 of 137

(2) The contractor and its subcontractors shall allow authorized representatives of the Contracting Officer or the Department of Labor to inspect, copy, or transcribe records maintained under paragraph (d)(1) of this clause. The Contractor or subcontractor also shall allow authorized representatives of the Contracting Officer or Department of Labor to interview employees in the workplace during working hours.

(e) *Subcontracts.* The Contractor shall insert the provisions set forth in paragraphs (a) through (d) of this clause in subcontracts that may require or involve the employment of laborers and mechanics and require subcontractors to include these provisions in any such lower tier subcontracts. The Contractor shall be responsible for compliance by any subcontractor or lower-tier subcontractor with the provisions set forth in paragraphs (a) through (d) of this clause.

SECTION 5.19
EQUAL OPPORTUNITY (MAR 2007) (FAR 52.222-26)

(a) *Definition.* "United States," as used in this clause, means the 50 States, the District of Columbia, Puerto Rico, the Northern Mariana Islands, American Samoa, Guam, the U.S. Virgin Islands, and Wake Island.

(b)(1) If, during any 12-month period (including the 12 months preceding the award of this contract), the Contractor has been or is awarded nonexempt Federal contracts and/or subcontracts that have an aggregate value in excess of $10,000, the Contractor shall comply with this clause, except for work performed outside the United States by employees who were not recruited within the United States. Upon request, the Contractor shall provide information necessary to determine the applicability of this clause.

(2) If the Contractor is a religious corporation, association, educational institution, or society, the requirements of this clause do not apply with respect to the employment of individuals of a particular religion to perform work connected with the carrying on of the Contractor's activities (41 CFR 60-1.5).

(c)(1) The Contractor shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. However, it shall not be a violation of this clause for the Contractor to extend a publicly announced preference in employment to Indians living on or near an Indian reservation, in connection with employment opportunities on or near an Indian reservation, as permitted by 41 CFR 60-1.5.

(2) The Contractor shall take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. This shall include, but not be limited to—

(i) Employment;
(ii) Upgrading;
(iii) Demotion;
(iv) Transfer;
(v) Recruitment or recruitment advertising;
(vi) Layoff or termination;
(vii) Rates of pay or other forms of compensation; and
(viii) Selection for training, including apprenticeship.

(3) The Contractor shall post in conspicuous places available to employees and applicants for employment the notices to be provided by the Contracting Officer that explain this clause.

(4) The Contractor shall, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

(5) The Contractor shall send, to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, the notice to be provided by the Contracting Officer advising the labor union or workers' representative of the Contractor's commitments under this clause, and post copies of the notice in conspicuous places available to employees and applicants for employment.

(6) The Contractor shall comply with Executive Order 11246, as amended, and the rules, regulations, and orders of the Secretary of Labor.

(7) The Contractor shall furnish to the contracting agency all information required by Executive Order 11246, as amended, and by the rules, regulations, and orders of the Secretary of Labor. The Contractor shall also file Standard Form 100 (EEO-1), or any successor form, as prescribed in 41 CFR Part 60-1. Unless the Contractor has filed within the 12 months preceding the date of contract award, the Contractor shall, within 30 days after contract award, apply to either the regional Office of Federal Contract Compliance Programs (OFCCP) or the local office of the Equal Employment Opportunity Commission for the necessary forms.

(8) The Contractor shall permit access to its premises, during normal business hours, by the contracting agency or the OFCCP for the purpose of conducting on-site compliance evaluations and complaint investigations. The Contractor shall permit the Government to inspect and copy any books, accounts, records (including computerized records), and other material that may be relevant to the matter under investigation and pertinent to compliance with Executive Order 11246, as amended, and rules and regulations that implement the Executive Order.

(9) If the OFCCP determines that the Contractor is not in compliance with this clause or any rule, regulation, or order of the Secretary of Labor, this contract may be canceled, terminated, or suspended in whole or in part and the Contractor may be declared ineligible for further Government contracts, under the procedures authorized in Executive Order 11246, as amended. In addition, sanctions may be imposed and remedies invoked against the Contractor as provided in Executive Order 11246, as amended; in the rules, regulations, and orders of the Secretary of Labor; or as otherwise provided by law.

(10) The Contractor shall include the terms and conditions of this clause in every subcontract or purchase order that is not exempted by the rules, regulations, or orders of the Secretary of Labor issued under Executive Order 11246, as amended, so that these terms and conditions will be binding upon each subcontractor or vendor.

(11) The Contractor shall take such action with respect to any subcontract or purchase order as the Contracting Officer may direct as a means of enforcing these terms and conditions, including sanctions for noncompliance, provided, that if the Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of any direction, the Contractor may request the United States to enter into the litigation to protect the interests of the United States.

(d) Notwithstanding any other clause in this contract, disputes relative to this clause will be governed by the procedures in 41 CFR 60-1.1.

SECTION 5.20
[RESERVED]

SECTION 5.21

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 76 of 137

NOTIFICATION OF VISA DENIAL (JUN 2003) (FAR 52.222-29)

It is a violation of Executive Order 11246 for a Contractor to refuse to employ any applicant or not to assign any person hired in the United States, Puerto Rico, the Northern Mariana Islands, American Samoa, Guam, the U.S. Virgin Islands, or Wake Island on the basis that the individual's race, color, religion, sex, or national origin is not compatible with the policies of the country where the work is to be performed or for whom the work will be performed (41 CFR 60-1.10). The Contractor shall notify the U.S. Department of State, Assistant Secretary, Bureau of Political-Military Affairs (PM), 2201 C Street NW, Room 6212, Washington, DC 20520, and the U.S. Department of Labor, Deputy Assistant Secretary for Federal Contract Compliance, when it has knowledge of any employee or potential employee being denied an entry visa to a country where this contract will be performed, and it believes the denial is attributable to the race, color, religion, sex, or national origin of the employee or potential employee.

SECTION 5.22
EQUAL OPPORTUNITY FOR VETERANS (SEP 2010) (FAR 52.222-35)

(a) *Definitions.* As used in this clause—

*All employment openings* means all positions except executive and senior management, those positions that will be filled from within the Contractor's organization, and positions lasting 3 days or less. This term includes full-time employment, temporary employment of more than 3 days duration, and part-time employment.

*Armed Forces service medal veteran* means any veteran who, while serving on active duty in the U.S. military, ground, naval, or air service, participated in a United States military operation for which an Armed Forces service medal was awarded pursuant to Executive Order 12985 (61 FR 1209).

*Disabled veteran* means—

(1) A veteran of the U.S. military, ground, naval, or air service, who is entitled to compensation (or who but for the receipt of military retired pay would be entitled to compensation) under laws administered by the Secretary of Veterans Affairs; or

(2) A person who was discharged or released from active duty because of a service-connected disability.

*Executive and senior management* means—

(1) Any employee—

(i) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

(ii) Whose primary duty consists of the management of the enterprise in which the individual is employed or of a customarily recognized department or subdivision thereof;

(iii) Who customarily and regularly directs the work of two or more other employees; and

(iv) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; or

(2) Any employee who owns at least a bona fide 20-percent equity interest in the enterprise in which the employee is employed, regardless of whether the business is a corporate or other type of organization, and who is actively engaged in its management.

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 77 of 137

*Other protected veteran* means a veteran who served on active duty in the U.S. military, ground, naval, or air service, during a war or in a campaign or expedition for which a campaign badge has been authorized under the laws administered by the Department of Defense.

*Positions that will be filled from within the Contractor's organization* means employment openings for which the Contractor will give no consideration to persons outside the Contractor's organization (including any affiliates, subsidiaries, and parent companies) and includes any openings the Contractor proposes to fill from regularly established "recall" lists. The exception does not apply to a particular opening once an employer decides to consider applicants outside of its organization.

*Qualified disabled veteran* means a disabled veteran who has the ability to perform the essential functions of the employment positions with or without reasonable accommodation.

*Recently separated veteran* means any veteran during the three-year period beginning on the date of such veteran's discharge or release from active duty in the U.S. military, ground, naval or air service.

(b) *General.*

(1) The Contractor shall not discriminate against any employee or applicant for employment because the individual is a disabled veteran, recently separated veteran, other protected veterans, or Armed Forces service medal veteran, regarding any position for which the employee or applicant for employment is qualified. The Contractor shall take affirmative action to employ, advance in employment, and otherwise treat qualified individuals, including qualified disabled veterans, without discrimination based upon their status as a disabled veteran, recently separated veteran, Armed Forces service medal veteran, and other protected veteran in all employment practices including the following:

(i) Recruitment, advertising, and job application procedures.

(ii) Hiring, upgrading, promotion, award of tenure, demotion, transfer, layoff, termination, right of return from layoff and rehiring.

(iii) Rate of pay or any other form of compensation and changes in compensation.

(iv) Job assignments, job classifications, organizational structures, position descriptions, lines of progression, and seniority lists.

(v) Leaves of absence, sick leave, or any other leave.

(vi) Fringe benefits available by virtue of employment, whether or not administered by the Contractor.

(vii) Selection and financial support for training, including apprenticeship, and on the job training under 38 U.S.C. 3687, professional meetings, conferences, and other related activities, and selection for leaves of absence to pursue training.

(viii) Activities sponsored by the Contractor including social or recreational programs.

(ix) Any other term, condition, or privilege of employment.

(2) The Contractor shall comply with the rules, regulations, and relevant orders of the Secretary of Labor issued under the Vietnam Era Veterans' Readjustment Assistance Act of 1972 (the Act), as amended (38 U.S.C. 4211 and 4212).

(3) The Department of Labor's regulations require contractors with 50 or more employees and a contract of $100,000 or more to have an affirmative action program for veterans. *See* 41 CFR part 60–300, subpart C.

(c) *Listing openings.*

(1) The Contractor shall immediately list all employment openings that exist at the time of the execution of this contract and those which occur during the performance of this contract,

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 78 of 137

including those not generated by this contract, and including those occurring at an establishment of the Contractor other than the one where the contract is being performed, but excluding those of independently operated corporate affiliates, at an appropriate employment service delivery system where the opening occurs. Listing employment openings with the State workforce agency job bank or with the local employment service delivery system where the opening occurs shall satisfy the requirement to list jobs with the appropriate employment service delivery system.

(2) The Contractor shall make the listing of employment openings with the appropriate employment service delivery system at least concurrently with using any other recruitment source or effort and shall involve the normal obligations of placing a bona fide job order, including accepting referrals of veterans and nonveterans. This listing of employment openings does not require hiring any particular job applicant or hiring from any particular group of job applicants and is not intended to relieve the Contractor from any requirements of Executive orders or regulations concerning nondiscrimination in employment.

(3) Whenever the Contractor becomes contractually bound to the listing terms of this clause, it shall advise the State workforce agency in each State where it has establishments of the name and location of each hiring location in the State. As long as the Contractor is contractually bound to these terms and has so advised the State agency, it need not advise the State agency of subsequent contracts. The Contractor may advise the State agency when it is no longer bound by this contract clause.

(d) *Applicability.* This clause does not apply to the listing of employment openings that occur and are filled outside the 50 States, the District of Columbia, Puerto Rico, the Northern Mariana Islands, American Samoa, Guam, the U.S. Virgin Islands, and Wake Island.

(e) *Postings.* (1) The Contractor shall post employment notices in conspicuous places that are available to employees and applicants for employment.

(2) The employment notices shall—

(i) State the rights of applicants and employees as well as the Contractor's obligation under the law to take affirmative action to employ and advance in employment qualified employees and applicants who are disabled veterans, recently separated veterans, Armed Forces service medal veterans, and other protected veterans; and

(ii) Be in a form prescribed by the Director, Office of Federal Contract Compliance Programs, and provided by or through the Contracting Officer.

(3) The Contractor shall ensure that applicants or employees who are disabled veterans are informed of the contents of the notice (*e.g.,* the Contractor may have the notice read to a visually disabled veteran, or may lower the posted notice so that it can be read by a person in a wheelchair).

(4) The Contractor shall notify each labor union or representative of workers with which it has a collective bargaining agreement, or other contract understanding, that the Contractor is bound by the terms of the Act and is committed to take affirmative action to employ, and advance in employment, qualified disabled veterans, recently separated veterans, other protected veterans, and Armed Forces service medal veterans.

(f) *Noncompliance.* If the Contractor does not comply with the requirements of this clause, the Government may take appropriate actions under the rules, regulations, and relevant orders of the Secretary of Labor. This includes implementing any sanctions imposed on a contractor by the Department of Labor for violations of this clause (52.222–35, Equal Opportunity for Veterans). These sanctions (see 41 CFR 60–300.66) may include—

(1) Withholding progress payments;

(FEB 2013)

(2) Termination or suspension of the contract; or

(3) Debarment of the contractor.

(g) *Subcontracts.* The Contractor shall insert the terms of this clause in subcontracts of $100,000 or more unless exempted by rules, regulations, or orders of the Secretary of Labor. The Contractor shall act as specified by the Director, Office of Federal Contract Compliance Programs, to enforce the terms, including action for noncompliance.

SECTION 5.23
AFFIRMATIVE ACTION FOR WORKERS WITH DISABILITIES (OCT 2010) (FAR 52.222-36)

(a) General. (1) Regarding any position for which the employee or applicant for employment is qualified, the Contractor shall not discriminate against any employee or applicant because of physical or mental disability. The Contractor agrees to take affirmative action to employ, advance in employment, and otherwise treat qualified individuals with disabilities without discrimination based upon their physical or mental disabilities in all employment practices such as -

(i) Recruitment, Advertising, and job application procedures;

(ii) Hiring, upgrading, promotion, award of tenure, demotion, transfer, layoff, termination, right of return from layoff, and rehiring;

(iii) Rates of pay or any other form of compensation and changes in compensation;

(iv) Job assignments, job classifications, organizational structures, position descriptions, lines of progression, and seniority lists;

(v) Leaves of absence, sick leave, or any other leave;

(vi) Fringe benefits available by virtue of employment, whether or not administered by the Contractor;

(vii) Selection and financial support for training, including apprenticeships, professional meetings, conferences, and other related activities, and selection for leaves of absence to pursue training

(viii) Activities sponsored by the Contractor, including social or recreational programs; and

(ix) Any other term, condition, or privilege of employment.

(2) The Contractor agrees to comply with the rules, regulations, and relevant orders of the Secretary of Labor (Secretary) issued under the Rehabilitation Act of 1973 (29 U.S.C. 793) (the Act), as amended.

(b) Postings. (1) The Contractor agrees to post employment notices stating (i) the Contractor's obligation under the law to take affirmative action to employ and advance in employment qualified individuals with disabilities; and (ii) the rights of applicants and employees.

(2) These notices shall be posted in conspicuous places that are available to employees and applicants for employment. The Contractor shall ensure that applicants and employees with disabilities are informed of the contents of the notice (e.g., the Contractor may have the notice read to a visually disabled individual, or may lower the posted notice so that it might be read by a person in a wheelchair). The notices shall be in a form prescribed by the Deputy Assistant Secretary for Federal Contract Compliance, of the U.S. Department of Labor (Deputy Assistant Secretary), and shall be provided by or through the Contracting Officer.

(3) The Contractor shall notify each labor union or representative of workers with which it has a collective bargaining agreement or other contract understanding, that the Contractor is bound

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 80 of 137

by the terms of Section 503 of the Act and is committed to take affirmative action to employ, and advance in employment, qualified individuals with physical or mental disabilities.

(c) Noncompliance. If the Contractor does not comply with the requirements of this clause, appropriate actions may be taken under the rules, regulations, and relevant orders of the Secretary issued pursuant to the Act.

(d) Subcontracts. The Contractor shall include the terms of this clause in every subcontract or purchase order in excess of $15,000 unless exempted by rules, regulations, or orders of the Secretary. The Contractor shall act as specified by the Deputy Assistant Secretary to enforce the terms, including action for noncompliance.

SECTION 5.24
[RESERVED]

SECTION 5.25
DRUG-FREE WORKPLACE (MAY 2001) (FAR 52.223-6)

(a) Definitions. As used in this clause.

"Controlled substance" means a controlled substance in schedules I through V of section 202 of the Controlled Substances Act (21 U.S.C. 812) and as further defined in regulation at 21 CFR 1308.11-1308.15.

"Conviction" means a finding of guilt (including a plea of nolo contendere) or imposition of sentence, or both, by any judicial body charged with the responsibility to determine violations of the Federal or State criminal drug statutes.

"Criminal drug statute" means a Federal or non-Federal criminal statute involving the manufacture, distribution, dispensing, possession or use of any controlled substance.

"Drug-free workplace" means the site(s) for the performance of work done by the Contractor in connection with a specific contract where employees of the Contractor are prohibited from engaging in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance.

"Employee" means an employee of a Contractor directly engaged in the performance of work under a Government contract. Directly engaged is defined to include all direct cost employees and any other Contractor employee who has other than a minimal impact or involvement in contract performance.

"Individual" means an offeror/contractor that has no more than one employee including the offeror/contractor.

(b) The Contractor, if other than an individual, shall - within 30 days after award (unless a longer period is agreed to in writing for contracts of 30 days or more performance duration); or as soon as possible for contracts of less than 30 days performance duration -

(1) Publish a statement notifying its employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the contractor's workplace and specifying the actions that will be taken against employees for violations of such prohibition;

(2) Establish an ongoing drug-free awareness program to inform such employees about-

(i) The dangers of drug abuse in the workplace;

(ii) The contractor's policy of maintaining a drug-free workplace;

(iii) Any available drug counseling, rehabilitation, and employee assistance programs; and

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 81 of 137

(iv) The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace.

(3) Provide all employees engaged in performance of the contract with a copy of the statement required by subparagraph (b)(1) of this clause;

(4) Notify such employees in writing in the statement required by subparagraph (b)(1) of this clause that, as a condition of continued employment on this contract, the employee will -

(i) Abide by the terms of the statement; and

(ii) Notify the employer in writing of the employee's conviction under a criminal drug statute for a violation occurring in the workplace no later than 5 days after such conviction.

(5) Notify the Contracting Officer in writing within 10 days after receiving notice under subdivision (b)(4)(ii) of this clause, from an employee or otherwise receiving actual notice of such conviction. The notice shall include the position title of the employee:

(6) Within 30 days after receiving notice under subdivision (b)(4)(ii) of this clause of a conviction, take one of the following actions with respect to any employee who is convicted of a drug abuse violation occurring in the workplace:

(i) Taking appropriate personnel action against such employee, up to and including termination; or

(ii) Require such employee to satisfactorily participate in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency; and

(7) Make a good faith effort to maintain a drug-free workplace through implementation of subparagraphs (b)(1) through (b)(6) of this clause.

(c) The Contractor, if an individual, agrees by award of the contract or acceptance of a purchase order, not to engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance while performing this contract.

(d) In addition to other remedies available to the Government, the Contractor's failure to comply with the requirements of paragraphs (b) or (c) of this clause may, pursuant to FAR 23.506, render the Contractor subject to suspension of contract payments, termination of the contract for default, and suspension or debarment.

SECTION 5.26
[RESERVED]

SECTION 5.27
FEDERAL, STATE, AND LOCAL TAXES (STATE AND LOCAL ADJUSTMENTS) (APR 2003) (FAR 52.229-4)

(a) As used in this clause-

"After-imposed tax" means any new or increased Federal, State, or local tax or duty, or tax that was excluded on the contract date but whose exclusion was later revoked or amount of exemption reduced during the contract period, other than an excepted tax, on the transactions or property covered by this contract that the Contractor is required to pay or bear as the result of legislative, judicial, or administrative action taking effect after the contract date.

"After-relieved tax" means any amount of Federal, State, or local tax or duty, other than an excepted tax, that would otherwise have been payable on the transactions or property covered by this contract, but which the Contractor is not required to pay or bear, or for which the Contractor

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 82 of 137

(FEB 2013)

obtains a refund or drawback, as the result of legislative, judicial, or administrative action taking effect after the contract date.

"All applicable Federal, State, and local taxes and duties" means all taxes and duties, in effect on the contract date, that the taxing authority is imposing and collecting on the transactions or property covered by this contract.

"Contract date" means the effective date of this contract and, for any modification to this contract, the effective date of the modification.

"Excepted tax" means social security or other employment taxes, net income and franchise taxes, excess profits taxes, capital stock taxes, transportation taxes, unemployment compensation taxes, and property taxes. "Excepted tax" does not include gross income taxes levied on or measured by sales or receipts from sales, property taxes assessed on completed supplies covered by this contract, or any tax assessed on the Contractor's possession of, interest in, or use of property, title to which is in the Government.

"Local taxes" includes taxes imposed by a possession or territory of the United States, Puerto Rico, or the Northern Mariana Islands, if the contract is performed wholly or partly in any of those areas.

(b) Unless otherwise provided in this contract, the contract price includes all applicable Federal, State, and local taxes and duties.

(c) The contract price shall be increased by the amount of any after-imposed tax, or of any tax or duty specifically excluded from the contract price by a term or condition of this contract that the Contractor is required to pay or bear, including any interest or penalty, if the Contractor states in writing that the contract price does not include any contingency for such tax and if liability for such tax, interest, or penalty was not incurred through the Contractor's fault, negligence, or failure to follow instructions of the Contracting Officer.

(d) The contract price shall be decreased by the amount of any after-relieved tax. The Government shall be entitled to interest received by the Contractor incident to a refund of taxes to the extent that such interest was earned after the Contractor was paid by the Government for such taxes. The Government shall be entitled to repayment of any penalty refunded to the Contractor to the extent that the penalty was paid by the Government.

(e) The contract price shall be decreased by the amount of any Federal, State, or local tax, other than an excepted tax, that was included in the contract price and that the Contractor is required to pay or bear, or does not obtain a refund of, through the Contractor's fault, negligence, or failure to follow instructions of the Contracting Officer.

(f) No adjustment shall be made in the contract price under this clause unless the amount of the adjustment exceeds $250.

(g) The Contractor shall promptly notify the Contracting Officer of all matters relating to Federal, State, and local taxes and duties that reasonably may be expected to result in either an increase or decrease in the contract price and shall take appropriate action as the Contracting Officer directs. The contract price shall be equitably adjusted to cover the costs of action taken by the Contractor at the direction of the Contracting Officer, including any interest, penalty, and reasonable attorneys' fees.

(h) The Government shall furnish evidence appropriate to establish exemption from any Federal, State, or local tax when-

(1) The Contractor requests such exemption and states in writing that it applies to a tax excluded from the contract price; and

(2) A reasonable basis exists to sustain the exemption.

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 83 of 137

SECTION 5.28
RESERVED

SECTION 5.29
TAXES - FOREIGN NEGOTIATED BENEFITS CONTRACTS (JAN 1998) (FEHBAR
1652.229-70)

(a) To the extent that this contract provides for performing services outside the United States,
its possessions, and Puerto Rico, this clause applies in lieu of any Federal, State, and local taxes
clause of the contract.

(b) "Contract date," as used in this clause, means the effective date of this contract or
modification.

"Country concerned," as used in this clause, means any country, other than the United States,
its possessions, and Puerto Rico, in which expenditures under this contract are made.

"Tax" and "taxes," as used in this clause, include fees and charges for doing business that are
levied by the government of the country concerned or by its political subdivisions.

"All applicable taxes and duties," as used in this clause, means all taxes and duties, in effect on
the contract date, that the taxing authority is imposing and collecting on the transactions covered
by this contract, pursuant to written ruling or regulation in effect on the contract date.

"After-imposed tax," as used in this clause, means any new or increased tax or duty, or tax that
was exempted or excluded on the contract date but whose exemption was later revoked or
reduced during the contract period, other than excepted tax, on the transactions covered by this
contract that the Carrier is required to pay or bear as the result of legislative, judicial, or
administrative action taking effect after the contract date.

"After-relieved tax," as used in this clause, means any amount of tax or duty, other than an
excepted tax, that would otherwise have been payable on the transactions covered by this
contract, but which the Carrier is not required to pay or bear, or for which the Carrier obtains a
refund, as the result of legislative, judicial, or administrative action taking effect after the
contract date.

"Excepted tax," as used in this clause, means social security or other employment taxes, net
income and franchise taxes, excess profits taxes, capital stock taxes, transportation taxes,
unemployment compensation taxes, and property taxes. "Excepted tax" does not include gross
income taxes levied on or measured by sales or receipts from sales covered by this contract, or
any tax assessed on the Carrier's possession of, interest in, or use of property, title to which is in
the U.S. Government.

(c) Unless otherwise provided in this contract, the contract price includes all applicable taxes
and duties, except taxes and duties that the Government of the United States and the government
of the country concerned have agreed shall not be applicable to expenditures in such country by
or on behalf of the United States.

(d) The contract price shall be increased by the amount of any after-imposed tax or of any tax
or duty specifically excluded from the contract price by a provision of this contract that the
Carrier is required to pay or bear, including any interest or penalty, if the Carrier states in writing
that the contract price does not include any contingency for such tax and if liability for such tax,
interest, or penalty was not incurred through the Carrier's fault, negligence, or failure to follow
instructions of the Contracting Officer or to comply with the provisions of paragraph (i) below.

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 84 of 137

(e) The contract price shall be decreased by the amount of any after-relieved tax, including any interest or penalty. The Government of the United States shall be entitled to interest received by the Carrier incident to a refund of taxes to the extent that such interest was earned after the Carrier was paid by the Government of the United States for such taxes. The Government of the United States shall be entitled to repayment of any penalty refunded to the Carrier to the extent that the penalty was paid by the Government.

(f) The contract price shall be decreased by the amount of any tax or duty, other than an excepted tax, that was included in the contract and that the Carrier is required to pay or bear, or does not obtain a refund of, through the Carrier's fault, negligence, or failure to follow instructions of the Contracting Officer or to comply with the provisions of paragraph (i) below.

(g) No adjustment shall be made in the contract price under this clause unless the amount of the adjustment exceeds $250.

(h) If the Carrier obtains a reduction in tax liability under the United States Internal Revenue Code (Title 26, U.S. Code) because of the payment of any tax or duty that either was included in the contract price or was the basis of an increase in the contract price, the amount of the reduction shall be paid or credited to the Government of the United States as the Contracting Officer directs.

(i) The Carrier shall take all reasonable action to obtain exemption from or refund of any taxes or duties, including interest or penalty, from which the United States Government, the Carrier, any subcontractor, or the transactions covered by this contract are exempt under the laws of the country concerned or its political subdivisions or which the governments of the United States and of the country concerned have agreed shall not be applicable to expenditures in such country by or on behalf of the United States.

(j) The Carrier shall promptly notify the Contracting Officer of all matters relating to taxes or duties that reasonably may be expected to result in either an increase or decrease in the contract price and shall take appropriate action as the Contracting Officer directs. The contract price shall be equitably adjusted to cover the costs of action taken by the Carrier at the direction of the Contracting Officer, including any interest, penalty, and reasonable attorneys' fees.


SECTION 5.30
[RESERVED]

SECTION 5.31
[RESERVED]

SECTION 5.32
[RESERVED]

SECTION 5.33
DISCOUNTS FOR PROMPT PAYMENT (FEB 2002) (FAR 52.232-8)

(a) Discounts for prompt payment will not be considered in the evaluation of offers. However, any offered discount will form a part of the award, and will be taken if payment is made within the discount period indicated in the offer by the offeror. As an alternative to offering a discount for prompt payment in conjunction with the offer, offerors awarded contracts may include discounts for prompt payment on individual invoices.

(b) In connection with any discount offered for prompt payment, time shall be computed from the date of the invoice. If the Contractor has not placed a date on the invoice, the due date shall be calculated from the date the designated billing office receives a proper invoice, provided the agency annotates such invoice with the date of receipt at the time of receipt. For the purpose of computing the discount earned, payment shall be considered to have been made on the date that appears on the payment check or, for an electronic funds transfer, the specified payment date. When the discount date falls on a Saturday, Sunday, or legal holiday when Federal Government offices are closed and Government business is not expected to be conducted, payment may be made on the following business day.

SECTION 5.34
INTEREST (OCT 2010) (FAR 52.232-17) FEHBAR (JAN 1995)

(a) Except as otherwise provided in this contract under a Price Reduction for Defective Certified Cost or Pricing Data clause or a Cost Accounting Standards clause, all amounts that become payable by the Contractor to the Government under this contract shall bear simple interest from the date due until paid unless paid within 30 days of becoming due. The interest rate shall be the interest rate established by the Secretary of the Treasury as provided in Section 611 of the Contract Disputes Act of 1978 (Public Law 95-563), which is applicable to the period in which the amount becomes due, as provided in paragraph (e) of this clause, and then at the rate applicable for each six-month period as fixed by the Secretary until the amount is paid.

(b) The Government may issue a demand for payment to the Contractor upon finding a debt is due under the contract.

(c) Final Decisions. The Contracting Officer will issue a final decision as required by 33.211 if—

(1) The Contracting Officer and the Contractor are unable to reach agreement on the existence or amount of a debt in a timely manner;

(2) The Contractor fails to liquidate a debt previously demanded by the Contracting Officer within the timeline specified in the demand for payment unless the amounts were not repaid because the Contractor has requested an installment payment agreement; or

(3) The Contractor requests a deferment of collection on a debt previously demanded by the Contracting Officer (see 32.607-2).

(d) If a demand for payment was previously issued for the debt, the demand for payment included in the final decision shall identify the same due date as the original demand for payment.

(e) Amounts shall be due at the earliest of the following dates:

(1) The date fixed under this contract.

(2) The date of the first written demand for payment, including any demand resulting from a default termination.

(f) The interest charge shall be computed for the actual number of calendar days involved beginning on the due date and ending on—

(1) The date on which the designated office receives payment from the Contractor;

(2) The date of issuance of a Government check to the Contractor from which an amount otherwise payable has been withheld as a credit against the contract debt; or

(3) The date on which an amount withheld and applied to the contract debt would otherwise have become payable to the Contractor.

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 86 of 137

(c) The interest charge made under this clause may be reduced under the procedures prescribed in 32.608-2 of the Federal Acquisition Regulation in effect on the date of this contract.

## SECTION 5.35
## ASSIGNMENT OF CLAIMS  (JAN 1986) (FAR 52.232-23)

(a) The Contractor, under the Assignment of Claims Act, as amended. 31 U.S.C. 3727, 41 U.S.C. 15 (hereafter referred to as "the Act"). may assign its rights to be paid amounts due or to become due as a result of the performance of this contract to a bank. trust company. or other financing institution, including any Federal lending agency. The assignee under such an assignment may thereafter further assign or reassign its right under the original assignment to any type of financing institution described in the preceding sentence.

(b) Any assignment or reassignment authorized under the Act and this clause shall cover all unpaid amounts payable under this contract. and shall not be made to more than one party. except that an assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in the financing of this contract.

(c) The Contractor shall not furnish or disclose to any assignee under this contract any classified document (including this contract) or information related to work under this contract until the Contracting Officer authorizes such action in writing.

## SECTION 5.36
## DISPUTES (JUL 2002) (FAR 52.233-1)

(a) This contract is subject to the Contract Disputes Act of 1978. as amended (41 U.S.C. 601-613).

(b) Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.

(c) "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract.  However, a written demand or written assertion by the Contractor seeking the payment of money exceeding $100,000 is not a claim under the Act until certified. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the Act. The submission may be converted to a claim under the Act, by complying with the submission and certification requirements of this clause, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

(d)(1) A claim by the Contractor shall be made in writing and, unless otherwise stated in this contract, submitted within 6 years after accrual of the claim to the Contracting Officer for a written decision. A claim by the Government against the Contractor shall be subject to a written decision by the Contracting Officer.

(2)(i) The Contractor shall provide the certification specified in paragraph (d)(2)(iii) of this clause when submitting any claim exceeding $100,000.

(ii) The certification requirement does not apply to issues in controversy that have not been submitted as all or part of a claim.

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 87 of 137

(iii) The certification shall state as follows: "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor."

(3) The certification may be executed by any person duly authorized to bind the Contractor with respect to the claim.

(e) For Contractor claims of $100,000 or less, the Contracting Officer must, if requested in writing by the Contractor, render a decision within 60 days of the request. For Contractor-certified claims over $100,000, the Contracting Officer must, within 60 days, decide the claim or notify the Contractor of the date by which the decision will be made.

(f) The Contracting Officer's decision shall be final unless the Contractor appeals or files a suit as provided in the Act.

(g) If the claim by the Contractor is submitted to the Contracting Officer or a claim by the Government is presented to the Contractor, the parties, by mutual consent, may agree to use alternative dispute resolution (ADR). If the Contractor refuses an offer for ADR, the Contractor shall inform the Contracting Officer, in writing, of the Contractor's specific reasons for rejecting the offer.

(h) The Government shall pay interest on the amount found due and unpaid from (1) the date that the Contracting Officer receives the claim (certified, if required); or (2) the date that payment otherwise would be due, if that date is later, until the date of payment. With regard to claims having defective certifications, as defined in FAR 33.201, interest shall be paid from the date that the Contracting Officer initially receives the claim. Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury as provided in the Act, which is applicable to the period during which the Contracting Officer receives the claim and then at the rate applicable for each 6-month period as fixed by the Treasury Secretary during the pendency of the claim.

(i) The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under or relating to the contract, and comply with any decision of the Contracting Officer.

SECTION 5.37
NOTICE OF INTENT TO DISALLOW COSTS (APR 1984) (FAR 52.242-1)

(a) Notwithstanding any other clause of this contract--
(1) The Contracting Officer may at any time issue to the Contractor a written notice of intent to disallow specified costs incurred or planned for incurrence under this contract that have been determined not to be allowable under the contract terms; and
(2) The Contractor may, after receiving a notice under subparagraph (1) above, submit a written response to the Contracting Officer, with justification for allowance of the costs. If the Contractor does respond within 60 days, the Contracting Officer shall, within 60 days of receiving the response, either make a written withdrawal of the notice or issue a written decision.
(b) Failure to issue a notice under this Notice of Intent to Disallow Costs clause shall not affect the Government's right to take exception to incurred costs.

SECTION 5.38

CHANGES--NEGOTIATED BENEFITS CONTRACTS (JAN 1998) (FEHBAR 1652.243-70)

(a) The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract in any one or more of the following:
(1) Description of services to be performed.
(2) Time of performance (i.e., hours of the day, days of the week, etc.).
(3) Place of performance of the services.
(b) If any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the Contracting Officer shall make an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract.
(c) The Carrier must assert its right to an adjustment under this clause within 30 days from the date of receipt of the written order. However, if the Contracting Officer decides that the facts justify it, the Contracting Officer may receive and act upon a proposal submitted before final payment of the contract.
(d) Failure to agree to any adjustment shall be a dispute under the Disputes clause. However, nothing in this clause shall excuse the Carrier from proceeding with the contract as changed.

SECTION 5.39
COMPETITION IN SUBCONTRACTING (DEC 1996) (FAR 52.244-5)

(a) The Contractor shall select subcontractors (including suppliers) on a competitive basis to the maximum practical extent consistent with the objectives and requirements of the contract.
(b) If the Contractor is an approved mentor under the Department of Defense Pilot Mentor-Protègè Program (Pub. L. 101-510, section 831 as amended), the Contractor may award subcontracts under this contract on a noncompetitive basis to its protègès.

SECTION 5.40
GOVERNMENT PROPERTY (NEGOTIATED BENEFITS CONTRACTS) (JAN 1998)
(FEHBAR 1652.245-70)

(a) Government-furnished property. (1) The Government shall deliver to the Carrier, for use in connection with and under the terms of this contract, the Government-furnished property described in this contract together with any related data and information that the Carrier may request and is reasonably required for the intended use of the property (hereinafter referred to as "Government-furnished property").
(2) The delivery or performance dates for this contract are based upon the expectation that Government-furnished property suitable for use (except for property furnished "as-is") will be delivered to the Carrier at the times stated in this contract or, if not so stated, in sufficient time to enable the Carrier to meet the contract's performance dates.
(3) If Government-furnished property is received by the Carrier in a condition not suitable for the intended use, the Carrier shall, upon receipt of it, notify the Contracting Officer, detailing the facts, and, as directed by the Contracting Officer and at Government expense, either repair, modify, return, or otherwise dispose of the property. After completing the directed action and

upon written request of the Carrier. the Contracting Officer shall make an equitable adjustment as provided in paragraph (h) of this clause.

(b) Changes in Government-furnished property. (1) The Contracting Officer may, by written notice, (i) decrease the Government-furnished property provided or to be provided under this contract, or (ii) substitute other Government-furnished property for the property to be provided by the Government, or to be acquired by the Carrier for the Government, under this contract. The Carrier shall promptly take such action as the Contracting Officer may direct regarding the removal, shipment, or disposal of the property covered by such notice.

(2) Upon the Carrier's written request, the Contracting Officer shall make an equitable adjustment to the contract in accordance with paragraph (h) of this clause, if the Government has agreed in this contract to make the property available for performing this contract and there is any -

(i) Decrease or substitution in this property pursuant to subparagraph (b)(1) above; or

(ii) Withdrawal of authority to use this property, if provided under any other contract or lease.

(c) Title in Government property. (1) The Government shall retain title to all Government-furnished property.

(2) All Government-furnished property and all property acquired by the Carrier, title to which vests in the Government under this paragraph (collectively referred to as "Government proper-ty"), are subject to the provisions of this clause. Title to Government property shall not be affected by its incorporation into or attachment to any property not owned by the Government, nor shall Government property become a fixture or lose its identity as personal property by being attached to any real property.

(d) Use of Government property. The Government property shall be used only for performing this contract, unless otherwise provided in this contract or approved by the Contracting Officer.

(e) Property administration. (1) The Carrier shall be responsible and accountable for all Government property provided under this contract and shall comply with Federal Acquisition Regulation (FAR) subpart 45.5, as in effect on the date of this contract.

(2) The Carrier shall establish and maintain a program for the use, maintenance, repair, protection, and preservation of Government property in accordance with sound industrial practice and the applicable provisions of subpart 45.5 of the FAR.

(3) If damage occurs to Government property, the risk of which has been assumed by the Government under this contract, the Government shall replace the items or the Carrier shall make such repairs as the Government directs. However, if the Carrier cannot effect such repairs within the time required, the Carrier shall dispose of the property as directed by the Contracting Officer. When any property for which the Government is responsible is replaced or repaired, the Contracting Officer shall make an equitable adjustment in accordance with paragraph (h) of this clause.

(4) The Carrier represents that the contract price does not include any amount for repairs or replacement for which the Government is responsible. Repair or replacement of property for which the Carrier is responsible shall be accomplished by the Carrier at its own expense.

(f) Access. The Government and all its designees shall have access at all reasonable times to the premises in which any Government property is located for the purpose of inspecting the Government property.

(g) Risk of loss. Unless otherwise provided in this contract, the Carrier assumes the risk of, and shall be responsible for, any loss or destruction of, or damage to, Government property upon its delivery to the Carrier. However, the Carrier is not responsible for reasonable wear and tear

V-25                                                                      (FEB 2013)

to Government property or for Government property properly consumed in performing this contract.

(h) Equitable adjustment. When this clause specifies an equitable adjustment, it shall be made to any affected contract provision in accordance with the procedures of the Changes clause. When appropriate, the Contracting Officer may initiate an equitable adjustment in favor of the Government. The right to an equitable adjustment shall be the Carrier's exclusive remedy. The Government shall not be liable to suit for breach of contract for --

(1) Any delay in delivery of Government-furnished property;

(2) Delivery of Government-furnished property in a condition not suitable for its intended use;

(3) A decrease in or substitution of Government-furnished property; or

(4) Failure to repair or replace Government property for which the Government is responsible.

(i) Final accounting and disposition of Government property. Upon completing this contract, or at such earlier dates as may be fixed by the Contracting Officer, the Carrier shall submit, in a form acceptable to the Contracting Officer, inventory schedules covering all items of Government property (including any resulting scrap) not consumed in performing this contract or delivered to the Government. The Carrier shall prepare for shipment, deliver f.o.b. origin, or dispose of the Government property as may be directed or authorized by the Contracting Officer. The net proceeds of any such disposal shall be credited to the contract price or shall be paid to the Government as the Contracting Officer directs.

(j) Abandonment and restoration of Carrier's premises. Unless otherwise provided herein, the Government -

(1) May abandon any Government property in place, at which time all obligations of the Government regarding such abandoned property shall cease; and

(2) Has no obligation to restore or rehabilitate the Carrier's premises under any circumstances (e.g., abandonment, disposition upon completion of need; or upon contract completion). However, if the Government-furnished property is withdrawn or is unsuitable for the intended use, or if other Government property is substituted, then the equitable adjustment under paragraph (h) of this clause may properly include restoration or rehabilitation costs.

(k) Communications. All communications under this clause shall be in writing.

(l) Overseas contracts. If this contract is to be performed outside of the United States of America, its territories, or possessions, the words "Government" and "Government- furnished" (wherever they appear in this clause) shall be construed as "United States Government" and "United States Government-furnished", respectively.

SECTION 5.41
LIMITATION OF LIABILITY -- SERVICES (FEB 1997) (FAR 52.246-25)

(a) Except as provided in paragraphs (b) and (c) below, and except to the extent that the Contractor is expressly responsible under this contract for deficiencies in the services required to be performed under it (including any materials furnished in conjunction with those services), the Contractor shall not be liable for loss of or damage to property of the Government that (1) occurs after Government acceptance of services performed under this contract and (2) results from any defects or deficiencies in the services performed or materials furnished.

(b) The limitation of liability under paragraph (a) above shall not apply when a defect or deficiency in, or the Government's acceptance of, services performed or materials furnished results from willful misconduct or lack of good faith on the part of any of the Contractor's managerial

personnel. The term Contractor's managerial personnel, as used in this clause, means the Contractor's directors, officers, and any of the Contractor's managers, superintendents, or equivalent representatives who have supervision or direction of --

      (1) All or substantially all of the Contractor's business;

      (2) All or substantially all of the Contractor's operations at any one plant, laboratory, or separate location at which the contract is being performed; or

      (3) A separate and complete major industrial operation connected with the performance of this contract.

      (c) If the Contractor carries insurance, or has established a reserve for self-insurance, covering liability for loss or damage suffered by the Government through the Contractor's performance of services or furnishing of materials under this contract, the Contractor shall be liable to the Government, to the extent of such insurance or reserve, for loss of or damage to property of the Government occurring after Government acceptance of, and resulting from any defects and deficiencies in, services performed or materials furnished under this contract.

SECTION 5.42
PREFERENCE FOR U.S.-FLAG AIR CARRIERS (JUN 2003) (FAR 52.247-63)

(a) *Definitions.* As used in this clause-

"International air transportation" means transportation by air between a place in the United States and a place outside the United States or between two places both of which are outside the United States.

"United States" means the 50 States, the District of Columbia, and outlying areas.

"U.S.-flag air carrier" means an air carrier holding a certificate under 49 U.S.C. Chapter 411.

(b) Section 5 of the International Air Transportation Fair Competitive Practices Act of 1974 (49 U.S.C. 40118) (Fly America Act) requires that all Federal agencies and Government contractors and subcontractors use U.S.-flag air carriers for U.S. Government-financed international air transportation of personnel (and their personal effects) or property, to the extent that service by those carriers is available. It requires the Comptroller General of the United States, in the absence of satisfactory proof of the necessity for foreign-flag air transportation, to disallow expenditures from funds, appropriated or otherwise established for the account of the United States, for international air transportation secured aboard a foreign-flag air carrier if a U.S.-flag air carrier is available to provide such services.

(c) If available, the Contractor, in performing work under this contract, shall use U.S.-flag carriers for international air transportation of personnel (and their personal effects) or property.

(d) In the event that the Contractor selects a carrier other than a U.S.-flag air carrier for international air transportation, the Contractor shall include a statement on vouchers involving such transportation essentially as follows:

STATEMENT OF UNAVAILABILITY OF U.S.-FLAG AIR CARRIERS

    International air transportation of persons (and their personal effects) or property by U.S.-flag air carrier was not available or it was necessary to use foreign-flag air carrier service for the following reasons (see section 47.403 of the Federal Acquisition Regulation):

(State reasons):
(End of statement)

(e) The Contractor shall include the substance of this clause, including this paragraph (e), in each subcontract or purchase under this contract that may involve international air transportation.

SECTION 5.43
GOVERNMENT SUPPLY SOURCES (AUG 2010) (FAR 52.251-1)

The Contracting Officer may issue the Contractor an authorization to use Government supply sources in the performance of this contract. Title to all property acquired by the Contractor under such an authorization shall vest in the Government unless otherwise specified in the contract. Such property shall not be considered to be Government-furnished property, as distinguished from Government property. The provisions of the clause entitled "Government Property," at 52.245-1, shall apply to all property acquired under such authorization.

SECTION 5.44
AUTHORIZED DEVIATIONS IN CLAUSES (APR 1984) (FAR 52.252-6)

(a) The use in this solicitation or contract of any Federal Acquisition Regulation (48 CFR Chapter 1) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the clause.

(b) The use in this solicitation or contract of any Federal Employees Health Benefits Acquisition Regulation (48 CFR Chapter 16) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the name of the regulation.

SECTION 5.45
LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (OCT 2010) (FAR 52.203-12)

(a) *Definitions*. As used in this clause—

"Agency" means "executive agency" as defined in Federal Acquisition Regulation (FAR) 2.101.

"Covered Federal action" means any of the following actions:

(1) Awarding any Federal contract.
(2) Making any Federal grant.
(3) Making any Federal loan.
(4) Entering into any cooperative agreement.
(5) Extending, continuing, renewing, amending, or modifying any Federal contract, grant, loan, or cooperative agreement.

"Indian tribe" and "tribal organization" have the meaning provided in section 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450b) and include Alaskan Natives.

"Influencing or attempting to influence" means making, with the intent to influence, any communication to or appearance before an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any covered Federal action.

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 93 of 137

"Local government" means a unit of government in a State and, if chartered, established, or otherwise recognized by a State for the performance of a governmental duty, including a local public authority, a special district, an intrastate district, a council of governments, a sponsor group representative organization, and any other instrumentality of a local government.

"Officer or employee of an agency" includes the following individuals who are employed by an agency:

(1) An individual who is appointed to a position in the Government under Title 5, United States Code, including a position under a temporary appointment.

(2) A member of the uniformed services, as defined in subsection 101(3), Title 37, United States Code.

(3) A special Government employee, as defined in section 202, Title 18, United States Code.

(4) An individual who is a member of a Federal advisory committee, as defined by the Federal Advisory Committee Act, Title 5, United States Code, appendix 2.

"Person" means an individual, corporation, company, association, authority, firm, partnership, society, State, and local government, regardless of whether such entity is operated for profit, or not for profit. This term excludes an Indian tribe, tribal organization, or any other Indian organization eligible to receive Federal contracts, grants, cooperative agreements, or loans from an agency, but only with respect to expenditures by such tribe or organization that are made for purposes specified in paragraph (b) of this clause and are permitted by other Federal law.

"Reasonable compensation" means, with respect to a regularly employed officer or employee of any person, compensation that is consistent with the normal compensation for such officer or employee for work that is not furnished to, not funded by, or not furnished in cooperation with the Federal Government.

"Reasonable payment" means, with respect to professional and other technical services, a payment in an amount that is consistent with the amount normally paid for such services in the private sector.

"Recipient" includes the Contractor and all subcontractors. This term excludes an Indian tribe, tribal organization, or any other Indian organization eligible to receive Federal contracts, grants, cooperative agreements, or loans from an agency, but only with respect to expenditures by such tribe or organization that are made for purposes specified in paragraph (b) of this clause and *are* permitted by other Federal law.

"Regularly employed" means, with respect to an officer or employee of a person requesting or receiving a Federal contract, an officer or employee who is employed by such person for at least 130 working days within 1 year immediately preceding the date of the submission that initiates agency consideration of such person for receipt of such contract. An officer or employee who is employed by such person for less than 130 working days within 1 year immediately preceding the date of the submission that initiates agency consideration of such person shall be considered to be regularly employed as soon as he or she is employed by such person for 130 working days.

"State" means a State of the United States, the District of Columbia, or an outlying area of the United States, an agency or instrumentality of a State, and multi-State, regional, or interstate entity having governmental duties and powers.

(b) *Prohibition.* 31 U.S.C. 1352 prohibits a recipient of a Federal contract, grant, loan, or cooperative agreement from using appropriated funds to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any

V-29
(FPS 2013)

covered Federal actions. In accordance with 31 U.S.C. 1352 the Contractor shall not use appropriated funds to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the award of this contractor the extension, continuation, renewal, amendment, or modification of this contract.

(1) The term *appropriated funds* does not include profit or fee from a covered Federal action.

(2) To the extent the Contractor can demonstrate that the Contractor has sufficient monies, other than Federal appropriated funds, the Government will assume that these other monies were spent for any influencing activities that would be unallowable if paid for with Federal appropriated funds.

(c) *Exceptions.* The prohibition in paragraph (b) of this clause does not apply under the following conditions:

(1) *Agency and legislative liaison by Contractor employees.*

(i) Payment of reasonable compensation made to an officer or employee of the Contractor if the payment is for agency and legislative liaison activities not directly related to this contract. For purposes of this paragraph, providing any information specifically requested by an agency or Congress is permitted at any time.

(ii) Participating with an agency in discussions that are not related to a specific solicitation for any covered Federal action, but that concern—

(A) The qualities and characteristics (including individual demonstrations) of the person's products or services, conditions or terms of sale, and service capabilities; or

(B) The application or adaptation of the person's products or services for an agency's use.

(iii) Providing prior to formal solicitation of any covered Federal action any information not specifically requested but necessary for an agency to make an informed decision about initiation of a covered Federal action;

(iv) Participating in technical discussions regarding the preparation of an unsolicited proposal prior to its official submission; and

(v) Making capability presentations prior to formal solicitation of any covered Federal action by persons seeking awards from an agency pursuant to the provisions of the Small Business Act, as amended by Pub. L. 95-507, and subsequent amendments.

(2) *Professional and technical services.*

(i) A payment of reasonable compensation made to an officer or employee of a person requesting or receiving a covered Federal action or an extension, continuation, renewal, amendment, or modification of a covered Federal action, if payment is for professional or technical services rendered directly in the preparation, submission, or negotiation of any bid, proposal, or application for that Federal action or for meeting requirements imposed by or pursuant to law as a condition for receiving that Federal action.

(ii) Any reasonable payment to a person, other than an officer or employee of a person requesting or receiving a covered Federal action or an extension, continuation, renewal, amendment, or modification of a covered Federal action if the payment is for professional or technical services rendered directly in the preparation, submission, or negotiation of any bid, proposal, or application for that Federal action or for meeting requirements imposed by or pursuant to law as a condition for receiving that Federal action. Persons other than officers or

V-30                                      (FEB 2013)

employees of a person requesting or receiving a covered Federal action include consultants and trade associations.

   (iii) As used in paragraph (c)(2) of this clause, "professional and technical services" are limited to advice and analysis directly applying any professional or technical discipline (for examples, see FAR 3.803(a)(2)(iii)).

   (iv) Requirements imposed by or pursuant to law as a condition for receiving a covered Federal award include those required by law or regulation and any other requirements in the actual award documents.

   (3) Only those communications and services expressly authorized by paragraphs (c)(1) and (2) of this clause are permitted.

   (d) *Disclosure.*

   (1) If the Contractor did not submit OMB Standard Form LLL, Disclosure of Lobbying Activities, with its offer, but registrants under the Lobbying Disclosure Act of 1995 have subsequently made a lobbying contact on behalf of the Contractor with respect to this contract, the Contractor shall complete and submit OMB Standard Form LLL to provide the name of the lobbying registrants, including the individuals performing the services.

   (2) If the Contractor did submit OMB Standard Form LLL disclosure pursuant to paragraph (d) of the provision at FAR 52.203-11, Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions, and a change occurs that affects Block 10 of the OMB Standard Form LLL (name and address of lobbying registrant or individuals performing services), the Contractor shall, at the end of the calendar quarter in which the change occurs, submit to the Contracting Officer within 30 days an updated disclosure using OMB Standard Form LLL.

   (e) *Penalties.*

   (1) Any person who makes an expenditure prohibited under paragraph (b) of this clause or who fails to file or amend the disclosure to be filed or amended by paragraph (d) of this clause shall be subject to civil penalties as provided for by 31 U.S.C. 1352. An imposition of a civil penalty does not prevent the Government from seeking any other remedy that may be applicable.

   (2) Contractors may rely without liability on the representation made by their subcontractors in the certification and disclosure form.

   (f) *Cost allowability.* Nothing in this clause makes allowable or reasonable any costs which would otherwise be unallowable or unreasonable. Conversely, costs made specifically unallowable by the requirements in this clause will not be made allowable under any other provision.

   (g) *Subcontracts.*

   (1) The Contractor shall obtain a declaration, including the certification and disclosure in paragraphs (c) and (d) of the provision at FAR 52.203-11, Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions, from each person requesting or receiving a subcontract exceeding $150,000 under this contract. The Contractor or subcontractor that awards the subcontract shall retain the declaration.

   (2) A copy of each subcontractor disclosure form (but not certifications) shall be forwarded from tier to tier until received by the prime Contractor. The prime Contractor shall, at the end of the calendar quarter in which the disclosure form is submitted by the subcontractor, submit to the Contracting Officer within 30 days a copy of all disclosures. Each subcontractor certification shall be retained in the subcontract file of the awarding Contractor.

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 96 of 137

(3) The Contractor shall include the substance of this clause, including this paragraph (g), in any subcontract exceeding $150,000.

SECTION 5.46
[RESERVED]

SECTION 5.47
PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED OR PROPOSED FOR DEBARMENT  (DEC 2010) (FAR 52.209-6)

(a) *Definition. Commercially available off-the-shelf (COTS)* item, as used in this clause—
(1) Means any item of supply (including construction material) that is—
(i) A commercial item (as defined in paragraph (1) of the definition in FAR 2.101);
(ii) Sold in substantial quantities in the commercial marketplace; and
(iii) Offered to the Government, under a contract or subcontract at any tier, without modification, in the same form in which it is sold in the commercial marketplace; and
(2) Does not include bulk cargo, as defined in section 3 of the Shipping Act of 1984 (46 U.S.C. App. 1702), such as agricultural products and petroleum products.
(b) The Government suspends or debars Contractors to protect the Government's interests. Other than a subcontract for a commercially available off-the-shelf item, the Contractor shall not enter into any subcontract, in excess of $30,000 with a Contractor that is debarred, suspended, or proposed for debarment by any executive agency unless there is a compelling reason to do so.
(c) The Contractor shall require each proposed subcontractor whose subcontract will exceed $30,000, other than a subcontractor providing a commercially available off-the-shelf item, to disclose to the Contractor, in writing, whether as of the time of award of the subcontract, the subcontractor, or its principals, is or is not debarred, suspended, or proposed for debarment by the Federal Government.
(d) A corporate officer or a designee of the Contractor shall notify the Contracting Officer, in writing, before entering into a subcontract with a party (other than a subcontractor providing a commercially available off-the-shelf item) that is debarred, suspended, or proposed for debarment (*see* FAR 9.404 for information on the Excluded Parties List System). The notice must include the following:
(1) The name of the subcontractor.
(2) The Contractor's knowledge of the reasons for the subcontractor being in the Excluded Parties List System.
(3) The compelling reason(s) for doing business with the subcontractor notwithstanding its inclusion in the Excluded Parties List System.
(4) The systems and procedures the Contractor has established to ensure that it is fully protecting the Government's interests when dealing with such subcontractor in view of the specific basis for the party's debarment, suspension, or proposed debarment.
(e) *Subcontracts.* Unless this is a contract for the acquisition of commercial items, the Contractor shall include the requirements of this clause, including this paragraph (e) (appropriately modified for the identification of the parties), in each subcontract that—

(FFS-2013)

(1) Exceeds $30,000 in value; and
(2) Is not a subcontract for commercially available off-the-shelf items.

SECTION 5.48
BANKRUPTCY (JUL 1995) (FAR 52.242-13)

In the event the Contractor enters into proceedings relating to bankruptcy, whether voluntary or involuntary, the Contractor agrees to furnish, by certified mail or electronic commerce method authorized by the contract, written notification of the bankruptcy to the Contracting Office responsible for administering the contract. This notification shall be furnished within five days of the initiation of the proceedings relating to bankruptcy filing. This notification shall include the date on which the bankruptcy petition was filed, the identity of the court in which the bankruptcy petition was filed, and a listing of Government contract numbers and contracting offices for all Government contracts against which final payment has not been made. This obligation remains in effect until final payment under this contract.

SECTION 5.49
FEHBP TERMINATION FOR CONVENIENCE OF THE GOVERNMENT--NEGOTIATED
BENEFITS CONTRACTS (JAN 1998) (FEHBAR 1652.249-71)

(a) The Government may terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest. The Contracting Officer shall terminate by delivering to the Carrier a Notice of Termination specifying the extent of terminating and the effective date.

(b) After receipt of a Notice of Termination, and except as directed by the Contracting Officer, the Carrier shall immediately proceed with the following obligations, regardless of any delay in determining or adjusting any amounts due under this clause:

(1) Stop work as specified in the notice.

(2) Place no further subcontracts except as necessary to complete the continued portion of the contract.

(3) Terminate all subcontracts to the extent they relate to the work terminated.

(4) Assign to the Government, as directed by the Contracting Officer, all right, title, and interest of the Carrier under the subcontracts terminated, in which case the Government shall have the right to settle or to pay any termination settlement proposal arising out of those terminations.

(5) With approval or ratification to the extent required by the Contracting Officer, settle all outstanding liabilities and termination settlement proposals arising from the termination of subcontracts; the approval or ratification will be final for purposes of this clause.

(6) As directed by the Contracting Officer, deliver to the Government any data, reports, or studies that, if the contract had been completed, would be required to be furnished to the Government.

(7) Complete performance of the work not terminated.

(c) After termination, the Carrier shall submit a final termination settlement proposal to the Contracting Officer in the form and with the certification prescribed by the Contracting Officer. The Carrier shall submit the proposal promptly, but no later than 1 year from the effective date of termination, unless extended in writing by the Contracting Officer upon written request of the

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 98 of 137

Carrier within this 1-year period. However, if the Contracting Officer determines that the facts justify it, a termination settlement proposal may be received and acted on after 1 year or any extension. If the Carrier fails to submit the proposal within the time allowed, the Contracting Officer may determine, on the basis of information available, the amount, if any, due the Carrier because of the termination and shall pay the amount determined.

(d) Subject to paragraph (c) of this clause, the Carrier and the Contracting Officer may agree upon the whole or any part of the amount to be paid or remaining to be paid because of the termination. The amount may include a reasonable allowance for profit on work done. However, the agreed amount, whether under this paragraph (d) or paragraph (e) of this clause, exclusive of costs shown in subparagraph (e)(3) of this clause, may not exceed the total contract price as reduced by (1) the amount of payments previously made and (2) the contract price of work not terminated. The contract shall be modified, and the Carrier paid the agreed amount. Paragraph (e) of this clause shall not limit, restrict, or affect the amount that may be agreed upon to be paid under this paragraph.

(e) If the Carrier and the Contracting Officer fail to agree on the whole amount to be paid because of the termination of work, the Contracting Officer shall pay the Carrier the amounts determined by the Contracting Officer as follows, but without duplication of any amounts agreed on under paragraph (d) above:

(1) The contract price for completed services accepted by the Government not previously paid for.

(2) The total of--

(i) The costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto, but excluding any costs attributable to services paid or to be paid under paragraph (e)(1) of this clause;

(ii) The cost of settling and paying termination settlement proposals under terminated subcontracts that are properly chargeable to the terminated portion of the contract if not included in subdivision (e)(2)(i) of this clause; and

(iii) A sum, as profit on subdivision (e)(2)(i) of this clause, determined by the Contracting Officer under 49.202 of the Federal Acquisition Regulation, in effect on the date of this contract, to be fair and reasonable.

(3) The reasonable costs of settlement of the work terminated, including--

(i) Accounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and supporting data;

(ii) The termination and settlement of subcontracts (excluding the amounts of such settlements); and

(f) The cost principles and procedures of part 31 of the Federal Acquisition Regulation, in effect on the date of this contract, shall govern all costs claimed, agreed to, or determined under this clause.

(g) The Carrier shall have the right of appeal, under the Disputes clause, from any determination made by the Contracting Officer under paragraph (c), (e), or (i) of this clause, except that if the Carrier failed to submit the termination settlement proposal or request for equitable adjustment within the time provided in paragraph (c) or (i), respectively, and failed to request a time extension, there is no right of appeal.

(h) In arriving at the amount due the Carrier under this clause, there shall be deducted--

(1) All unliquidated advance or other payments to the Carrier under the terminated portion of this contract;

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 99 of 137

(2) Any claim which the Government has against the Carrier under this contract; and

(i) If the termination is partial, the Carrier may file a proposal with the Contracting Officer for an equitable adjustment of the price(s) of the continued portion of the contract. The Contracting Officer shall make any equitable adjustment agreed upon. Any proposal by the Carrier for an equitable adjustment under this clause shall be requested within 90 days from the effective date of termination unless extended in writing by the Contracting Officer.

(j)(1) The Government may, under the terms and conditions it prescribes, make partial payments and payments against costs incurred by the Carrier for the terminated portion of the contract, if the Contracting Officer believes the total of these payments will not exceed the amount to which the Carrier will be entitled.

(2) If the total payments exceed the amount finally determined to be due, the Carrier shall repay the excess to the Government upon demand, together with interest computed at the rate established by the Secretary of the Treasury under 50 U.S.C. App. 1215(b)(2). Interest shall be computed for the period from the date the excess payment is received by the Carrier to the date the excess is repaid.

(k) Unless otherwise provided in this contract or by statute, the Carrier shall maintain all records and documents relating to the terminated portion of this contract for 3 years after final settlement. This includes all books and other evidence bearing on the Carrier's costs and expenses under this contract. The Carrier shall make these records and documents available to the Government, at the Carrier's office, at all reasonable times, without any direct charge. If approved by the Contracting Officer, photographs, microphotographs, or other authentic reproductions may be maintained instead of original records and documents.

SECTION 5.50
FEHBP TERMINATION FOR DEFAULT-- NEGOTIATED BENEFITS CONTRACTS (JAN 1998) (FEHBAR 1652.249-72)

(a) (1) The Government may, subject to paragraphs (c) and (d) below, by written notice of default to the Carrier, terminate this contract in whole or in part if the Carrier fails to--

(i) Perform the services within the time specified in this contract or any extension;

(ii) Make progress, so as to endanger performance of this contract (but see subparagraph (a)(2) below); or

(iii) Perform any of the other provisions of this contract (but see subparagraph (a)(2) below).

(2) The Government's right to terminate this contract under subdivisions (1)(ii) and (1)(iii) above, may be exercised if the Carrier does not cure such failure within 10 days (or more if authorized in writing by the Contracting Officer) after receipt of the notice from the Contracting Officer specifying the failure.

(b) If the Government terminates this contract in whole or in part, it may acquire, under the terms and in the manner the Contracting Officer considers appropriate, supplies or service similar to those terminated, and the Carrier will be liable to the Government for any excess costs for those supplies or services. However, the Carrier shall continue the work not terminated.

(c) Except for defaults of subcontractors at any tier, the Carrier shall not be liable for any excess costs if the failure to perform the contract arises from causes beyond the control and without the fault or negligence of the Carrier. Examples of such causes include (1) acts of God or of the public enemy, (2) acts of the Government in either its sovereign or contractual capacity, (3) fires, (4) floods, (5) epidemics, (6) quarantine restrictions, (7) strikes, (8) freight embargoes,

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 100 of 137

and (9) unusually severe weather. In each instance the failure to perform must be beyond the control and without the fault or negligence of the Carrier.

(d) If the failure to perform is caused by the default of a subcontractor at any tier, and if the cause of the default is beyond the control of both the Carrier and subcontractor, and without the fault or negligence of either, the Carrier shall not be liable for any excess costs for failure to perform, unless the subcontracted supplies or services were obtainable from other sources in sufficient time for the Carrier to meet the required delivery schedule.

(e) If this contract is terminated for default, the Government may require the Carrier to transfer title and deliver to the Government, as directed by the Contracting Officer, any completed or partially completed information and contract rights that the Carrier has specifically produced or acquired for the terminated portion of this contract.

(f) If, after termination, it is determined that the Carrier was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the Government.

(g) The rights and remedies of the Government in this clause are in addition to any other rights and remedies provided by law or under this contract.

SECTION 5.51
PENSION ADJUSTMENTS AND ASSET REVERSIONS (OCT 2010) (FAR 52.215-15)

(a) The Contractor shall promptly notify the Contracting Officer in writing when it determines that it will terminate a defined benefit pension plan or otherwise recapture such pension fund assets.

(b) For segment closings, pension plan terminations, or curtailment of benefits, the amount of the adjustment shall be-

(1) For contracts and subcontracts that are subject to full coverage under Cost Accounting Standards (CAS) Board rules and regulations (48 CFR Chapter 99), the amount measured, assigned, and allocated in accordance with 48 CFR 9904.413-50(c)(12); and

(2) For contracts and subcontracts that are not subject to full coverage under CAS, the amount measured, assigned, and allocated in accordance with 48 CFR 9904.413-50(c)(12), except the numerator of the fraction at 48 CFR 9904.413-50(c)(12)(vi)shall be the sum of the pension plan costs allocated to all non-CAS-covered contracts and subcontracts that are subject to Federal Acquisition Regulation (FAR) Subpart 31.2 or for which certified cost or pricing data were submitted.

(c) For all other situations where assets revert to the Contractor, or such assets are constructively received by it for any reason, the Contractor shall, at the Government's option, make a refund or give a credit to the Government for its equitable share of the gross amount withdrawn. The Government's equitable share shall reflect the Government's participation in pension costs through those contracts for which certified cost or pricing data were submitted or that are subject to FAR Subpart 31.2.

(d) The Contractor shall include the substance of this clause in all subcontracts under this contract that meet the applicability requirement of FAR 15.408(g).

SECTION 5.52
REVERSION OR ADJUSTMENT OF PLANS FOR POSTRETIREMENT BENEFITS (PRB)
OTHER THAN PENSIONS (JUL 2005) (FAR 52.215-18)

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 101 of 137

(a) The Contractor shall promptly notify the Contracting Officer in writing when it determines that it will terminate or reduce a PRB plan.

(b) If PRB fund assets revert, or inure to the Contractor, or are constructively received by it under a plan termination or otherwise, the Contractor shall make a refund or give a credit to the Government for its equitable share as required by 31.205-6(o)(6) of the Federal Acquisition Regulation (FAR). When determining or agreeing on the method for recovery of the Government's equitable share, the contracting parties should consider the following methods: cost reduction, amortizing the credit over a number of years (with appropriate interest), cash refund, or some other agreed upon method. Should the parties be unable to agree on the method for recovery of the Government's equitable share, through good faith negotiations, the Contracting Officer shall designate the method of recovery.

(c) The Contractor shall insert the substance of this clause in all subcontracts that meet the applicability requirements of FAR 15.408(j).

SECTION 5.53
NOTICE TO THE GOVERNMENT OF LABOR DISPUTES (FEB 1997) (FAR 52.222-1)

If the Contractor has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of this contract, the Contractor shall immediately give notice, including all relevant information, to the Contracting Officer.

SECTION 5.54
PENALTIES FOR UNALLOWABLE COSTS (MAY 2001) (FAR 52.242-3)

(a) Definition. Proposal, as used in this clause, means either --

(1) A final indirect cost rate proposal submitted by the Contractor after the expiration of its fiscal year which--

(i) Relates to any payment made on the basis of billing rates; or

(ii) Will be used in negotiating the final contract price; or

(2) The final statement of costs incurred and estimated to be incurred under the Incentive Price Revision clause (if applicable), which is used to establish the final contract price.

(b) Contractors which include unallowable indirect costs in a proposal may be subject to penalties. The penalties are prescribed in 10 U.S.C. 2324 or 41 U.S.C. 256, as applicable, which is implemented in Section 42.709 of the Federal Acquisition Regulation (FAR).

(c) The Contractor shall not include in any proposal any cost that is unallowable, as defined in Subpart 2.1 of the FAR, or an executive agency supplement to the FAR.

(d) If the Contracting Officer determines that a cost submitted by the Contractor in its proposal is expressly unallowable under a cost principle in the FAR, or an executive agency supplement to the FAR, that defines the allowability of specific selected costs, the Contractor shall be assessed a penalty equal to--

(1) The amount of the disallowed cost allocated to this contract; plus

(2) Simple interest, to be computed--

(i) On the amount the Contractor was paid (whether as a progress or billing payment) in excess of the amount to which the Contractor was entitled; and

(ii) Using the applicable rate effective for each six-month interval prescribed by the Secretary of the Treasury pursuant to Pub. L. 92-41 (85 Stat. 97).

(e) If the Contracting Officer determines that a cost submitted by the Contractor in its proposal includes a cost previously determined to be unallowable for that Contractor, then the Contractor will be assessed a penalty in an amount equal to two times the amount of the disallowed cost allocated to this contract.

(f) Determinations under paragraphs (d) and (e) of this clause are final decisions within the meaning of the Contract Disputes Act of 1978 (41 U.S.C. 601. et seq.).

(g) Pursuant to the criteria in FAR 42.709-5. the Contracting Officer may waive the penalties in paragraph (d) or (e) of this clause.

(h) Payment by the Contractor of any penalty assessed under this clause does not constitute repayment to the Government of any unallowable cost which has been paid by the Government to the Contractor.

SECTION 5.55
EMPLOYMENT REPORTS ON VETERANS (SEP 2010) (FAR 52.222-37)

(a) *Definitions.* As used in this clause, ''Armed Forces service medal veteran,'' ''disabled veteran,'' ''other protected veteran,'' and ''recently separated veteran,'' have the meanings given in the Equal Opportunity for Veterans clause 52.222–35.

(b) Unless the Contractor is a State or local government agency, the Contractor shall report at least annually, as required by the Secretary of Labor, on—

(1) The total number of employees in the contractor's workforce, by job category and hiring location, who are disabled veterans, other protected veterans, Armed Forces service medal veterans. and recently separated veterans.

(2) The total number of new employees hired during the period covered by the report. and of the total, the number of disabled veterans, other protected veterans, Armed Forces service medal veterans, and recently separated veterans; and

(3) The maximum number and the minimum number of employees of the Contractor or subcontractor at each hiring location during the period covered by the report.

(c) The Contractor shall report the above items by completing the Form VETS-100A, entitled "Federal Contractor Veterans' Employment Report (VETS-100A Report)."

(d) The Contractor shall submit VETS-100A Reports no later than September 30 of each year.

(e) The employment activity report required by paragraphs (b)(2) and (b)(3) of this clause shall reflect total new hires, and maximum and minimum number of employees, during the most recent 12-month period preceding the ending date selected for the report. Contractors may select an ending date—

(1) As of the end of any pay period between July 1 and August 31 of the year the report is due; or

(2) As of December 31, if the Contractor has prior written approval from the Equal Employment Opportunity Commission to do so for purposes of submitting the Employer Information Report EEO-1 (Standard Form 100).

(f) The number of veterans reported must be based on data known to the contractor when completing the VETS–100A. The contractor's knowledge of veterans status may be obtained in a variety of ways, including an invitation to applicants to self-identify (in accordance with 41 CFR 60–300.42), voluntary self-disclosure by employees, or actual knowledge of veteran status by the

contractor. This paragraph does not relieve an employer of liability for discrimination under 38 U.S.C. 4212.

(g) The Contractor shall insert the terms of this clause in subcontracts of $100,000 or more unless exempted by rules, regulations, or orders of the Secretary of Labor.

SECTION 5.56
AUTHORIZATION AND CONSENT (DEC 2007) (FAR 52.227-1)

(a) The Government authorizes and consents to all use and manufacture. in performing this contract or any subcontract at any tier. of any invention described in and covered by a United States patent—
(1) Embodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract; or
(2) Used in machinery, tools, or methods whose use necessarily results from compliance by the Contractor or a subcontractor with (i) specifications or written provisions forming a part of this contract or (ii) specific written instructions given by the Contracting Officer directing the manner of performance. the entire liability to the Government for infringement of a United States patent shall be determined solely by the provisions of the indemnity clause, if any, included in this contract or any subcontract hereunder (including any lower-tier subcontract). and the Government assumes liability for all other infringement to the extent of the authorization and consent hereinabove granted.

(b) The Contractor shall include the substance of this clause, including this paragraph (b), in all subcontracts that are expected to exceed the simplified acquisition threshold. However, omission of this clause from any subcontract, including those at or below the simplified acquisition threshold. does not affect this authorization and consent.

SECTION 5.57
NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT (DEC 2007) (FAR 52.227-2)

a) The Contractor shall report to the Contracting Officer, promptly and in reasonable written detail, each notice or claim of patent or copyright infringement based on the performance of this contract of which the Contractor has knowledge.

(b) In the event of any claim or suit against the Government on account of any alleged patent or copyright infringement arising out of the performance of this contract or out of the use of any supplies furnished or work or services performed under this contract, the Contractor shall furnish to the Government, when requested by the Contracting Officer, all evidence and information in the Contractor's possession pertaining to such claim or suit. Such evidence and information shall be furnished at the expense of the Government except where the Contractor has agreed to indemnify the Government.

(c) The Contractor shall include the substance of this clause, including this paragraph (c), in all subcontracts that are expected to exceed the simplified acquisition threshold.

SECTION 5.58
PAYMENT BY ELECTRONIC FUNDS TRANSFER--CENTRAL CONTRACTOR REGISTRATION (OCT 2003)(FAR 52.232-33)

(a) *Method of payment.*

(1) All payments by the Government under this contract shall be made by electronic funds transfer (EFT), except as provided in paragraph (a)(2) of this clause. As used in this clause, the term "EFT" refers to the funds transfer and may also include the payment information transfer.

(2) In the event the Government is unable to release one or more payments by EFT, the Contractor agrees to either --

(i) Accept payment by check or some other mutually agreeable method of payment; or

(ii) Request the Government to extend the payment due date until such time as the Government can make payment by EFT (but see paragraph (d) of this clause).

(b) *Contractor's EFT information.* The Government shall make payment to the Contractor using the EFT information contained in the Central Contractor Registration (CCR) database. In the event that the EFT information changes, the Contractor shall be responsible for providing the updated information to the CCR database.

(c) *Mechanisms for EFT payment.* The Government may make payment by EFT through either the Automated Clearing House (ACH) network, subject to the rules of the National Automated Clearing House Association, or the Fedwire Transfer System. The rules governing Federal payments through the ACH are contained in 31 CFR part 210.

(d) *Suspension of payment.* If the Contractor's EFT information in the CCR database is incorrect, then the Government need not make payment to the Contractor under this contract until correct EFT information is entered into the CCR database; and any invoice or contract financing request shall be deemed not to be a proper invoice for the purpose of prompt payment under this contract. The prompt payment terms of the contract regarding notice of an improper invoice and delays in accrual of interest penalties apply.

(e) *Liability for uncompleted or erroneous transfers.* (1) If an uncompleted or erroneous transfer occurs because the Government used the Contractor's EFT information incorrectly, the Government remains responsible for –

(i) Making a correct payment;

(ii) Paying any prompt payment penalty due; and

(iii) Recovering any erroneously directed funds.

(2) If an uncompleted or erroneous transfer occurs because the Contractor's EFT information was incorrect, or was revised within 30 days of Government release of the EFT payment transaction instruction to the Federal Reserve System, and –

(i) If the funds are no longer under the control of the payment office, the Government is deemed to have made payment and the Contractor is responsible for recovery of any erroneously directed funds; or

(ii) If the funds remain under the control of the payment office, the Government shall not make payment, and the provisions of paragraph (d) of this clause shall apply.

(f) *EFT and prompt payment.* A payment shall be deemed to have been made in a timely manner in accordance with the prompt payment terms of this contract if, in the EFT payment transaction instruction released to the Federal Reserve System, the date specified for settlement of the payment is on or before the prompt payment due date, provided the specified payment date is a valid date under the rules of the Federal Reserve System.

(g) *EFT and assignment of claims.* If the Contractor assigns the proceeds of this contract as provided for in the assignment of claims terms of this contract, the Contractor shall require as a

condition of any such assignment, that the assignee shall register separately in the CCR database and shall be paid by EFT in accordance with the terms of this clause. Notwithstanding any other requirement of this contract, payment to an ultimate recipient other than the Contractor, or a financial institution properly recognized under an assignment of claims pursuant to subpart 32.8 is not permitted. In all respects, the requirements of this clause shall apply to the assignee as if it were the Contractor. EFT information that shows the ultimate recipient of the transfer to be other than the Contractor, in the absence of a proper assignment of claims acceptable to the Government, is incorrect EFT information within the meaning of paragraph (d) of this clause.

(h) *Liability for change of EFT information by financial agent.* The Government is not liable for errors resulting from changes to EFT information made by the Contractor's financial agent.

(i) *Payment information.* The payment or disbursing office shall forward to the Contractor available payment information that is suitable for transmission as of the date of release of the EFT instruction to the Federal Reserve System. The Government may request the Contractor to designate a desired format and method(s) for delivery of payment information from a list of formats and methods the payment office is capable of executing. However, the Government does not guarantee that any particular format or method of delivery is available at any particular payment office and retains the latitude to use the format and delivery method most convenient to the Government. If the Government makes payment by check in accordance with paragraph (a) of this clause, the Government shall mail the payment information to the remittance address contained in the CCR database.

(End of clause)


SECTION 5.59
PROHIBITION OF SEGREGATED FACILITIES (FEB 1999) (FAR 52.222-21)

(a) "Segregated facilities," as used in this clause, means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees, that are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, sex, or national origin because of written or oral policies or employee custom. The term does not include separate or single-user rest rooms or necessary dressing or sleeping areas provided to assure privacy between the sexes.

(b) The Contractor agrees that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. The Contractor agrees that a breach of this clause is a violation of the Equal Opportunity clause in this contract.

(c) The Contractor shall include this clause in every subcontract and purchase order that is subject to the Equal Opportunity clause of this contract.


SECTION 5.60
SUBCONTRACTS FOR COMMERCIAL ITEMS (DEC 2010) (FAR 52.244-6)

(a) *Definitions.* As used in this clause—

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 106 of 137

"Commercial item" has the meaning contained in Federal Acquisition Regulation 2.101, Definitions.

"Subcontract" includes a transfer of commercial items between divisions, subsidiaries, or affiliates of the Contractor or subcontractor at any tier.

(b) To the maximum extent practicable, the Contractor shall incorporate, and require its subcontractors at all tiers to incorporate, commercial items or nondevelopmental items as components of items to be supplied under this contract.

(c)(1) The Contractor shall insert the following clauses in subcontracts for commercial items:

(i) 52.203-13, Contractor Code of Business Ethics and Conduct (APR 2010) (Pub. L. 110-252, Title VI, Chapter 1 (41 U.S.C. 251 note), if the subcontract exceeds $5,000,000 and has a performance period of more than 120 days. In altering this clause to identify the appropriate parties, all disclosures of violation of the civil False Claims Act or of Federal criminal law shall be directed to the agency Office of the Inspector General, with a copy to the Contracting Officer.

(ii) 52.203-15, Whistleblower Protections Under the American Recovery and Reinvestment Act of 2009 (JUN 2010) (Section 1553 of Pub. L. 111-5), if the subcontract is funded under the Recovery Act.

(iii) 52.219-8, Utilization of Small Business Concerns (DEC 2010) (15 U.S.C. 637(d)(2) and (3)), if the subcontract offers further subcontracting opportunities. If the subcontract (except subcontracts to small business concerns) exceeds $650,000 $1.5 million for construction of any public facility), the subcontractor must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities.

(iv) 52.222-26, Equal Opportunity (Mar 2007) (E.O. 11246).

(v) 52.222–35, Equal Opportunity for Veterans (SEP 2010) (38 U.S.C. 4212(a))

(vi) 52.222-36, Affirmative Action for Workers with Disabilities (OCT 2010) (29 U.S.C. 793).

(vii) 52.222–40, Notification of Employee Rights Under the National Labor Relations Act (Dec 2010) (E.O. 13496), if flow down is required in accordance with paragraph (f) of FAR clause 52.222–40.

(viii) [Reserved].

(ix) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. App. 1241 and 10 U.S.C. 2631), if flow down is required in accordance with paragraph (d) of FAR clause 52.247-64.

(2) While not required, the Contractor may flow down to subcontracts for commercial items a minimal number of additional clauses necessary to satisfy its contractual obligations.

(d) The Contractor shall include the terms of this clause, including this paragraph (d), in subcontracts awarded under this contract.

SECTION 5.61
NOTIFICATION OF EMPLOYEE RIGHTS UNDER NATIONAL LABOR RELATIONS ACT (DEC 2010)

(a) During the term of this contract, the Contractor shall post an employee notice, of such size and in such form, and containing such content as prescribed by the Secretary of Labor, in conspicuous places in and about its plants and offices where employees covered by the National Labor Relations Act engage in activities relating to the performance of the contract, including all

places where notices to employees are customarily posted both physically and electronically, in the languages employees speak, in accordance with 29 CFR 471.2(d) and (f).

(1) Physical posting of the employee notice shall be in conspicuous places in and about the Contractor's plants and offices so that the notice is prominent and readily seen by employees who are covered by the National Labor Relations Act and engage in activities related to the performance of the contract.

(2) If the Contractor customarily posts notices to employees electronically, then the Contractor shall also post the required notice electronically by displaying prominently, on any Web site that is maintained by the Contractor and is customarily used for notices to employees about terms and conditions of employment, a link to the Department of Labor's Web site that contains the full text of the poster. The link to the Department's Web site, as referenced in (b)(3) of this section, must read, "Important Notice about Employee Rights to Organize and Bargain Collectively with Their Employers."

(b) This required employee notice, printed by the Department of Labor, may be—

(1) Obtained from the Division of Interpretations and Standards, Office of Labor-Management Standards, U.S. Department of Labor, 200 Constitution Avenue, NW., Room N–5609, Washington, DC 20210, (202) 693–0123, or from any field office of the Office of Labor-Management Standards or Office of Federal Contract Compliance Programs;

(2) Provided by the Federal contracting agency if requested;

(3) Downloaded from the Office of Labor-Management Standards Web site at *http://www.dol.gov/olms/regs/compliance/EO13496.htm;* or

(4) Reproduced and used as exact duplicate copies of the Department of Labor's official poster.

(c) The required text of the employee notice referred to in this clause is located at Appendix A, Subpart A, 29 CFR Part 471.

(d) The Contractor shall comply with all provisions of the employee notice and related rules, regulations, and orders of the Secretary of Labor.

(e) In the event that the Contractor does not comply with the requirements set forth in paragraphs (a) through (d) of this clause, this contract may be terminated or suspended in whole or in part, and the Contractor may be suspended or debarred in accordance with 29 CFR 471.14 and subpart 9.4. Such other sanctions or remedies may be imposed as are provided by 29 CFR part 471, which implements Executive Order 13496 or as otherwise provided by law.

(f) *Subcontracts.*

(1) The Contractor shall include the substance of this clause, including this paragraph (f), in every subcontract that exceeds $10,000 and will be performed wholly or partially in the United States, unless exempted by the rules, regulations, or orders of the Secretary of Labor issued pursuant to section 3 of Executive Order 13496 of January 30, 2009, so that such provisions will be binding upon each subcontractor.

(2) The Contractor shall not procure supplies or services in a way designed to avoid the applicability of Executive Order 13496 or this clause.

(3) The Contractor shall take such action with respect to any such subcontract as may be directed by the Secretary of Labor as a means of enforcing such provisions, including the imposition of sanctions for noncompliance.

(4) However, if the Contractor becomes involved in litigation with a subcontractor, or is threatened with such involvement, as a result of such direction, the Contractor may request the

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 108 of 137
(FFS 2013)

United States, through the Secretary of Labor, to enter into such litigation to protect the interests of the United States.

SECTION 5.62
APPLICABLE LAW FOR BREACH OF CONTRACT CLAIM (OCT 2004) (FAR 52.233-4)

United States law will apply to resolve any claim of breach of this contract.

SECTION 5.63
CENTRAL CONTRACTOR REGISTRATION (FEB 2012) (FAR 52.204-7)

(a) Definitions. As used in this clause—
"Central Contractor Registration (CCR) database" means the primary Government repository for Contractor information required for the conduct of business with the Government.
"Data Universal Numbering System (DUNS) number" means the 9-digit number assigned by Dun and Bradstreet, Inc. (D&B) to identify unique business entities.
"Data Universal Numbering System +4 (DUNS+4) number" means the DUNS number assigned by D&B plus a 4-character suffix that may be assigned by a business concern. (D&B has no affiliation with this 4-character suffix.) This 4-character suffix may be assigned at the discretion of the business concern to establish additional CCR records for identifying alternative Electronic Funds Transfer (EFT) accounts (see the FAR at Subpart 32.11) for the same concern.
"Registered in the CCR database" means that—
(1) The Contractor has entered all mandatory information, including the DUNS number or the DUNS+4 number, into the CCR database; and
(2) The Government has validated all mandatory data fields, to include validation of the Taxpayer Identification Number (TIN) with the Internal Revenue Service (IRS), and has marked the record "Active". The Contractor will be required to provide consent for TIN validation to the Government as a part of the CCR registration process.
(b)(1) By submission of an offer, the offeror acknowledges the requirement that a prospective awardee shall be registered in the CCR database prior to award, during performance, and through final payment of any contract, basic agreement, basic ordering agreement, or blanket purchasing agreement resulting from this solicitation.
(2) The offeror shall enter, in the block with its name and address on the cover page of its offer, the annotation "DUNS" or "DUNS +4" followed by the DUNS or DUNS +4 number that identifies the offeror's name and address exactly as stated in the offer. The DUNS number will be used by the Contracting Officer to verify that the offeror is registered in the CCR database.
(c) If the offeror does not have a DUNS number, it should contact Dun and Bradstreet directly to obtain one.
(1) An offeror may obtain a DUNS number—
(i) Via the Internet at http://fedgov.dnb.com/webform or if the offeror does not have internet access, it may call Dun and Bradstreet at 1-866-705-5711 if located within the United States; or
(ii) If located outside the United States, by contacting the local Dun and Bradstreet office. The offeror should indicate that it is an offeror for a U.S. Government contract when contacting the local Dun and Bradstreet office.
(2) The offeror should be prepared to provide the following information:

     (i) Company legal business.

     (ii) Tradestyle, doing business, or other name by which your entity is commonly recognized.

     (iii) Company Physical Street Address, City, State, and ZIP Code.

     (iv) Company Mailing Address, City, State and ZIP Code (if separate from physical).

     (v) Company Telephone Number.

     (vi) Date the company was started.

     (vii) Number of employees at your location.

     (viii) Chief executive officer/key manager.

     (ix) Line of business (industry).

     (x) Company Headquarters name and address (reporting relationship within your entity).

(d) If the Offeror does not become registered in the CCR database in the time prescribed by the Contracting Officer, the Contracting Officer will proceed to award to the next otherwise successful registered Offeror.

(e) Processing time, which normally takes 48 hours, should be taken into consideration when registering. Offerors who are not registered should consider applying for registration immediately upon receipt of this solicitation.

(f) The Contractor is responsible for the accuracy and completeness of the data within the CCR database, and for any liability resulting from the Government's reliance on inaccurate or incomplete data. To remain registered in the CCR database after the initial registration, the Contractor is required to review and update on an annual basis from the date of initial registration or subsequent updates its information in the CCR database to ensure it is current, accurate and complete. Updating information in the CCR does not alter the terms and conditions of this contract and is not a substitute for a properly executed contractual document.

(g)

     (1)

     (i) If a Contractor has legally changed its business name, "doing business as" name, or division name (whichever is shown on the contract), or has transferred the assets used in performing the contract, but has not completed the necessary requirements regarding novation and change-of-name agreements in Subpart 42.12, the Contractor shall provide the responsible Contracting Officer a minimum of one business day's written notification of its intention to (A) change the name in the CCR database; (B) comply with the requirements of Subpart 42.12 of the FAR; and (C) agree in writing to the timeline and procedures specified by the responsible Contracting Officer. The Contractor must provide with the notification sufficient documentation to support the legally changed name.

     (ii) If the Contractor fails to comply with the requirements of paragraph (g)(1)(i) of this clause, or fails to perform the agreement at paragraph (g)(1)(i)(C) of this clause, and, in the absence of a properly executed novation or change-of-name agreement, the CCR information that shows the Contractor to be other than the Contractor indicated in the contract will be considered to be incorrect information within the meaning of the "Suspension of Payment" paragraph of the electronic funds transfer (EFT) clause of this contract.

     (2) The Contractor shall not change the name or address for EFT payments or manual payments, as appropriate, in the CCR record to reflect an assignee for the purpose of assignment of claims (see FAR Subpart 32.8, Assignment of Claims). Assignees shall be separately registered in the CCR database. Information provided to the Contractor's CCR record that indicates payments, including those made by EFT, to an ultimate recipient other than that

V-45                                    (FFS 2013)

Contractor will be considered to be incorrect information within the meaning of the "Suspension of payment" paragraph of the EFT clause of this contract.

(h) Offerors and Contractors may obtain information on registration and annual confirmation requirements via the internet at https://www.acquisition.gov or by calling 1-888-227-2423, or 269-961-5757.

SECTION 5.64
CONTRACTOR CODE OF BUSINESS ETHICS AND CONDUCT (APR 2010) (FAR 52.203–13).

(a) *Definitions*. As used in this clause--

*Agent* means any individual, including a director, an officer, an employee, or an independent Contractor, authorized to act on behalf of the organization.

*Full cooperation*--(1) Means disclosure to the Government of the information sufficient for law enforcement to identify the nature and extent of the offense and the individuals responsible for the conduct. It includes providing timely and complete response to Government auditors' and investigators' request for documents and access to employees with information;

(2) Does not foreclose any Contractor rights arising in law, the FAR, or the terms of the contract. It does not require--

(i) A Contractor to waive its attorney-client privilege or the protections afforded by the attorney work product doctrine; or

(ii) Any officer, director, owner, or employee of the Contractor, including a sole proprietor, to waive his or her attorney client privilege or Fifth Amendment rights; and

(3) Does not restrict a Contractor from--

(i) Conducting an internal investigation: or

(ii) Defending a proceeding or dispute arising under the contract or related to a potential or disclosed violation.

*Principal* means an officer, director, owner, partner, or a person having primary management or supervisory responsibilities within a business entity (e.g., general manager; plant manager; head of a division, or business segment; and similar positions).

*Subcontract* means any contract entered into by a subcontractor to furnish supplies or services for performance of a prime contract or a subcontract.

*Subcontractor* means any supplier, distributor, vendor, or firm that furnished supplies or services to or for a prime contractor or another subcontractor.

*United States* means the 50 States, the District of Columbia, and outlying areas.

(b) *Code of business ethics and conduct.* (1) Within 30 days after contract award, unless the Contracting Officer establishes a longer time period, the Contractor shall—

(i) Have a written code of business ethics and conduct;

(ii) Make a copy of the code available to each employee engaged in performance of the contract.

(2) The Contractor shall--

(i) Exercise due diligence to prevent and detect criminal conduct; and

(ii) Otherwise promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law.

(3)(i) The Contractor shall timely disclose, in writing, to the agency Office of the Inspector General (OIG), with a copy to the

Contracting Officer, whenever, in connection with the award, performance, or closeout of this contract or any subcontract thereunder, the Contractor has credible evidence that a principal, employee, agent, or subcontractor of the Contractor has committed--

(A) A violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or

(B) A violation of the civil False Claims Act (31 U.S.C. 3729-3733).

(ii) The Government, to the extent permitted by law and regulation, will safeguard and treat information obtained pursuant to the Contractor's disclosure as confidential where the information has been marked "confidential" or "proprietary" by the company. To the extent permitted by law and regulation, such information will not be released by the Government to the public pursuant to a Freedom of Information Act request, 5 U.S.C. Section 552, without prior notification to the Contractor. The Government may transfer documents provided by the Contractor to any department or agency within the Executive Branch if the information relates to matters within the organization's jurisdiction.

(iii) If the violation relates to an order against a Governmentwide acquisition contract, a multi-agency contract, a multiple-award schedule contract such as the Federal Supply Schedule, or any other procurement instrument intended for use by multiple agencies, the Contractor shall notify the OIG of the ordering agency and the IG of the agency responsible for the basic contract.

(c) Business ethics awareness and compliance program and internal control system. This paragraph (c) does not apply if the Contractor has represented itself as a small business concern pursuant to the award of this contract or if this contract is for the acquisition of a commercial item as defined at FAR 2.101. The Contractor shall establish the following within 90 days after contract award, unless the Contracting Officer establishes a longer time period:

(1) An ongoing business ethics awareness and compliance program.

(i) This program shall include reasonable steps to communicate periodically and in a practical manner the Contractor's standards and procedures and other aspects of the Contractor's business ethics awareness and compliance program and internal control system, by conducting effective training programs and otherwise disseminating information appropriate to an individual's respective roles and responsibilities.

(ii) The training conducted under this program shall be provided to the Contractor's principals and employees, and as appropriate, the Contractor's agents and subcontractors.

(2) An internal control system.

(i) The Contractor's internal control system shall--

(A) Establish standards and procedures to facilitate timely discovery of improper conduct in connection with Government contracts; and

(B) Ensure corrective measures are promptly instituted and carried out.

(ii) At a minimum, the Contractor's internal control system shall provide for the following:

(A) Assignment of responsibility at a sufficiently high level and adequate resources to ensure effectiveness of the business ethics awareness and compliance program and internal control system.

(B) Reasonable efforts not to include an individual as a principal, whom due diligence would have exposed as having engaged in conduct that is in conflict with the Contractor's code of business ethics and conduct.

(C) Periodic reviews of company business practices, procedures, policies, and internal controls for compliance with the Contractor's code of business ethics and conduct and the special requirements of Government contracting, including--

(1) Monitoring and auditing to detect criminal conduct;

(2) Periodic evaluation of the effectiveness of the business ethics awareness and compliance program and internal control system, especially if criminal conduct has been detected; and

(3) Periodic assessment of the risk of criminal conduct, with appropriate steps to design, implement, or modify the business ethics awareness and compliance program and the internal control system as necessary to reduce the risk of criminal conduct identified through this process.

(D) An internal reporting mechanism, such as a hotline, which allows for anonymity or confidentiality, by which employees may report suspected instances of improper conduct, and instructions that encourage employees to make such reports.

(E) Disciplinary action for improper conduct or for failing to take reasonable steps to prevent or detect improper conduct.

(F) Timely disclosure, in writing, to the agency OIG, with a copy to the Contracting Officer, whenever, in connection with the award, performance, or closeout of any Government contract performed by the Contractor or a subcontractor thereunder, the Contractor has credible evidence that a principal, employee, agent, or subcontractor of the Contractor has committed a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 U.S.C. or a violation of the civil False Claims Act (31 U.S.C. 3729-3733).

(1) If a violation relates to more than one Government contract, the Contractor may make the disclosure to the agency OIG and Contracting Officer responsible for the largest dollar value contract impacted by the violation.

(2) If the violation relates to an order against a Governmentwide acquisition contract, a multi-agency contract, a multiple-award schedule contract such as the Federal Supply Schedule, or any other procurement instrument intended for use by multiple agencies, the contractor shall notify the OIG of the ordering agency and the IG of the agency responsible for the basic contract, and the respective agencies' contracting officers.

(3) The disclosure requirement for an individual contract continues until at least 3 years after final payment on the contract.

(4) The Government will safeguard such disclosures in accordance with paragraph (b)(3)(ii) of this clause.

(G) Full cooperation with any Government agencies responsible for audits, investigations, or corrective actions.

(d) Subcontracts. (1) The Contractor shall include the substance of this clause, including this paragraph (d), in subcontracts that have a value in excess of $5,000,000 and a performance period of more than 120 days.

(2) In altering this clause to identify the appropriate parties, all disclosures of violation of the civil False Claims Act or of Federal criminal law shall be directed to the agency Office of the Inspector General, with a copy to the Contracting Officer.

SECTION 5.65
EMPLOYMENT ELIGIBILITY VERIFICATION (JAN 2009) (FAR 52.222-54).

(a) Definitions. As used in this clause--Commercially available off-the-shelf (COTS) item--

(1) Means any item of supply that is--

(i) A commercial item (as defined in paragraph (1) of the definition at 2.101):

(ii) Sold in substantial quantities in the commercial marketplace; and

(iii) Offered to the Government, without modification, in the same form in which it is sold in the commercial marketplace; and

(2) Does not include bulk cargo, as defined in section 3 of the Shipping Act of 1984 (46 U.S.C. App. 1702), such as agricultural products and petroleum products. Per 46 CFR 525.1(c)(2), "bulk cargo" means cargo that is loaded and carried in bulk onboard ship without mark or count, in a loose unpackaged form, having homogenous characteristics. Bulk cargo loaded into intermodal equipment, except LASH or Seabee barges, is subject to mark and count and, therefore, ceases to be bulk cargo.

Employee assigned to the contract means an employee who was hired after November 6, 1986, who is directly performing work, in the United States, under a contract that is required to include the clause prescribed at 22.1803. An employee is not considered to be directly performing work under a contract if the employee--

(1) Normally performs support work, such as indirect or overhead functions; and

(2) Does not perform any substantial duties applicable to the contract.

Subcontract means any contract, as defined in 2.101, entered into by a subcontractor to furnish supplies or services for performance of a prime contract or a subcontract. It includes but is not limited to purchase orders, and changes and modifications to purchase orders.

Subcontractor means any supplier, distributor, vendor, or firm that furnishes supplies or services to or for a prime Contractor or another subcontractor.

United States, as defined in 8 U.S.C. 1101(a)(38), means the 50 States, the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands.

(b) Enrollment and verification requirements. (1) If the Contractor is not enrolled as a Federal Contractor in E-Verify at time of contract award, the Contractor shall--

(i) Enroll. Enroll as a Federal Contractor in the E-Verify program within 30 calendar days of contract award;

(ii) Verify all new employees. Within 90 calendar days of enrollment in the E-Verify program, begin to use E-Verify to initiate verification of employment eligibility of all new hires of the Contractor, who are working in the United States, whether or not assigned to the contract, within 3 business days after the date of hire (but see paragraph (b)(3) of this section); and

(iii) Verify employees assigned to the contract. For each employee assigned to the contract, initiate verification within 90 calendar days after date of enrollment or within 30 calendar days of the employee's assignment to the contract, whichever date is later (but see paragraph (b)(4) of this section).

(2) If the Contractor is enrolled as a Federal Contractor in E-Verify at time of contract award, the Contractor shall use E-Verify to initiate verification of employment eligibility of--

(i) All new employees. (A) Enrolled 90 calendar days or more. The Contractor shall initiate verification of all new hires of the Contractor, who are working in the United States, whether or not assigned to the contract, within 3 business days after the date of hire (but see paragraph (b)(3) of this section); or

(B) Enrolled less than 90 calendar days. Within 90 calendar days after enrollment as a Federal Contractor in E-Verify, the Contractor shall initiate verification of all new hires of the Contractor, who are working in the United States, whether or not assigned to the contract, within 3 business days after the date of hire (but see paragraph (b)(3) of this section); or

(ii) Employees assigned to the contract. For each employee assigned to the contract, the Contractor shall initiate verification within 90 calendar days after date of contract award or within 30 days after assignment to the contract, whichever date is later (but see paragraph (b)(4) of this section).

(3) If the Contractor is an institution of higher education (as defined at 20 U.S.C. 1001(a)); a State or local government or the government of a Federally recognized Indian tribe; or a surety performing under a takeover agreement entered into with a Federal agency pursuant to a performance bond, the Contractor may choose to verify only employees assigned to the contract, whether existing employees or new hires. The Contractor shall follow the applicable verification requirements at (b)(1) or (b)(2), respectively, except that any requirement for verification of new employees applies only to new employees assigned to the contract.

(4) Option to verify employment eligibility of all employees. The Contractor may elect to verify all existing employees hired after November 6, 1986, rather than just those employees assigned to the contract. The Contractor shall initiate verification for each existing employee working in the United States who was hired after November 6, 1986, within 180 calendar days of--

(i) Enrollment in the E-Verify program; or

(ii) Notification to E-Verify Operations of the Contractor's decision to exercise this option, using the contact information provided in the E-Verify program Memorandum of Understanding (MOU).

(5) The Contractor shall comply, for the period of performance of this contract, with the requirements of the E-Verify program MOU.

(i) The Department of Homeland Security (DHS) or the Social Security Administration (SSA) may terminate the Contractor's MOU and deny access to the E-Verify system in accordance with the terms of the MOU. In such case, the Contractor will be referred to a suspension or debarment official.

(ii) During the period between termination of the MOU and a decision by the suspension or debarment official whether to suspend or debar, the Contractor is excused from its obligations under paragraph (b) of this clause. If the suspension or debarment official determines not to suspend or debar the Contractor, then the Contractor must reenroll in E-Verify.

(c) Web site. Information on registration for and use of the E-Verify program can be obtained via the Internet at the Department of Homeland Security Web site: http://www.dhs.gov/E-Verify.

(d) Individuals previously verified. The Contractor is not required by this clause to perform additional employment verification using E-Verify for any employee--

(1) Whose employment eligibility was previously verified by the Contractor through the E-Verify program;

(2) Who has been granted and holds an active U.S. Government security clearance for access to confidential, secret, or top secret information in accordance with the National Industrial Security Program Operating Manual; or

(3) Who has undergone a completed background investigation and been issued credentials pursuant to Homeland Security Presidential Directive (HSPD)-12, Policy for a Common Identification Standard for Federal Employees and Contractors.

(e) Subcontracts. The Contractor shall include the requirements of this clause, including this paragraph (e) (appropriately modified for identification of the parties), in each subcontract that-

(1) Is for--(i) Commercial or noncommercial services (except for commercial services that are part of the purchase of a COTS item (or an item that would be a COTS item, but for minor

modifications), performed by the COTS provider, and are normally provided for that COTS item); or

(ii) Construction;

(2) Has a value of more than $3,000; and

(3) Includes work performed in the United States.

SECTION 5.66
UPDATES OF PUBLICALLY AVAILABLE INFORMATION REGARDING RESPONSIBILITY MATTERS (FEB 2012) (FAR 52.209-9)

(a) The Contractor shall update the information in the Federal Awardee Performance and integrity Information System (FAPIIS) on a semi-annual basis, throughout the life of the contract, by posting the required information in the Central Contractor Registration database via https://www.acquisition.gov.

(b) As required by section 3010 of the Supplemental Appropriations Act, 2010 (Pub. L. 111-212), all information posted in FAPIIS on or after April 15, 2011, except past performance reviews, will be publicly available. FAPIIS consists of two segments—

(1) The non-public segment, into which Government officials and the Contractor post information, which can only be viewed by—

(i) Government personnel and authorized users performing business on behalf of the Government; or

(ii) The Contractor, when viewing data on itself; and

(2) The publicly-available segment, to which all data in the non-public segment of FAPIIS is automatically transferred after a waiting period of 14 calendar days, except for—

(i) Past performance reviews required by subpart 42.15;

(ii) Information that was entered prior to April 15, 2011; or

(iii) Information that is withdrawn during the 14-calendar-day waiting period by the Government official who posted it in accordance with paragraph (c)(1) of this clause.

(c) The Contractor will receive notification when the Government posts new information to the Contractor's record.

(1) If the Contractor asserts in writing within 7 calendar days, to the Government official who posted the information, that some of the information posted to the non-public segment of FAPIIS is covered by a disclosure exemption under the Freedom of Information Act, the Government official who posted the information must within 7 calendar days remove the posting from FAPIIS and resolve the issue in accordance with agency Freedom of Information procedures, prior to reposting the releasable information. The contractor must cite 52.209-9 and request removal within 7 calendar days of the posting to FAPIIS.

(2) The Contractor will also have an opportunity to post comments regarding information that has been posted by the Government. The comments will be retained as long as the associated information is retained, i.e., for a total period of 6 years. Contractor comments will remain a part of the record unless the Contractor revises them.

(3) As required by section 3010 of Pub. L. 111-212, all information posted in FAPIIS on or after April 15, 2011, except past performance reviews, will be publicly available.

(d) Public requests for system information posted prior to April 15, 2011, will be handled under Freedom of Information Act procedures, including, where appropriate, procedures

Version 1 (FEB 2013)

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 116 of 137

promulgated under E.O. 12600.

## SECTION 5.67
## PERSONAL IDENTITY VERIFICATION OF CONTRACTOR PERSONNEL (JAN 2011) (FAR 52.204-9)

(a) The Contractor shall comply with agency personal identity verification procedures identified in the contract that implement Homeland Security Presidential Directive-12 (HSPD-12). Office of Management and Budget (OMB) guidance M-05-24 and Federal Information Processing Standards Publication (FIPS PUB) Number 201.

(b) The Contractor shall account for all forms of Government-provided identification issued to the Contractor employees in connection with performance under this contract. The Contractor shall return such identification to the issuing agency at the earliest of any of the following, unless otherwise determined by the Government:

(1) When no longer needed for contract performance.

(2) Upon completion of the Contractor employee's employment.

(3) Upon contract completion or termination.

(c) The Contracting Officer may delay final payment under a contract if the Contractor fails to comply with these requirements.

(d) The Contractor shall insert the substance of this clause, including this paragraph (d), in all subcontracts when the subcontractor's employees are required to have routine physical access to a Federally-controlled facility and/or routine access to a Federally-controlled information system. It shall be the responsibility of the prime Contractor to return such identification to the issuing agency in accordance with the terms set forth in paragraph (b) of this section, unless otherwise approved in writing by the Contracting Officer.

[Note: For purposes of this Contract, a Federally-controlled information system means the OPM Letter of Credit System.]

## SECTION 5.68
## PRIVACY OR SECURITY SAFEGUARDS (AUG 1996) (FAR 52.239-1)

(a) The Contractor shall not publish or disclose in any manner, without the Contracting Officer's written consent, the details of any safeguards either designed or developed by the Contractor under this contract or otherwise provided by the Government.

(b) To the extent required to carry out a program of inspection to safeguard against threats and hazards to the security, integrity, and confidentiality of Government data, the Contractor shall afford the Government access to the Contractor's facilities, installations, technical capabilities, operations, documentation, records, and databases.

(c) If new or unanticipated threats or hazards are discovered by either the Government or the Contractor, or if existing safeguards have ceased to function, the discoverer shall immediately bring the situation to the attention of the other party.

[Note: For purposes of this Contract and this clause, privacy or security safeguards pertain to the OPM Letter of Credit System.]

SECTION 5.69
ENCOURAGING CONTRACTOR POLICIES TO BAN TEXT MESSAGING WHILE
DRIVING (AUG 2011) (FAR 52.223-18)

(a) Definitions. As used in this clause—
    "Driving"–
        (1) Means operating a motor vehicle on an active roadway with the motor running,
including while temporarily stationary because of traffic, a traffic light, stop sign, or otherwise.
        (2) Does not include operating a motor vehicle with or without the motor running when
one has pulled over to the side of, or off, an active roadway and has halted in a location where
one can safely remain stationary.
    "Text messaging" means reading from or entering data into any handheld or other electronic
device, including for the purpose of short message service texting, e-mailing, instant messaging,
obtaining navigational information, or engaging in any other form of electronic data retrieval or
electronic data communication. The term does not include glancing at or listening to a
navigational device that is secured in a commercially designed holder affixed to the vehicle,
provided that the destination and route are programmed into the device either before driving or
while stopped in a location off the roadway where it is safe and legal to park.
(b) This clause implements Executive Order 13513, Federal Leadership on Reducing Text
Messaging While Driving, dated October 1, 2009.
(c) The Contractor is encouraged to—
        (1) Adopt and enforce policies that ban text messaging while driving—
                (i) Company-owned or -rented vehicles or Government-owned vehicles; or
                (ii) Privately-owned vehicles when on official Government business or when
performing any work for or on behalf of the Government.
        (2) Conduct initiatives in a manner commensurate with the size of the business, such as—
                (i) Establishment of new rules and programs or re-evaluation of existing
        programs to prohibit text messaging while driving; and
                (ii) Education, awareness, and other outreach to employees about the safety risks
associated with texting while driving.
(d) Subcontracts. The Contractor shall insert the substance of this clause, including this
paragraph (d), in all subcontracts that exceed the micro-purchase threshold.

# APPENDIX A

# 2013

# Brochure Text

**For a copy of the 2013 brochure, please go to** <u>www.fepblue.org</u>.

(FFS-2013)

## APPENDIX B

### SUBSCRIPTION RATES, CHARGES, ALLOWANCES AND LIMITATIONS

Fee-For-Service Carrier

(Blue Cross and Blue Shield Association)
CONTRACT NO. CS 1039
Effective January 1, 2013

(a) Biweekly net-to-carrier rates, with appropriate adjustments for Enrollees paid on other than a biweekly basis, are as follows:

| Standard Option | | Basic Option | |
|---|---|---|---|
| Self Only | $266.11 | Self Only | $227.21 |
| Self and Family | $601.05 | Self and Family | $532.02 |

(b) The amount of administrative expenses and charges to be included in the Annual Accounting Statement required by Section 3.2 shall be as set out in the schedule below:

| Item | Amount |
|---|---|
| (i) Administrative Expenses | Actual, but not to exceed the Contractual Expense Limitation for 2013.* plus an amount sufficient to cover the costs needed to pay the Plan's Independent Public Accountant to undertake the audits and agreed upon procedures required in the "FEHBP Experienced-Rated Carrier and Service Organization Audit Guide." |
| (ii) Taxes | Actual (except that premium taxes as defined are not allowable). |
| (iii) Service Charge | **REDACTED** |

*The Contractual Expense Limitation for 2013 is the Contractual Expense Limitation for 2012 ( **REDACTED** ), plus or minus adjustments for inflation and enrollment changes. Notwithstanding Section 3.2(b) of this Contract, costs of "activities that improve health care quality", as determined in accordance with the medical loss ratio provision of the Affordable Care Act (Section 2718 of the Public Health Service Act; 42 U.S.C. § 300gg-18, and its implementing regulations), are accounted for as benefits and are not counted toward the

B-5 (FFS-2013)

Contractual Expense Limit. The base shall be adjusted by percentage changes in enrollment (from OPM's March 2012 to March 2013 headcount) and by the percentage change in the average monthly Consumer Price Index for All Urban Consumers (published monthly by the Bureau of Labor Statistics) from the 12 month period ending on June 30, 2012, to the 12 month period ending on June 30, 2013.

(FFS 2013)

**APPENDIX C**
FEHB Supplemental Literature Guidelines
(RV JAN 2013)

This is the primary guide a Carrier should use to assess whether the Carrier's supplemental marketing literature, including website material, complies with FEHBAR 1603.70, Misleading, Deceptive or Unfair Advertising. (Use the NAIC Guidelines for additional guidance when needed.)

a) GENERAL

1. Section 1.13 of the FEHB contract requires that the Carrier may not distribute or display marketing materials or other supplemental literature (including provider directories) in a Federal or Tribal Employer facility or arrange for the distribution of such documents by Federal agencies or Tribal Employers unless the documents have been prepared in accordance with FEHBAR 1652.203-70, and the Carrier has certified to OPM that is the case.

2. Review supplemental marketing material for compliance each year, whether or not it changed from the past year.

3. Word the literature simply and concisely to get a readily understandable, attractive marketing piece.

4. Include sufficient detail to ensure accuracy.

5. Under the FEHBP, the FEHB brochure is based on text approved by OPM and is a complete statement of benefits, limitations, and exclusions. Include the following statement (website material should include the statement as a preface) in all supplemental literature which in any way discusses Plan benefits:

*"This is a summary [or brief description] of the features of the [insert Plan's name]. Before making a final decision, please read the Plan's Federal brochure ([insert brochure number]). All benefits are subject to the definitions, limitations, and exclusions set forth in the Federal brochure."*

6. You may include non-FEHBP benefits, i.e., benefits which are not FEHB benefits and are not guaranteed under the Federal contract with the following disclaimer:

"These benefits are neither offered nor guaranteed under contract with the FEHB Program, but are made available to all Enrollees and family members who become members of [insert Plan's name]."

7. Supplemental literature must be clearly distinguishable from the Federal brochure.

8. Do not use the FEHB logo in your supplemental literature.

9. Do not use material which conflicts with the Federal brochure. If your material conflicts, you must change the material or not distribute it.

b) RATE PRESENTATIONS

Under the FEHBP there are only two categories of enrollment, Self Only and Self and Family. For most enrollments, the premium for each Enrollee's enrollment is shared between the Enrollee and the Government or Tribal Employer. The Government or Tribal Employer contribution is based on the formula provided in the FEHB law. Deductions for most Enrollees' share, along with the Government's contribution or Tribal Employer's contribution, are made in accordance with the schedule on which the employee, Tribal Employee, or annuitant's (retiree)

salary or annuitant check is issued by the Enrollee's agency, Tribal Employer, or retiree's retirement system. Most employees are paid biweekly. Annuitants are issued monthly checks.

Employees, Tribal Employees, and annuitants do not have separate categories of enrollment. They pay the same rates, whether on a biweekly, semimonthly, or monthly basis, and receive the same benefits when they are in the same FEHB Plan, except that active Postal employees pay a lesser share, as their cost sharing formula with the Postal Service calls for a greater Government contribution.

The Enrollee's share for each FEHB Plan for each type of enrollment (Self Only, Self and Family) is listed in the Guide to Federal Benefits. This Guide is prepared each Open Season and is distributed directly to agencies by OPM; they in turn distribute the Guide to employees. The Guide will be made available to Tribal Employers to distribute to Tribal Employees. Biweekly and monthly rates are also shown on an insert you prepare for your brochure. Separate guides are prepared for special groups of Enrollees, including those for which the agency or Tribal Employer makes no premium contribution, such as former spouses and employees and family members with temporarily continued coverage.

In making your rate presentations:

1. With the exception of the Summary of Benefits and Coverage referenced at section 1.13(e), list your FEHB rates in each piece of supplemental material which lists benefits. Do not list the rates of any competitor Plan.

2. Immediately above the rates include the following statement:

"These rates do not apply to all Enrollees. If you are in a special enrollment category, please refer to your special Guide to Federal Benefits or contact the agency or Tribal Employer which maintains your health benefits enrollment."

3. If you wish to list Postal rates in addition to non-Postal rates, Postal and non-Postal rates should be clearly identified and listed separately. (Please note there are no monthly Postal rates; upon retirement, Postal employees receive the non-postal contribution.)

c) BENEFIT PRESENTATIONS

Please note the following:

1. Do not compare your benefits or operations with that of any other Plan.

2. Accurately describe your FEHB benefits offering.

3. Avoid incomplete or overstated benefit descriptions, or those which conflict with the Federal brochure.

4. Show applicable coverage limitations, such as day or dollar limitations, coinsurance or deductibles.

5. Do not list exclusions and limitations not listed in the Federal brochure.

6. Do not include general references not in the brochure.

7. Do not reference coverage for which a Federal employee, Tribal Employee, or retiree would have to drop FEHB coverage. Exception: 5 CFR 890.301 provides that an annuitant or former spouse, as defined in 5 U.S.C. 8901(10), who cancels FEHBP enrollment for the purpose of enrolling in a prepaid health Plan under sections 1833 or 1876 of the Social Security Act may register to re-enroll. Therefore, if yours is such a prepaid Plan contracting with Medicare you must describe your Medicare supplemental program for Medicare-covered retirees.

d) ENROLLMENT INSTRUCTIONS

Enrollment under the FEHBP is governed solely by the Federal Employees Health Benefits law and applicable regulations. The various Federal agencies and Tribal Employers have responsibility for administering the law and regulations during the annual open enrollment

C-2   (FFS 2013)

period (Open Season) and at all other times during the year. Agency and Tribal Employer personnel offices perform the basic health benefits functions, such as instructing employees about the conduct of the Open Season and other health benefits matters, answering employee questions, and processing elections and changes of enrollment, including determinations of eligibility and assignment of effective dates of coverage. Agency and Tribal Employer payroll offices make the necessary salary deductions.

The Federal instrument for electing to enroll in a Plan or changing an existing enrollment in a Plan from Self Only to Self and Family (or the reverse) is the Standard Form (SF) 2809, or alternative electronic or telephonic method approved by OPM. Carriers must be able to accept electronic file transfers. The effective date for Open Season enrollments is the first day of the first pay period which begins on or after January 1 for employees; the effective date generally is January 1 for annuitants and Tribal Employees. The specific effective date for an individual will be assigned by the individual's personnel office.

Covered Family Members are as defined in the FEHB regulations. Basically, Family Members are immediate family members, including spouse and children under age 26. When Self and Family coverage is established for an individual, all family members as defined under the regulations are automatically covered as of the effective date assigned by the personnel office, whether or not they are listed on the SF 2809, on other documents, or communicated by electronic or telephonic transmittal. Family members (e.g., newborns) who are added under an existing Self and Family enrollment are automatically covered from the date the individual becomes a family member, e.g., from birth. Personnel offices do not issue any notification when a new Family Member is added under an existing Self and Family enrollment and the Enrollee does not submit a new SF 2809 or other election instrument.

The agencies and Tribal Employers are the primary contact point for employees and Tribal Employees on health benefits enrollment matters. OPM's Office of Retirement Programs performs this function for annuitants (retirees). As highlighted below, Carriers may not impose their own enrollment requirements and procedures.

1. Do not give specific instructions on enrollment. Statements regarding election of coverage or change of enrollment procedures, requirements, or eligibility must be limited to referring individuals to their personnel office for the appropriate instructions; your plan's Self Only and Self and Family enrollment codes; and notice for retirees to contact their retirement system for instructions.

2. While the Carrier may ask Enrollees for information (see Section f) and may follow-up with Enrollees and, when necessary, the employing office, the Carrier will not require a member complete plan specific enrollment or application forms. (You may ask the Enrollee to complete "information" forms.) You may ask the Enrollee to keep you advised of family member changes and you may verify the change, but failure to complete a form does not render an eligible Family Member ineligible.

3. Personnel offices will not stock your Plan's forms. Do not indicate otherwise.

4. If supplemental literature is directed to potential members rather than just-enrolled members, do not include statements indicating otherwise.

5. Again, the Federal brochure, rather than any other plan document, is the Member's complete statement of benefits. Do not indicate otherwise.

e) PROVIDER DIRECTORIES

The provider directory must conform to the requirements listed below. Carriers must provide access to the provider directory on their website and send a provider directory to any Enrollee who requests one.

Please note that a Federal employee. Tribal Employee. or annuitant choosing your Plan during the Open Season is doing so with the expectation that the Plan's provider directory is accurate and that providers shown will be available starting January 1.

1. Show the Plan's hospitals, individual physicians, and group practice medical facilities. State the addresses of the medical facilities and show the general location within the service area for individual doctors and hospitals.

2. In the directory, display prominently the following statement: "It is important to know when you enroll in this Plan. benefits are available as described in the Plan's Federal brochure, but the continued participation of any one doctor. hospital or other provider cannot be guaranteed."

3. Do not list enrollment or eligibility requirements on the provider directory.

f) INFORMATION FORMS

You may distribute forms to obtain information from Enrollees about the Enrollee and any Family Members. For instance. to obtain the information regarding Medicare you will need for rate-setting purposes under the Federal Program. you may ask who is enrolled under Medicare Part A. Medicare Part B or Medicare Parts A and B. For another example. Carriers may ask that a primary care doctor be selected for a Point of Service product. If you wish to distribute an information form, you may find such forms are more readily returned if they are postage-paid. Do not indicate enrollment in the Plan is contingent upon completing and returning the form.

When a person is covered by two (2) or more plans, the rules for determining the order of benefit payments are as follows:

A.  (1)  The primary plan shall pay or provide its benefits as if the secondary plan or plans did not exist.

    (2)  If the primary plan is a closed panel plan and the secondary plan is not a closed panel plan, the secondary plan shall pay or provide benefits as if it were the primary plan when a covered person uses a non-panel provider, except for emergency services or authorized referrals that are paid or provided by the primary plan.

    (3)  When multiple contracts providing coordinated coverage are treated as a single plan under this regulation, this section applies only to the plan as a whole, and coordination among the component contracts is governed by the terms of the contracts. If more than one carrier pays or provides benefits under the plan, the carrier designated as primary within the plan shall be responsible for the plan's compliance with this regulation.

    (4)  If a person is covered by more than one secondary plan, the order of benefit determination rules of this regulation decide the order in which secondary plans benefits are determined in relation to each other. Each secondary plan shall take into consideration the benefits of the primary plan or plans and the benefits of any other plan, which, under the rules of this regulation, has its benefits determined before those of that secondary plan.

B.  (1)  Except as provided in Paragraph (2), a plan that does not contain order of benefit determination provisions that are consistent with this regulation is always the primary plan unless the provisions of both plans, regardless of the provisions of this paragraph, state that the complying plan is primary.

    (2)  Coverage that is obtained by virtue of membership in a group and designed to supplement a part of a basic package of benefits may provide that the supplementary coverage shall be excess to any other parts of the plan provided by the contract holder. Examples of these types of situations are major medical coverages that are superimposed over base plan hospital and surgical benefits, and insurance type coverages that are written in connection with a closed panel plan to provide out-of-network benefits.

(FFS-2013)

Case 3:15-cv-00208-JWS   Document 1-3   Filed 10/29/15   Page 126 of 137

C.      A plan may take into consideration the benefits paid or provided by another plan only when, under the rules of this regulation, it is secondary to that other plan.

D.      Order of Benefit Determination

Each plan determines its order of benefits using the first of the following rules that applies:

(1)      Non-Dependent or Dependent

(a)      Subject to Subparagraph (b) of this paragraph, the plan that covers the person other than as a dependent, for example as an employee, member, subscriber, policyholder or retiree, is the primary plan and the plan that covers the person as a dependent is the secondary plan.

(b)      (i)      If the person is a Medicare beneficiary, and, as a result of the provisions of Title XVIII of the Social Security Act and implementing regulations, Medicare is:

(I)      Secondary to the plan covering the person as a dependent; and

(II)      Primary to the plan covering the person as other than a dependent (e.g. a retired employee),

(ii)      Then the order of benefits is reversed so that the plan covering the person as an employee, member, subscriber, policyholder or retiree is the secondary plan and the other plan covering the person as a dependent is the primary plan.

**Drafting Note**: The provisions of Subparagraph (b) address the situation where federal law requires Medicare to be secondary with respect to group health plans in certain situations despite state law order of benefit determination provisions to the contrary. One example of this type of situation arises when a person, who is a Medicare beneficiary, is also covered under his or her own group health plan as a retiree and under a group health plan as a dependent of an active employee. In this situation, each of the three plans is secondary to the other as the following illustrates: (1) Medicare is secondary to the group health plan covering the person as a dependent of an active employee as required pursuant to the Medicare secondary payer rules; (2) the group health plan covering the person as a dependent of an active employee is secondary to the group health plan covering the person as a retiree, as required under Subparagraph (a); and (3) the group health plan covering the claimant as retiree is secondary to Medicare because the plan is designed to supplement Medicare when Medicare is the primary plan. Subparagraph (b) resolves this problem by making the group health plan covering the person as a dependent of an active employee the primary plan. The dependent coverage pays before the non-dependent coverage even though under state law order of benefit determination provisions in the absence of Subparagraph (b), the non-dependent coverage (e.g. retiree coverage) would be expected to pay before the dependent coverage. Therefore, in cases that involve Medicare, generally, the dependent coverage pays first as the primary plan, Medicare

pays second as the secondary plan, and the non-dependent coverage (e.g. retiree coverage) pays third.

The reason why Subparagraph (b) provides for this order of benefits making the plan covering the person as dependent of an active employee primary is because Medicare will not be primary in most situations to any coverage that a dependent has on the basis of active employment and, as such, Medicare will not provide any information as to what Medicare would have paid had it been primary. The plan covering the person as a retiree cannot determine its payment as a secondary plan unless it has information about what the primary plan paid. The plan covering the person as a dependent of an active employee could be subject to penalties under the Medicare secondary payer rules if it refuses to pay its benefits. The plan covering the person as a retiree is not subject to the same penalties because, in this particular situation, as described above, which does not involve a person eligible for Medicare based on end-stage renal disease (ESRD), the plan can never be primary to Medicare. As such, out of the three plans providing coverage to the person, the plan covering the person as a dependent of an active employee can determine its benefits most easily.

    (2)    Dependent Child Covered Under More Than One Plan

Unless there is a court decree stating otherwise, plans covering a dependent child shall determine the order of benefits as follows:

    (a)    For a dependent child whose parents are married or are living together, whether or not they have ever been married:

        (i)    The plan of the parent whose birthday falls earlier in the calendar year is the primary plan; or

        (ii)    If both parents have the same birthday, the plan that has covered the parent longest is the primary plan.

    (b)    For a dependent child whose parents are divorced or separated or are not living together, whether or not they have ever been married:

        (i)    If a court decree states that one of the parents is responsible for the dependent child's health care expenses or health care coverage and the plan of that parent has actual knowledge of those terms, that plan is primary. If the parent with responsibility has no health care coverage for the dependent child's health care expenses, but that parent's spouse does, that parent's spouse's plan is the primary plan. This item shall not apply with respect to any plan year during which benefits are paid or provided before the entity has actual knowledge of the court decree provision;

        (ii)If a court decree states that both parents are responsible for the dependent child's health care expenses or health care coverage, the provisions of Subparagraph (a) of this paragraph shall determine the order of benefits;

(iii)     If a court decree states that the parents have joint custody without specifying that one parent has responsibility for the health care expenses or health care coverage of the dependent child, the provisions of Subparagraph (a) of this paragraph shall determine the order of benefits: or

(iv)     If there is no court decree allocating responsibility for the child's health care expenses or health care coverage, the order of benefits for the child are as follows:

(I)     The plan covering the custodial parent:

(II)     The plan covering the custodial parent's spouse:

(III)     The plan covering the non-custodial parent: and then

(IV)     The plan covering the non-custodial parent's spouse.

(c)     For a dependent child covered under more than one plan of individuals who are not the parents of the child. the order of benefits shall be determined, as applicable, under Subparagraph (a) or (b) of this paragraph as if those individuals were parents of the child.

**Drafting Note:** Subparagraph (c) addresses the situation where individuals other than the parents of a child are responsible for the child's health care expenses or provide health care coverage for the child under each of their plans. In this situation, for the purpose of determining the order of benefits under this paragraph, Subparagraph (c) requires that these individuals be treated in the same manner as parents of the child.

(3)     Active Employee or Retired or Laid-Off Employee

(a)     The plan that covers a person as an active employee that is, an employee who is neither laid off nor retired or as a dependent of an active employee is the primary plan. The plan covering that same person as a retired or laid-off employee or as a dependent of a retired or laid-off employee is the secondary plan.

(b)     If the other plan does not have this rule, and as a result, the plans do not agree on the order of benefits, this rule is ignored.

(c)     This rule does not apply if the rule in Paragraph (1) can determine the order of benefits.

**Drafting Note:** This rule applies only in the situation when the same person is covered under two plans, one of which is provided on the basis of active employment and the other of which is provided to retired or laid-off employees. The rule in Paragraph (1) does not apply because the person is covered either as a non-dependent under both plans (i.e. the person is covered under one

plan as an active employee and at the same time is covered as a retired or laid-off employee under the other plan) or as a dependent under both plans (i.e. the person is covered under one plan as a dependent of an active employee and at the same time is covered under the other plan as a dependent of a retired or laid-off employee). This rule does not apply when a person is covered under his or her own plan as an active employee or retired or laid-off employee and a dependent under a spouse's plan provided to the spouse on the basis of active employment. In this situation, the rule in Paragraph (1) applies because the person is covered as a non-dependent under one plan (i.e. the person is covered as an active employee or retired or laid-off employee) and at the same time is covered as a dependent under the other plan (i.e. the person is covered as a dependent under a plan provided on the basis of active employment or a plan that is provided to retired or laid-off employees).

        (4)    COBRA or State Continuation Coverage

            (a)    If a person whose coverage is provided pursuant to COBRA or under a right of continuation pursuant to state or other federal law is covered under another plan, the plan covering the person as an employee, member, subscriber or retiree or covering the person as a dependent of an employee, member, subscriber or retiree is the primary plan and the plan covering that same person pursuant to COBRA or under a right of continuation pursuant to state or other federal law is the secondary plan.

            (b)    If the other plan does not have this rule, and if, as a result, the plans do not agree on the order of benefits, this rule is ignored.

            (c)    This rule does not apply if the rule in Paragraph (1) can determine the order of benefits

**Drafting Note:** COBRA originally provided that coverage under a new group health plan caused the COBRA coverage to end. An amendment passed as part of P.L. 101-239, the Omnibus Budget Reconciliation Act of 1989 (OBRA 89), allows the COBRA coverage to continue if the newly acquired group health plan contains any preexisting condition exclusion or limitation. In this instance two group health plans will cover the person, and the rule above will be used to determine which of the plans determines its benefits first. In addition, some states have continuation provisions comparable to COBRA.

**Drafting Note:** This rule applies only in the situation when a person has coverage pursuant to COBRA or under a right of continuation pursuant to state or other federal law and has coverage under another plan on the basis of employment. The rule under Paragraph (1) does not apply because the person is covered either: (a) as a non-dependent under both plans (i.e. the person is covered under a right of continuation as a qualified beneficiary who, on the day before a qualifying event, was covered under the group health plan as an employee or as a retired employee and is covered under his or her own plan as an employee, member, subscriber or retiree); or (b) as a dependent under both plans (i.e. the person is covered under a right of continuation as a qualified beneficiary who, on the day before a qualifying event, was covered under the group health plan as a dependent of an employee, member or subscriber or retired employee and is covered under the other plan as a dependent of an employee, member, subscriber or retiree). The rule under Paragraph (1)

applies when the person is covered pursuant to COBRA or under a right of continuation pursuant to state or other federal law as a non-dependent and covered under the other plan as a dependent of an employee, member, subscriber or retiree. The rule in this paragraph does not apply because the person is covered as a non-dependent under one of the plans and as a dependent under the other plan.

    (5)    Longer or Shorter Length of Coverage

        (a)    If the preceding rules do not determine the order of benefits, the plan that covered the person for the longer period of time is the primary plan and the plan that covered the person for the shorter period of time is the secondary plan.

        (b)    To determine the length of time a person has been covered under a plan, two successive plans shall be treated as one if the covered person was eligible under the second plan within twenty-four (24) hours after coverage under the first plan ended.

        (c)    The start of a new plan does not include:

            (i)    A change in the amount or scope of a plan's benefits;

            (ii)    A change in the entity that pays, provides or administers the plan's benefits; or

            (iii)    A change from one type of plan to another, such as, from a single employer plan to a multiple employer plan.

        (d)    The person's length of time covered under a plan is measured from the person's first date of coverage under that plan. If that date is not readily available for a group plan, the date the person first became a member of the group shall be used as the date from which to determine the length of time the person's coverage under the present plan has been in force.

    (6)    If none of the preceding rules determines the order of benefits, the allowable expenses shall be shared equally between the plans.

# APPENDIX E
Small Business Subcontracting Plan (JUL 2005)

(a) This clause does not apply to small business concerns.

(b) *Definitions.* As used in this clause—

"Commercial item" means a product or service that satisfies the definition of commercial item in section 2.101 of the Federal Acquisition Regulation.

"Commercial plan" means a subcontracting plan (including goals) that covers the offeror's fiscal year and that applies to the entire production of commercial items sold by either the entire company or a portion thereof (*e.g.*, division, plant, or product line).

"Individual contract plan" means a subcontracting plan that covers the entire contract period (including option periods), applies to a specific contract, and has goals that are based on the offeror's planned subcontracting in support of the specific contract, except that indirect costs incurred for common or joint purposes may be allocated on a prorated basis to the contract.

"Master plan" means a subcontracting plan that contains all the required elements of an individual contract plan, except goals, and may be incorporated into individual contract plans, provided the master plan has been approved.

"Subcontract" means any agreement (other than one involving an employer-employee relationship) entered into by a Federal Government prime Contractor or subcontractor calling for supplies or services required for performance of the contract or subcontract.

(c) The offeror, upon request by the Contracting Officer, shall submit and negotiate a subcontracting plan, where applicable, that separately addresses subcontracting with small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business concerns, small disadvantaged business, and women-owned small business concerns. If the offeror is submitting an individual contract plan, the plan must separately address subcontracting with small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns, with a separate part for the basic contract and separate parts for each option (if any). The plan shall be included in and made a part of the resultant contract. The subcontracting plan shall be negotiated within the time specified by the Contracting Officer. Failure to submit and negotiate the subcontracting plan shall make the offeror ineligible for award of a contract.

(d) The offeror's subcontracting plan shall include the following:

(1) Goals, expressed in terms of percentages of total planned subcontracting dollars, for the use of small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns as subcontractors. The offeror shall include all subcontracts that contribute to contract performance, and may include a proportionate share of products and services that are normally allocated as indirect costs.

(2) A statement of—

(i) Total dollars planned to be subcontracted for an individual contract plan; or the offeror's total projected sales, expressed in dollars, and the total value of projected subcontracts to support the sales for a commercial plan;

(ii) Total dollars planned to be subcontracted to small business concerns;

(iii) Total dollars planned to be subcontracted to veteran-owned small business concerns;

(iv) Total dollars planned to be subcontracted to service-disabled veteran-owned small business;

(v) Total dollars planned to be subcontracted to HUBZone small business concerns;

(vi) Total dollars planned to be subcontracted to small disadvantaged business concerns; and

(vii) Total dollars planned to be subcontracted to women-owned small business concerns.

(3) A description of the principal types of supplies and services to be subcontracted, and an identification of the types planned for subcontracting to—

(i) Small business concerns;

(ii) Veteran-owned small business concerns;

(iii) Service-disabled veteran-owned small business concerns;

(iv) HUBZone small business concerns;

(v) Small disadvantaged business concerns; and

(vi) Women-owned small business concerns.

(4) A description of the method used to develop the subcontracting goals in paragraph (d)(1) of this clause.

(5) A description of the method used to identify potential sources for solicitation purposes (*e.g.,* existing company source lists, the Procurement Marketing and Access Network (PRO-Net) of the Small Business Administration (SBA), veterans service organizations, the National Minority Purchasing Council Vendor Information Service, the Research and Information Division of the Minority Business Development Agency in the Department of Commerce, or small, HUBZone, small disadvantaged, and women-owned small business trade associations). A firm may rely on the information contained in PRO-Net as an accurate representation of a concern's size and ownership characteristics for the purposes of maintaining a small, veteran-owned small, service-disabled veteran-owned small, HUBZone small, small disadvantaged, and women-owned small business source list. Use of PRO-Net as its source list does not relieve a firm of its responsibilities (*e.g.,* outreach, assistance, counseling, or publicizing subcontracting opportunities) in this clause.

(6) A statement as to whether or not the offeror included indirect costs in establishing subcontracting goals, and a description of the method used to determine the proportionate share of indirect costs to be incurred with—

(i) Small business concerns;

(ii) Veteran-owned small business concerns;

(iii) Service-disabled veteran-owned small business concerns;

(iv) HUBZone small business concerns;

(v) Small disadvantaged business concerns; and

(vi) Women-owned small business concerns.

(7) The name of the individual employed by the offeror who will administer the offeror's subcontracting program, and a description of the duties of the individual.

(8) A description of the efforts the offeror will make to assure that small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns have an equitable opportunity to compete for subcontracts.

(9) Assurances that the offeror will include the clause of this contract entitled "Utilization of Small Business Concerns" in all subcontracts that offer further subcontracting opportunities, and that the offeror will require all subcontractors (except small business concerns) that receive

E-2

subcontracts in excess of $500,000 ($1,000,000 for construction of any public facility) to adopt a subcontracting plan that complies with the requirements of this clause.

(10) Assurances that the offeror will—

(i) Cooperate in any studies or surveys as may be required;

(ii) Submit periodic reports so that the Government can determine the extent of compliance by the offeror with the subcontracting plan;

(iii) Submit Standard Form (SF) 294, Subcontracting Report for Individual Contracts, and/or SF 295, Summary Subcontract Report, in accordance with paragraph (j) of this clause. The reports shall provide information on subcontract awards to small business concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns, HUBZone small business concerns, small disadvantaged business concerns, women-owned small business concerns, and Historically Black Colleges and Universities and Minority Institutions. Reporting shall be in accordance with the instructions on the forms or as provided in agency regulations.

(iv) Ensure that its subcontractors agree to submit SF 294 and SF 295.

(11) A description of the types of records that will be maintained concerning procedures that have been adopted to comply with the requirements and goals in the plan, including establishing source lists; and a description of the offeror's efforts to locate small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns and award subcontracts to them. The records shall include at least the following (on a plant-wide or company-wide basis, unless otherwise indicated):

(i) Source lists (*e.g.*, PRO-Net), guides, and other data that identify small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns.

(ii) Organizations contacted in an attempt to locate sources that are small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, or women-owned small business concerns.

(iii) Records on each subcontract solicitation resulting in an award of more than $100,000, indicating—

(A) Whether small business concerns were solicited and, if not, why not;

(B) Whether veteran-owned small business concerns were solicited and, if not, why not;

(C) Whether service-disabled veteran-owned small business concerns were solicited and, if not, why not;

(D) Whether HUBZone small business concerns were solicited and, if not, why not;

(E) Whether small disadvantaged business concerns were solicited and, if not, why not;

(F) Whether women-owned small business concerns were solicited and, if not, why not; and

(G) If applicable, the reason award was not made to a small business concern.

(iv) Records of any outreach efforts to contact—

(A) Trade associations;

(B) Business development organizations;

(C) Conferences and trade fairs to locate small, HUBZone small, small disadvantaged, and women-owned small business sources; and

(D) Veterans service organizations.

(v) Records of internal guidance and encouragement provided to buyers through—

E-3

(A) Workshops, seminars, training, etc.; and

(B) Monitoring performance to evaluate compliance with the program's requirements.

(vi) On a contract-by-contract basis, records to support award data submitted by the offeror to the Government, including the name, address, and business size of each subcontractor. Contractors having commercial plans need not comply with this requirement.

(e) In order to effectively implement this plan to the extent consistent with efficient contract performance, the Contractor shall perform the following functions:

(1) Assist small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns by arranging solicitations, time for the preparation of bids, quantities, specifications, and delivery schedules so as to facilitate the participation by such concerns. Where the Contractor's lists of potential small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business subcontractors are excessively long, reasonable effort shall be made to give all such small business concerns an opportunity to compete over a period of time.

(2) Provide adequate and timely consideration of the potentialities of small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns in all "make-or-buy" decisions.

(3) Counsel and discuss subcontracting opportunities with representatives of small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business firms.

(4) Confirm that a subcontractor representing itself as a HUBZone small business concern is identified as a certified HUBZone small business concern by accessing the Central Contractor Registration (CCR) database or by contacting SBA.

(5) Provide notice to subcontractors concerning penalties and remedies for misrepresentations of business status as small, veteran-owned small business, HUBZone small, small disadvantaged, or women-owned small business for the purpose of obtaining a subcontract that is to be included as part or all of a goal contained in the Contractor's subcontracting plan.

(f) A master plan on a plant or division-wide basis that contains all the elements required by paragraph (d) of this clause, except goals, may be incorporated by reference as a part of the subcontracting plan required of the offeror by this clause; provided—

(1) The master plan has been approved;

(2) The offeror ensures that the master plan is updated as necessary and provides copies of the approved master plan, including evidence of its approval, to the Contracting Officer; and

(3) Goals and any deviations from the master plan deemed necessary by the Contracting Officer to satisfy the requirements of this contract are set forth in the individual subcontracting plan.

(g) A commercial plan is the preferred type of subcontracting plan for contractors furnishing commercial items. The commercial plan shall relate to the offeror's planned subcontracting generally, for both commercial and Government business, rather than solely to the Government contract. Commercial plans are also preferred for subcontractors that provide commercial items under a prime contract, whether or not the prime contractor is supplying a commercial item.

(h) Prior compliance of the offeror with other such subcontracting plans under previous contracts will be considered by the Contracting Officer in determining the responsibility of the offeror for award of the contract.

E-4

(JUL 2013)

(i) The failure of the Contractor or subcontractor to comply in good faith with—

(1) The clause of this contract entitled "Utilization Of Small Business Concerns;" or

(2) An approved plan required by this clause, shall be a material breach of the contract.

(j) The Contractor shall submit the following reports:

(1) *Standard Form 294, Subcontracting Report for Individual Contracts.* This report shall be submitted to the Contracting Officer semiannually and at contract completion. The report covers subcontract award data related to this contract. This report is not required for commercial plans.

(2) *Standard Form 295, Summary Subcontract Report.* This report encompasses all of the contracts with the awarding agency. It must be submitted semi-annually for contracts with the Department of Defense and annually for contracts with civilian agencies. If the reporting activity is covered by a commercial plan, the reporting activity must report annually all subcontract awards under that plan. All reports submitted at the close of each fiscal year (both individual and commercial plans) shall include a breakout, in the Contractor's format, of subcontract awards, in whole dollars, to small disadvantaged business concerns by North American Industry Classification System (NAICS) Industry Subsector. For a commercial plan, the Contractor may obtain from each of its subcontractors a predominant NAICS Industry Subsector and report all awards to that subcontractor under its predominant NAICS Industry Subsector.

(End of clause)

*Alternate I (Oct 2001).* When contracting by sealed bidding rather than by negotiation, substitute the following paragraph (c) for paragraph (c) of the basic clause:

(c) The apparent low bidder, upon request by the Contracting Officer, shall submit a subcontracting plan, where applicable, that separately addresses subcontracting with small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns. If the bidder is submitting an individual contract plan, the plan must separately address subcontracting with small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns, with a separate part for the basic contract and separate parts for each option (if any). The plan shall be included in and made a part of the resultant contract. The subcontracting plan shall be submitted within the time specified by the Contracting Officer. Failure to submit the subcontracting plan shall make the bidder ineligible for the award of a contract.

*Alternate II (Oct 2001).* As prescribed in 19.708(b)(1), substitute the following paragraph (c) for paragraph (c) of the basic clause:

(c) Proposals submitted in response to this solicitation shall include a subcontracting plan that separately addresses subcontracting with small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns. If the offeror is submitting an individual contract plan, the plan must separately address subcontracting with small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns, with a separate part for the basic contract and separate parts for each

E-5

option (if any). The plan shall be included in and made a part of the resultant contract. The subcontracting plan shall be negotiated within the time specified

(FEB 2013)